LEXSEE 1985 U.S. DIST. LEXIS 21042

**HAROLD FREEMAN BRIGHT, HAROLD BRIGHT JUNIOR, Plaintiffs, - against - CITY OF NEW YORK, EDWARD I. KOCH, Individually and as Mayor of New York, et al, Defendants**

**No. 83 Civ. 7775-CSH**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1985 U.S. Dist. LEXIS 21042*

**April 4, 1985**

**OPINION BY: [*1] HAIGHT**

**OPINION**

MEMORANDUM OPINION

AND ORDER

HAIGHT, District Judge:

Plaintiffs, Harold Freeman Bright ("Bright") and his son, Harold Bright Jr. ("Junior") brought this action pursuant to *42 U.S.C. §§1981, 1983, 1985* and *1988* alleging violations of their civil rights.

They now make two motions for leave to file amended complaints pursuant to *F.R.Civ.P. 15(a)*. The first proposed amended complaint ("Motion I") adds Bright's alleged "common-law" wife, Mrs. Dawn Johannes, as a party plaintiff and asserts a derivative claim for loss of consortium on her behalf based on defendants' alleged wrongdoing to Bright. It also asserts causes of action on behalf of Junior for assault and intentional infliction of emotional distress. Finally, it reorganizes and clarifies the pleadings in the original complaint regarding Bright's claims and adds new causes of action on behalf of Bright for malicious prosecution, false arrest and imprisonment. The second amended complaint ("Motion II") redesignates some of the defendant police officers, who are described in the first proposed amended complaint only as, e.g. "Lieutenant" "H" "Doe," by their proper names.

Defendants do not oppose Motion [*2] II, and it is therefore granted on consent. Defendants also do not oppose that portion of Motion I that reorganizes and clarifies the pleadings in the original complaint concern-ing Bright's claims, and that portion of the motion is therefore also granted on consent.

However, defendants do oppose the amendments concerning the claims of Junior and Mrs. Johannes, and the proposed additional state law claims on behalf of Bright. Although leave to amend is ordinarily to be "freely given," *Foman v. Davis, 371 U.S. 178, 182 (1962)*, such leave will not be granted where amendment would prejudice opposing parties, or where amendment would prove futile because the proposed claims are either frivolous or would be immediately subject to a successful motion to dismiss. *Kaster v. Modification Systems, Inc., 731 F.2d 1014, 1018 (2d Cir. 1984); SS. Silberblatt, Inc. v. East Harlem Pilot Block-Building 1 Housing Development Fund Co., 608 F.2d 28, 42 (2d Cir. 1979)*. Defendants assert that this Court should deny leave to amend the complaint to include the proposed claims of Junior and, Mrs. Johannes either on grounds of prejudice or futility. More specifically, defendants claim that the proposed [*3] claims are state law claims over which this Court lacks jurisdiction or, in the alternative, that those claims are barred by plaintiffs' failure timely to file a notice of their claims against the City.

A. Claims of Mrs. Dawn Johannes

In the proposed amended complaint, Mrs. Johannes seeks to be added as a new party plaintiff in order to assert a cause of action for loss of consortium as a result of the alleged unlawful assault and arrest of her "common-law" husband Bright.

Defendants rightly point out that loss of consortium is a state law tort claim that is not cognizable under *section 1983* as deprivation of a right, privilege or immunity secured by the Constitution or federal law. See, e.g., *Stanley v. City of New York, 587 F.Supp. 393, 396 (E.D.N.Y. 1984); Walters v. Village of Oak Lawn, 548*

*F.Supp. 417, 419 (N.D.Ill. 1982); Leopold v. Birkett, 523 F.Supp. 525, 526 (E.D.N.Y. 1981).* There is thus no basis for this Court to exercise pendent or ancillary jurisdiction over Mrs. Johannes' state law claim on the basis of her husband's claim. Plaintiffs point out that her claims derive from a common nucleus of operative fact and suggest that judicial economy [*4] would be served by hearing all such related claims in one court at one time.

This argument, as a ground for expanding federal jurisdiction to include related state law claims of a new party, has not found favor with the Supreme Court. In *Aldinger v. Howard, 427 U.S. 1 (1976),* the Court affirmed dismissal of a state law claim against a particular defendant in a *section 1983* action. The Court held since there was no federal claim against pendent jurisdiction over the state law claim against him. In rejecting the idea of "pendent party" jurisdiction, *427 U.S. at 15,* the Court said:

> "From a purely factual point of view, it is one thing to authorize two parties, already present in federal court by virtue of a case over which the court has jurisdiction, to litigate in addition to their federal claim a state-law claim over which there is no independent basis of federal jurisdiction. But it is quite another thing to permit a plaintiff, who has asserted a claim against one defendant with respect to which there is federal jurisdiction, to join an entirely different defendant on the basis of a state-law claim over which there is no independent basis of federal jurisdiction, simply [*5] because his claim against the second defendant 'derive from a common nucleus of operative fact.' Ibid. True, the same considerations of judicial economy would be served insofar as plaintiff's claims 'are such that he would ordinarily be expected to try them all in one judicial proceeding....' Ibid. But the addition of a completely new party would run counter to the well-established principle that federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress."

*427 U.S. at 14-15.*

Even though Aldinger addressed the question of pendent jurisdiction over state law claims against a party defendant, I find the Court's rationale in rejecting such jurisdiction equally authoritative with regard to the question of federal court jurisdiction over state law claims by a proposed new party plaintiff. The only case cited by plaintiffs in direct support of their request for pendent jurisdiction over Mrs. Johannes' claims, *Drollinger v. Milligan, 552 F.2d 1220 (1977),* is entirely inapposite as that case dealt only with issues of standing, not jurisdiction. I conclude that the claims of Mr. Johannes may [*6] not be joined with the claims of her husband under the pendent jurisdiction of this Court. This holding is supported by other courts who have considered the issue in light of Aldinger. See, e.g., *Walters, 548 F.Supp. at 420; Leopold, 523 F.Supp. at 527.*

That portion of plaintiffs' motion I for leave to amend the complaint to assert claims on behalf of Mrs. Dawn Johannes is denied for lack of subject matter jurisdiction.

B. Claims of Harold Bright Jr.

Defendants oppose Junior's proposed amended claims on the same ground as their opposition to Mrs. Johannes' claim: that Junior raises only state law claims over which this Court lacks jurisdiction. Junior's proposed pleading states claims for assault and for intentional infliction of emotional distress based on his presence at the alleged beating and arrest of his father.

It appears that an individual's claim for emotional distress arising from alleged violations of a loved one's civil rights, standing alone, is not cognizable under *section 1983.* See, *Robinson v. McCorkle, 462 F.2d 111, 114 (3d Cir. 1972)* (parents' claims of physical and emotional distress not actionable under *section 1983* or *1985);* [*7] *Buikema v. Hayes, 562 F.Supp. 910 (N.D.Ill. 1983)* (wife's claim for infliction of emotional distress not actionable under *section 1983).*

However, Junior's claim for emotional distress is coupled here with his claim for an assault upon his own person -- a claim which, if true, would constitute a deprivation of his federally protected rights. Since the Court has a valid basis for exercising federal jurisdiction over Junior's claim for assault, I may consider his state law claim for emotional distress under this Court's pendent jurisdiction.

Nevertheless, defendants claim that even if this Court has jurisdiction over Junior's claims, the amendment should not be permitted because of his claims are barred due to his failure to file a notice of claim against the City as required by *N.Y. General Municipal Law §50-e,* and due to the state of limitations on such actions as contained in *N.Y. General Municipal Law §50-i.*

It is undisputed that no notice of claim was filed by Junior as required be *section 50-e,* and that filing of such a notice is a condition precedent to prosecution of a tort claim against the City, its officers or employees. But

plaintiffs argue that this Court should [*8] exercise the discretion vested in it by *section 50-e(5)* to permit Junior to serve a late notice of claim if the City "acquired actual knowledge of the essential facts constituting the claim within (ninety days after the claim arose) or within a reasonable time thereafter" and if the City will not be "substantially prejudiced...in maintaining its defense on the merits." Actual knowledge and lack of perjudice are two of the factors which *section 50-e(5)* permits the Court to take into account in permitting a late notice of claim.

The Court's exercise of its discretion in this regard is expressly limited by the additional requirement set forth in section 50e(5) that any extension granted "shall not exceed the time limited for the commencement of an action by the claimant against the public corporation." The limitation period for commencement of such an action is "one year and ninety days after the happening of the event upon which the claim is based," according to *N.Y. General Municipal Law § 50-i.*

Junior's causes of action arose when he witnessed the alleged beating and arrest of his father on July 26, 1982 (that incident giving rise to a fear of imminent bodily harm to himself which [*9] constitutes Junior's assault claim). The original complaint in this action was served and filed December 6, 1983. Even if the proposed amended complaint is deemed to relate back to the filing of the original complaint, that filing occurred more than one year and ninety days after the event upon which Junior's claims are based.

However, the limitation period contained in *section 50-i* applies only to state law tort claims alleged against the City or any of its officers and employees and is not applicable to federal causes of action commenced under *section 1983*. Since Congress did not provide a federal statute of limitations for *section 1983* actions, the federal courts must borrow the most appropriate analogous state statute limitations. The appropriate state statute of limitations for *section 1983* actions is the three-year limitations period for actions to recover upon a liability created or imposed by statute. *Pauk v. Board of Trustees of City University of New York, 654 F.2d 856, 866 (2d Cir. 1981),* cert. denied, *455 U.S. 1000 (1982).* Thus Junior's *section 1983* claim for assault is not barred by the statute of limitations.

Similarly, Junior's failure timely to file a [*10] notice of his claim pursuant to *section 50-e* is irrelevant since no notice of claim is required for *section 1983* actions. *Cooper v. Morin. 50 A.D.2d 32, 375 N.Y.S.2d 928 (1975).* Therefore, Junior is granted leave to amend the complaint to state a cause of action for assault pursuant to *42 U.S.C. § 1983.*

This Court, having jurisdiction over Junior's *section 1983* claim, may exercise pendent jurisdiction over his claim for intentional infliction of emotional distress, but only if Junior is permitted to file a late notice of claim regarding that issue. As noted above, my discretion to extend the time for filing such notice is expressly limited by the requirement that such an extension may not exceed the one year and ninety day limitation period for the commencement of such an action. Junior's claim for intentional infliction of emotional distress is consequently barred by the statute of limitations and his failure timely to file a notice of claim. That portion of Motion I seeking to leave to amend the complaint to assert a claim on behalf of Junior for emotional distress is denied.

## C. Bright's State Law Claims

Defendants claim that Bright's state law claims of malicious prosecution [*11] and false arrest and imprisonment are barred by one year and ninety day limitation period contained in *section 50-i*. The complaint in this action was filed December 6, 1983. The crucial question is when these causes of action arose. Defendants argue that they arose on the date Bright was allegedly beaten and arrested, July 26, 1982; consequently, they assert, Bright's claims are time-barred. Bright correctly counters that a cause of action does not accrue until all of the requisite elements of the cause of action have occurred.

Both the claims of malicious prosecution and false arrest and imprisonment require proof that the criminal proceedings were terminated in favor of the accused. It was not until September 28, 1982 that the charges against Bright were dismissed. Thus these causes of action did not arise, for limitation purposes, until that date. Since the proposed amended complaint may be deemed to relate back to the time of the filing of the original complaint on December 6, 1983, Bright's state law claims are not barred by the statute of limitations. That portion of Motion I seeking leave to amend the complaint to assert causes of action for malicious prosecution and false [*12] arrest and imprisonment on behalf of Bright is granted.

## CONCLUSION

Plaintiffs' Motion I for leave to amend the complaint is granted insofar as it seeks to add causes of action for malicious prosecution and false arrest and imprisonment on behalf of Harold Freeman Bright, to add a cause of action for assault under *42 U.S.C. § 1983* on behalf of Harold Bright, Jr., and to reorganize and clarify the pleadings in the original complaint regarding Harold Freeman Bright's claims under *42 U.S.C. § 1983.* In all other respects, plaintiffs' Motion I is denied. Plaintiff's Motion II for leave to amend the complaint to redesig-

1985 U.S. Dist. LEXIS 21042, *

nate defendant police officers originally named as "Doe" by their proper names is granted on consent.

Plaintiffs are directed to serve and file an amended complaint, consistent with this decision, within twenty (20) days of the date of this Order. The parties are directed to proceed in accordance with the Scheduling Order separately entered.

It is *SO ORDERED*.

LEXSEE 2003 U.S. DIST. LEXIS 21642

**TIMOTHY BRYANT, MAURICE CASSIDY, JOSEPH DEFILIPPIS, JESSICA DYSON, LEONARD GAY, ROBERT TAKACS, ULRIK TROJABORG, Plaintiffs, v. CITY OF NEW YORK, Defendant.**

**99 Civ. 11237 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 21642*

**December 1, 2003, Decided
December 2, 2003, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Bryant v. City of New York, 2005 U.S. App. LEXIS 5376 (2d Cir. N.Y., Apr. 5, 2005)*

**PRIOR HISTORY:** *Bryant v. City of New York, 2002 U.S. Dist. LEXIS 11114 (S.D.N.Y., June 20, 2002)*

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted with respect to plaintiffs' federal claims. Jurisdiction over plaintiffs' state law claims declined.

**COUNSEL:** For Timothy Bryant, Maurice Cassidy, Joseph Defilippis, Jessica Dyson, Leonard Gay, Steven Story, Robert Takacs, Ulrik Trojaborg, PLAINTIFFS: Daniel L Alterman, Alterman & Boop, PC, New York, NY USA.

For City of New York, City of New York Police Department, Rudolph Giuliani, Howard Safir, Allan Hoehl, john Doe, DEFENDANTS: Jonathan M Houghton, Corporation Counsel of the City of New York, New York, NY USA.

For Rudolph Giuliani, Howard Safir, Allan Hoehl, DEFENDANTS: Michael Oliver Hueston, Corporation Counsel of the City of NY, New York, NY USA.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.

Plaintiffs bring this action against the City of New York pursuant to *42 U.S.C. § 1983* and [*2] New York state law alleging violations of their civil rights arising from arrests made on October 19, 1998. Plaintiffs seek to hold the city liable under *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)*, for violation of their constitutional rights under the *First* and *Fourteenth Amendments*, alleging that city policy caused the violations, and under the doctrine of respondeat superior for state law claims of false arrest and imprisonment and malicious prosecution. Plaintiffs seek injunctive and monetary relief.

On July 31, 2002, Defendants filed a motion pursuant to *56 of the Federal Rules of Civil Procedure* for summary judgment on all of Plaintiffs' claims. On October 25, 2002, Plaintiffs filed a cross-motion for partial summary judgment on the state law claims for false arrest and imprisonment. For the reasons set forth below, Defendants' motion for summary judgment is granted as to the federal claims, and the Court declines to exercise jurisdiction over the state claims.

**Background**

On the evening of October 19, 1998, all Plaintiffs attended [*3] an event [1] in memory of Matthew Shepard. Matthew Shepard was a gay college student whose beating and death garnered national media attention. The event, which took place approximately one week after Matthew Shepard's death, was both to honor him and to protest anti-gay violence. (Pl. Mem. at 1.) Although the event, scheduled to begin around 6:00 pm, was expected to draw around 200 people (Def. 56.1 Stmt. P 10-11), the

Case 1:07-cv-04795-NRB    Document 6-2    Filed 07/21/2008    Page 6 of 50

Page 2
2003 U.S. Dist. LEXIS 21642, *

number of participants rose to over 4000 within about two hours, and the number of mobilized police increased accordingly (NYPD Unusual Incident Report dated Oct. 20, 1998, Houghton Decl. Ex. E (Unusual Incident Rep.) at 2; Pl. Resp. 56.1 Stmt. P 16). The event was to include a march down Fifth Avenue from 59th Street to Madison Square Park, which spans from 26th to 23rd Streets, and conclude in a candlelight vigil. (Def. 56.1 Stmt. P 12; NYPD Manhattan Borough South Detail Report dated Oct. 19, 1998, Houghton Decl. Ex. F P 1; Unusual Incident Rep. at 2.) During the event itself, participants marched on both the sidewalk and in the street. (Def. 56.1 Stmt. PP 31-32, 36, 40.) The march was directed and temporarily diverted by the police at 56th Street (Pl. Resp. 56.1 [*4] Stmt. P 35; Pl. Mem. at 1), where it went west to Sixth Avenue, then proceeded down Sixth Avenue to 54th Street, at which point it was directed back to Fifth Avenue (Def. 56.1 Stmt. P 39; Pl. Resp. 56.1 Stmt. P 39). It continued down Fifth Avenue with another pause at 43rd Street (Deposition of Inspector Thomas Graham, Alterman Decl. Ex. E (Graham Dep.) at 104-05), and eventually continued all the way to Madison Square Park at 26th Street, arriving there around 9 pm (Def. 56.1 Stmt. P 42; Unusual Incident Rep. at 2). Once there, the participants held a candlelight vigil and heard from speakers (Unusual Incident Rep. at 2; Gay Decl. P 11). The event and corresponding police mobilization ended at approximately 10:30 pm. (Unusual Incident Rep. at 2-3.)

1   The parties disagree as to the appropriate designation for the event: defendants characterize it as a demonstration (Def. 56.1 Stmt P 8), whereas plaintiffs state that this is an improper label and call it a vigil (Pl. Resp. 56.1 Stmt. P 8). However, both parties have used both labels to describe the event, and the nomenclature is not a material issue.

[*5] During the course of the event, 115 people, including the seven plaintiffs, were arrested by the police. (Def. 56.1 Stmt. P 9; Pl. Resp. 56.1 Stmt. P 187.) Eventually, almost all arrestees were taken to police facilities downtown. [2] All Plaintiffs, except for Plaintiff Gay, were arrested while in the roadway and presumably for blocking traffic. A brief description of the circumstances of each of Plaintiffs' arrests follows.

2   Apparently, one arrestee was taken to police facilities in midtown Manhattan due to a misunderstanding between Inspector Graham and the arresting officer. (Graham Dep. at 96-97.)

Plaintiffs Timothy Bryant and Jessica Dyson, who were coworkers, attended the event together after work. (Def. 56.1 Stmt. P 55; Pl. Resp. 56.1 Stmt. P 55.) Police arrested Dyson while she was standing in the roadway of Fifth Avenue near the beginning of the march. (Def. 56.1 Stmt. P 116-17.) While Dyson was being arrested, Bryant went up to the arresting officer to intervene on Dyson's behalf. (Def. 56.1 Stmt. [*6] P 66; Pl. Resp. 56.1 Stmt. PP 64-67.) The police then arrested Bryant. (Def. 56.1 Stmt. P 67; Pl. Resp. 56.1 Stmt. P 67.) Both Bryant and Dyson were handcuffed, led to a van, and eventually taken to Central Booking. (Bryant Decl. PP 10, 14, 19; Dyson Decl. PP 18-19.) Both were in police custody until the following day; Bryant was arraigned around noon (Bryant Decl. P 22) and Dyson was arraigned between 4:30 and 5:30 pm (Dyson Decl. P 33). Bryant and Dyson were each charged with one count of disorderly conduct for obstructing vehicular or pedestrian traffic in violation of N.Y. Penal Law § 240.20(5). (Pl. Mem. at 23.) Bryant appeared at trial on November 17, 1998. (Pl. Resp. 56.1 Stmt. P 68A.) The arresting police officer admitted during his testimony that the accusatory instrument, which said Bryant was sitting in the street, was untrue, and Bryant was found not guilty by the judge. (Pl. Resp. 56.1 Stmt. PP 68A-68G; Bryant 50(h) Testimony, dated Apr. 1, 1999, Houghton Decl. Ex. L at 10.) On November 25, 1998, on motion of the district attorney, the charges against Dyson were dismissed. (Pl. Resp. 56.1 Stmt. P 121L.)

Plaintiff Maurice Cassidy also went to [*7] the event from work. (Def. 56.1 Stmt. P 69.) He marched with the crowd down Fifth Avenue to 56th Street, where he went west to Sixth Avenue, and was eventually approached by an officer who pointed to various marchers saying, "He's one of them." or "She's one of them." (Def. 56.1 Stmt. PP 79-82; Pl. Resp. 56.1 Stmt. PP 77-80.) As Cassidy was standing in the street near the southwest corner of Sixth Avenue and 56th Street, he was handcuffed and placed on a city bus that had been commandeered by the police. (Def. 56.1 Stmt. PP 82-83; Pl. Resp. 56.1 Stmt. P 81.) Cassidy remained on the bus from about 7:15 pm until about 1:00 am (Cassidy Decl. P 16, 26), and his handcuffs were removed around 9:00pm while he was still on the bus. (Cassidy Decl. P 19.) The officer who released the arrestees on the bus at around 1:00 am informed them that their arrests would be voided. (Def. 56.1 Stmt. P 84; Cassidy Decl. P 25.)

Plaintiff Joseph DeFilippis joined the event at Fifth Avenue and turned with the crowd onto 56th Street. (Pl. Resp. 56.1 Stmt. P 97; DeFilippis Decl. P 7.) He was arrested and handcuffed with plastic handcuffs while standing in the roadway at the intersection of Sixth Avenue and 56th [*8] Street (Def. 56.1 Stmt. P 101-04; DeFilippis Decl. P 12). DeFilippis was placed on a bus with other arrestees. (Def. 56.1 Stmt. P 105.) Another arrestee on the same bus cut off DeFilippis's handcuffs, as well as those of other arrestees, with an Xacto knife

around 8:30 pm, and the police released DeFilippis and the other arrestees from the bus and voided their arrests at approximately 1:15 am. (Def. 56.1 Stmt. PP 106-07; Pl. Resp. 56.1 Stmt. P 106; DeFilippis Decl. PP 30-31.)

Plaintiff Leonard Gay saw the event taking place as he was at the New York Public Library at Fifth Avenue and 40th Street. (Pl. Resp. 56.1 Stmt. P 122.) He followed the crowd, eventually joining them at Madison Square Park. (Def. 56.1 Stmt. P 123; Pl. Resp. 56.1 Stmt. P 123; Gay Decl. P 9.) At the conclusion of the event, Gay walked to the area near 25th Street and Fifth Avenue. (Def. 56.1 Stmt. P 124.) He stood on the sidewalk about three feet from a group of people recording interviews for television. (Pl. Resp. 56.1 Stmt. P 125; Gay Decl. P 16.) A police officer asked Gay for his press credentials, and, when he said he had none, asked him to step away from the press area. (Def. 56.1 Stmt. P 126-29.) After **[\*9]** asking again, the officer told him, "Sir, if you don't step off the sidewalk, you are going to be arrested." (Def. 56.1 Stmt. P 129-30.) Eventually, the officer motioned to a nearby van, and another officer came up and handcuffed and arrested Gay. (Def. 56.1 Stmt. P 134-38.) The officer took Gay to the police van, which took him to One Police Plaza, after which he was placed on a commandeered MTA bus with other arrestees. (Def. 56.1 Stmt. PP 139-40.) While on the bus, the police replaced Gay's metal handcuffs with plastic ones. (Pl. Resp. 56.1 Stmt. PP 141-43.) After being on the bus about an hour, Gay was placed in a cell at One Police Plaza, where his plastic handcuffs were eventually removed. (Def. 56.1 Stmt. PP 144-45; Pl. Resp. 56.1 Stmt. P 145.) The police took Gay to the criminal court building between 7:00 am and 8:00 am the following morning, and he appeared before a judge at approximately 12:15 pm, where he was charged with two counts of disorderly conduct for making unreasonable noise and for refusing to disperse under *N.Y. Penal Law § 240.20(2)and (6).* (Def. 56.1 Stmt. PP 146-48; Pl. Resp. 56.1 Stmt. PP 146-47; Gay's Misdemeanor Criminal Cmplt. **[\*10]** , dated Oct. 20, 1998, Houghton Decl. Ex. T.) Gay accepted a plea of Adjournment in Contemplation of Dismissal (Def. 56.1 Stmt. P 149), and the case was dismissed on October 6, 1999 (Gay Decl. P 42).

Plaintiff Robert Takacs joined the event at 59th Street and Fifth Avenue. (Def. 56.1 Stmt. P 153.) With the crowd, Takacs moved down Fifth Avenue to 56th Street, where he went west to Sixth Avenue and down to 54th Street, and then headed east on 54th back in the direction of Fifth Avenue. (Def. 56.1 Stmt. PP 156-59.) Takacs was arrested while standing in the roadway on 54th Street. (Def. 56.1 Stmt. P 161-62.) Takacs, hindered by parked cars and scaffolding from getting onto the sidewalk, "got loud" when the officer arrested him. (Def. 56.1 Stmt. P 163 (quoting Takacs's 50(h) Testimony,

dated May 18, 1999, Houghton Decl. Ex. V at 8); Pl. Resp. 56.1 Stmt. P 158-60).) A brief struggle ensued, during which other officers, assisting the original arresting officer, forced Takacs to the ground and handcuffed him, as well as stomped on his candle. (Def. 56.1 Stmt. PP 164-66; Pl. Resp. 56.1 Stmt. P 162-66.) The officers then placed Takacs on a commandeered city bus. (Def. 56.1 Stmt. P 167.) The **[\*11]** bus went downtown at approximately 10:00 pm, and Takacs was eventually placed in a cell. (Def. 56.1 Stmt. P 169; Pl. Resp. 56.1 Stmt. P 169.) The police voided Takacs's arrest, and he was released sometime after midnight. (Def. 56.1 Stmt. P 171; Pl. Resp. 56.1 Stmt. P 171.)

Plaintiff Ulrik Trojaborg joined the event at 59th and Fifth Avenue. (Def. 56.1 Stmt. P 172-73.) Trojaborg went with the crowd to Sixth Avenue, continued down to 54th Street, and was stopped by a police officer while in the roadway near 54th Street and Sixth Avenue. (Def. 56.1 Stmt. P 179-83.) Like Takacs, Trojaborg also maintains that he was prevented from getting to the sidewalk by parked cars and scaffolding. (Pl. Resp. 56.1 Stmt. PP 181-82.) He was handcuffed and placed on a city bus, after which he was taken to Central Booking. (Def. 56.1 Stmt. P 184-85.) He was not charged with an offense, and was released at approximately 4:00 am. (Pl. Resp. 56.1 Stmt. P 185.)

Under New York criminal procedure law, police officers, under certain circumstances, may issue a desk appearance ticket to an arrestee rather than holding him or her in custody until a judge is available. The arrestee may then be released and must **[\*12]** return to the criminal court at a future date for arraignment. *See N.Y. Crim. Proc. Law § 150.20(2)(a)* (McKinney 1992); *see also* Preiser, *Practice Commentaries.* McKinney's Vol. 11A Crim. Proc. Law § 150.20, at 682 (1992). In a situation like the one at issue here, the statute contemplates that those arrested will be brought to the stationhouse, where a post arrest evaluation can be made to determine the "necessity for continuing with the costly and liberty restricting physical arrest procedures." Preiser, *Practice Commentaries.* at 682. In 1987, a police officer's ability to issue desk appearance tickets was expanded as part of a bill "primarily devoted to the subject of relieving jail overcrowding in the city of New York." *Id.* at 683. Desk appearance tickets can be made available, based upon a variety of criteria, to persons arrested for a number of offenses, including disorderly conduct. *See N.Y. Crim. Proc. Law § 150.20(2)(a)*; Police Procedures Regarding Issuance of Desk Appearance Tickets, Alterman Decl. Ex. D. The decision to issue a desk appearance ticket or not is at the discretion of the **[\*13]** police. *Id.* In the current case, had the Plaintiffs received a desk appearance ticket, they would arguably have spent a shorter time in police custody after their arrests. (Pl. Mem. at 15-16.)

Plaintiffs assert, and it is assumed for the purposes of this motion, that none of the Plaintiffs had outstanding warrants and all were otherwise eligible to receive desk appearance tickets. (Pl Resp. 56.1 Stmt. P 188; Pl. Mem. at 18.)

No desk appearance tickets were issued to the Plaintiffs or to any other person at Central Booking arrested in connection with the Shepard event. (Pl. Resp. 56.1 Stmt. P 53.) Plaintiffs allege that Chief of Department Louis Anemone made a blanket decision not to issue desk appearance tickets before he left the event, without considering the individual circumstances of each arrestee. (Pl. Mem. at 9, 16-17.) According to Anemone, desk appearance tickets were not issued because the participants in the Shepard event were violating police directives, threatening public and police safety, would continue to engage in illegal activity after release, and were part of a violent, uncontrollable group. (Anemone Dep. at 48-49, 56.) [3] Plaintiffs assert that none of these [*14] reasons applied to them. (Pl. Mem. at 19-20.)

> 3   Anemone also expressed a desire to preserve police manpower. (Anemone Dep. at 70-71.)

**Standard of Review**

Under 56, an action will be dismissed on summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The court must view all evidence in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)).*

Once a moving party [*15] presents appropriate support showing that there is no genuine issue of material fact, the nonmoving party must present similar support setting forth specific facts about which a genuine issue remains. *Fed. R. Civ. P. 56(e); see Anderson, 477 U.S. at 256.* The party with the burden of proof at trial must "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Mere conclusory allegations will not suffice. *Fed. R. Civ. P. 56(e).* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary

judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).*

**Discussion**

In Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment (Pl. Mem.), Plaintiffs assert that [*16] the denial of desk appearance tickets (DATs) despite their eligibility to receive them was in violation of their constitutional rights. (Pl. Mem. at 3.) Specifically, they claim that this denial deprived them of due process, both by punishing them for the acts of others and by the arbitrary and capricious nature of the decision, and was retaliatory in violation of their *First Amendment* rights. (Pl. Mem. at 15-17 (due process), 20-21 (*First Amendment*).) Additionally, they claim the denial was discriminatory in violation of their rights under the *Equal Protection Clause of the Fourteenth Amendment.* (Pl. Mem. at 3.) Under New York state law, they claim that the arrests violated their rights because they were effectuated without probable cause. (Pl. Mem. at 22.) Accordingly, they assert claims under New York state law for false arrest and false imprisonment as to all the Plaintiffs, as well as claims of malicious prosecution for the prosecutions of Bryant and Dyson. (Pl. Mem. at 22 (false arrest and imprisonment), 34 (malicious prosecution).)

**I. Monell Liability**

A municipality cannot be held liable under *§ 1983* solely under a theory of respondeat superior. *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* [*17] Plaintiffs must establish the fault of the municipality itself. *Oklahoma City v. Tuttle, 471 U.S. 808, 810, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985); Monell, 436 U.S. at 690-91.* In other words, the plaintiffs must demonstrate that an official policy or custom of the municipality was the cause of the deprivation of constitutional rights. *Id.* This causation has two components. First, Plaintiffs "must ... prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused [their] injuries beyond merely employing the misbehaving officer." *Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)* (citing *Tuttle, 471 U.S. at 824, n.8*) (plurality opinion). Second, Plaintiffs must establish a "causal connection ... between the policy and the deprivation of [their] constitutional rights." *Id.*

**A. Existence of a municipal policy**

Plaintiffs can demonstrate the existence of the requisite municipal policy by showing that an official or officials with final decision-making authority with respect to the subject matter in question took action or made [*18]

a specific decision which caused the alleged violation of constitutional rights. *Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir. 2003); Pembaur v. City of Cincinnati, 475 U.S. 469, 482-84, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986).*

Whether or not an official has final policymaking authority is an issue of state and local law, to be determined by the court before the case goes to a jury. *Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000)* (citing *Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989)).* "The court must 'ask whether [the] governmental official[is a] final policymaker[] for the local government in a particular area, or on [the] particular issue' involved in the action." *Id.* (quoting *McMillian v. Monroe County, 520 U.S. 781, 785, 138 L. Ed. 2d 1, 117 S. Ct. 1734 (1997))* (alterations in *Jeffes*).

Here, Plaintiffs argue that the denial of desk appearance tickets was a decision by an official whose action represented official policy. Under New York criminal procedure law, the police have discretion over whether or not to issue a [*19] desk appearance ticket to a statutorily-eligible arrestee. *N.Y. Crim. Proc. Law § 150.20(2)(a).* Former Police Chief Allan Hoehl, who was present at the event, testified that the decision to deny the desk appearance tickets that night would have been made by either the First Deputy Commissioner, Patrick Kelleher, or by the Chief of Department, Louis Anemone. (Deposition of Police Chief Allan Hoehl, Alterman Decl. Ex. B (Hoehl Dep.) at 10-12, 19-20.) When Chief Anemone was deposed, he stated that, as Chief of Department, he was the chief operating officer for the NYPD, the highest-ranking uniformed officer, and reported directly to the Police Commissioner, Howard Safir. (Deposition of Former Chief of Department Louis Anemone, Alterman Decl. Ex. C (Anemone Dep.) at 9, 12.) During the event, Anemone took over operation command from Chief Hoehl, and remained in command until the conclusion of the event. (Anemone Dep. at 33-34, 99.)

Plaintiffs point to evidence suggesting that Chief Anemone either gave the order not to issue desk appearance tickets after the event or had final review of the decision. (Anemone Dep. at 47-49.) As Commissioner Safir was out of town [*20] at the time of the event (Def. 56.1 Stmt. P 45), Plaintiffs argue, Anemone's decision represented official municipal policy. (Pl. Mem. at 8-10.)

Although Defendants do not concede this issue, they do not brief opposing arguments in their Reply Memorandum, and Plaintiffs have pointed to evidence that could allow the Court to find as a matter of law that Chief Anemone was the final policymaker with respect

to the issuance of desk appearance tickets to the seven plaintiffs. (*See* Deposition of Inspector Thomas Graham, Alterman Decl. Ex. E (Graham Dep.) at 160-62 (stating that the chief of department makes the policy regarding issuance of desk appearance tickets).) However, because the claims fail on other grounds, this determination is unnecessary at this time.

## B. Violation of a constitutionally protected right

The second step in establishing *Monell* liability is to show a causal connection between the policy and a constitutional violation. *Vippolis, 768 F.2d at 40.* "A plaintiff may prove the causation element by showing ... that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal [*21] rights ...." *Jeffes, 208 F.3d at 61.* Because Plaintiffs are alleging this sort of direct causation, the causal connection itself is not in question.

What is at issue, however, is whether Plaintiffs have demonstrated that a constitutional violation took place -- a crucial step in holding a municipality liable under *Monell. See, e.g., Los Angeles v. Heller, 475 U.S. 796, 799, 89 L. Ed. 2d 806, 106 S. Ct. 1571 (1986)* (municipality cannot be held liable for police department training policy without showing of constitutional violation); *Curley v. Village of Suffern, 268 F.3d 65, 71 (2d Cir. 2001)* (affirming grant of summary judgment as to municipal liability when individual officers did not violate constitutional rights while making arrest, and village was implicated only by individual defendants' conduct) (citing *Heller, 475 U.S. at 799*).

The plaintiffs' various constitutional claims are addressed below.

## II. Federal Constitutional Claims: Denial of Issuance of Desk Appearance Tickets

Defendants argue that, because only three of the plaintiffs were arraigned, while the other four had their arrests voided, [*22] only the former three were eligible to receive desk appearance tickets in the first place. (Def. R. Mem. at 5-6.) Plaintiffs, on the other hand, assert that the issuance of desk appearance tickets would have shortened the confinement of all Plaintiffs. (Pl. Mem. at 16.) Because summary judgment is granted on other grounds, this point does not need to be discussed.

## A. Substantive Due Process

The Due Process Clause of the *Fourteenth Amendment* "serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels v. Williams, 474 U.S. 327, 331-32, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)* (quoting *Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 18 How. 272, 277, 15 L.*

*Ed. 372 (1856)* (discussing the Due Process Clause of the *Fifth Amendment*)). It protects not only against procedural unfairness, but also against "'the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Wantanabe Realty Corp. v. City of New York,* 2003 U.S. Dist. LEXIS 11617, No. 01 Civ. 10137, 2003 U.S. Dist. LEXIS 11617, at *42 (S.D.N.Y. July 10, 2003) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)). **[*23]**

Plaintiffs claim that Anemone's refusal to issue desk appearance tickets was arbitrary and capricious in violation of their due process rights. (Pl. Mem. at 15.) "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is 'incorrect or ill-advised.'" *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir. 1994) (quoting *Bishop v. Wood,* 426 U.S. 341, 350, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976)) (other citations omitted). *See also Daniels,* 474 U.S. at 331 ("The Due Process Clause, like its forebear in the Magna Carta, ... was 'intended to secure the individual from the arbitrary exercise of the powers of government.'") (quoting *Hurtado v. California,* 110 U.S. 516, 527, 28 L. Ed. 232, 4 S. Ct. 111 (1884) (other citations omitted)). "Moreover, government action might be so arbitrary that it violates substantive due process 'regardless of the fairness of the procedures used.'" *Lowrance,* 20 F.2d at 537 (quoting *Foucha v. Louisiana,* 504 U.S. 71, 80, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992)). **[*24]**

Plaintiffs also allege that the refusal to issue desk appearance tickets, because it was based on the supposedly violent and uncontrollable conduct of the other participants in the event, violated their rights to due process by depriving them of their liberty because of the conduct of others. Instead, they argue, the determination should have been made on an individual basis. (Pl. Mem. at 17.) To support their position that Defendants have violated their substantive due process rights, Plaintiffs cite, among other cases, *Scales v. United States,* 367 U.S. 203, 224, 6 L. Ed. 2d 782, 81 S. Ct. 1469 (1961). In *Scales,* the Supreme Court stated the following:

> In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity ..., that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the *Fifth Amendment.*

*Id. at 224-25.*

Imposing criminal liability for the acts of another offends substantive **[*25]** due process. *See id.; see also Ferguson v. Estelle,* 718 F.2d 730, 735-36 (5th Cir. 1983) (interpreting vicarious criminal liability under Texas Anti-Riot Law) (citing *Scales,* 367 U.S. 203, 6 L. Ed. 2d 782, 81 S. Ct. 1469). The principle reaches beyond criminal liability. For example, in *St. Ann v. Palisi,* 495 F.2d 423, 426 (5th Cir. 1974), the 5th Circuit found that suspension of schoolchildren for an altercation their mother had with the assistant principal violated the children's due process rights. "Personal guilt is a fundamental element in the American scheme of liberty." *Id.* In *Tyson v. New York City Housing Auth.,* 369 F. Supp. 513, 518-19 (S.D.N.Y. 1974), the district court, denying a motion to dismiss the claim, applied the notion of personal guilt to the termination of tenants' public housing leases for the acts of the tenants' adult children. *United States v. One 1971 Ford Truck,* 346 F. Supp. 613, 619 (C.D. Cal. 1972), applied the same notion to a case involving the *Takings Clause of the Fifth Amendment,* in which the federal government seized a truck because of the illegal activities **[*26]** of the owner's son. "Implicit within the concept of due process is that liability may be imposed on an individual only as a result of that person's own acts or omissions, not merely because of his association with any group." *Tyson,* 369 F. Supp. at 518.

A substantive due process claim has two elements:

(1) identification of the constitutional right at stake, and (2) consideration of whether the state action was arbitrary in a constitutional sense. *Lowrance,* 20 F.3d at 537 (citations omitted).

### 1. Constitutional Violation

The analysis first requires the identification of the constitutional violation. *See Lowrance,* 20 F.3d at 537 (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992)). "This threshold determination of the right at issue is critical because the seriousness of the official misconduct may determine whether the constitutional line between a procedural and a substantive due process violation has been crossed." *Curro v. Watson,* 884 F. Supp. 708, 719 (E.D.N.Y. 1995) (citing *Lowrance,* 20 F.3d at 537).

The cases **[*27]** cited above each involved a protected property or liberty interest. In *One 1971 Ford Truck,* the government seized a truck because it was used in connection with possession and sale of an unregistered firearm. The owner of the truck, however, was innocent of any wrongdoing, and was connected to the crime only

2003 U.S. Dist. LEXIS 21642, *

because his son -- without his father's permission -- used the truck at the time. *One 1971 Ford Truck, 346 F. Supp. at 616-17*. The decision in *Tyson* dealt with the tenants' leases in public housing, and was a related decision to *Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir. 1970)*, in which the Second Circuit determined that continued tenancy in public housing was subject to due process protection. *Escalera, 425 F.2d at 861-62; Tyson, 369 F. Supp. at 518-19. Palisi*, likewise, involved a constitutionally protected liberty interest in a public education. [4] *495 F.2d at 426-27*. And *Lowrance* involved the liberty interest, defined under state regulations, of a prisoner's right to remain free from administrative confinement unless a corrections officer had reasonable grounds [*28] to believe him a threat to the order, safety, or security of the prison. *Lowrance, 20 F.3d at 537*.

    4 *Palisi* contains language that could be read to suggest that a "cardinal notion of liberty" could stem solely from the notion of punishment in the absence of personal guilt. *495 F.2d at 426-27*. However, the *Palisi* court did note its belief that the states did not have the power to arbitrarily deny the right to a public education. *See id. at 427*. Furthermore, later treatment of *Palisi* indicates that this protected interest was crucial to the decision. *See Burris v. Willis Indep. Sch. Dist., Inc., 713 F.2d 1087, 1093 n.3 (5th Cir. 1983)* (finding no property right in employment contract renewal with school district, contrasting it with the constitutionally protected right present in *Palisi*); *Justice v. Nat'l Collegiate Athletic Ass'n, 577 F. Supp. 356, 369-70 (D. Ariz. 1983)* (finding no constitutionally protected property or liberty interest in the right to participate in post-season or televised college athletic competitions).

    [*29] New York state law does not create a protected right in the issuance of a desk appearance ticket; its issuance is purely discretionary. "Under New York law, a 'defendant has no constitutional or statutory right to a DAT, and a police officer who has arrested a defendant for a misdemeanor may choose instead to retain custody of the defendant until his arraignment in a local Criminal Court.'" *Greenfield v. City of New York*, No. 99 Civ. 2330, 2000 U.S. Dist. LEXIS 1164, at *30 (S.D.N.Y. Feb. 3, 2000) (quoting *People v. Bracken, 129 Misc. 2d 1048, 494 N.Y.S.2d 1021, 1023 (Crim. Ct. Kings Co. 1985)), aff'd without opinion, 234 F.3d 1262 (2d Cir. 2000). See also People v. Stone, 128 Misc. 2d 1009, 491 N.Y.S.2d 921, 924 (Crim. Ct. Richmond Co. 1985)* ("The issuance of a DAT is at the discretion of the arresting police officer. The defendant has no right to receive a DAT.").

*Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494 (2001)*, a land use regulation case, is analogous to the current case. In *Harlen Associates*, the plaintiffs challenged the denial of a special use permit for their [*30] convenience store. *Id. at 497-98*. In affirming the grant of summary judgment, the Second Circuit said that no property right existed in the special use permit, in part because the board making the decision had full discretion whether or not to issue it. *Harlen Assoc., 273 F.3d at 503-04*. The Second Circuit stated that in a land use regulation case, it would apply a strict "entitlement test" to determine whether the property right in question was protected under the substantive component of the Due Process Clause. *Id. at 503*. The court determined that the necessary entitlement "turns on whether the issuing authority lacks discretion to deny the permit, i.e., is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met.'" *Id. at 504* (quoting *Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999)*). Because the issuing board had the discretion to grant or deny special use permits, even though it was required to consider certain standards, the required entitlement was not present that would have given the plaintiffs substantive due process protection. [*31] *Id. at 505*.

    In this case, the Plaintiffs suggest that because they met the criteria set forth in the regulations for issuing desk appearance tickets, the police should have issued them. At the very least, they argue the decision was ill-founded. (*See* Pl. Mem. at 18.) A similar argument made in *Harlen Associates* was rejected by the Second Circuit: "Such a result [requiring a permit after the filing of a valid application] is diametrically opposed to the intent of the Village in drafting its zoning law to give the Board discretion and the duty to protect the interests of the community." *Harlen Assoc., 273 F.3d at 504. See also Maybee v. Town of Newfield, 789 F. Supp. 86, 90 (N.D.N.Y. 1992)* (holding that entitlement analysis must focus on the degree of official discretion and not on the probability of favorable action in the particular case) (citing *RRI Realty Corp. v. Incorporated Village of Southampton, 870 F.2d 911 (2d Cir. 1989)*).

    In contrast to a land use regulation case, which involves a property interest, the plaintiffs here argue that they were deprived of a liberty interest. (*See* Pl. Mem. at 14 n.3.) [5] However, [*32] the analysis surrounding the existence of a discretionary procedure also affects cases in which a liberty interest is potentially at stake. In *Morel v. Thomas*, the district court, citing *Barna v. Travis, 239 F.3d 169, 171 (2d Cir. 2001)* (per curiam), found that there was no liberty interest in parole under New York state law such as to create full procedural due process protection. *Morel v. Thomas*, No. 02 CV 9622, 2003 U.S. Dist. LEXIS 10935, at *11 (S.D.N.Y. June 25, 2003).

Because the Parole Board had the discretion, after weighing the various factors prescribed by the regulations, to grant or deny parole, the petitioner's due process rights "extended only to a refusal by the Parole Board to deny release arbitrarily or capriciously, based on inappropriate consideration of a protected classification or an irrational distinction, or on any other unconstitutional grounds." 2003 U.S. Dist. LEXIS 10935, [WL] at *13. Although the court did not agree with the ultimate decision of the Parole Board, because the Board considered all the evidence before it, the decision did not rise to the level of arbitrariness or capriciousness necessary under a substantive due process analysis. **[*33]** 2003 U.S. Dist. LEXIS 10935, [WL] at *16 n.8.

> 5  As mentioned above, Plaintiffs argue that the issuance of desk appearance tickets would have shortened their confinement following their arrests. (Pl. Mem. at 15-16.) They argue separately that the arrests themselves were unlawful under New York state law. (Pl. Mem. at 21-30.) Those claims, however, are not discussed in this opinion, as the Court will not exercise supplemental jurisdiction over them.

This does not fully address Plaintiffs' argument, because they claim that Anemone did not conduct any individual assessment of the type undertaken in both *Harlen Associates* and *Morel*. However, *Harlen Associates* involved a Mineola, New York, zoning statute, which required that the zoning board consider certain standards in making its decision whether or not to issue the permit. *Harlen Assoc., 273 F.3d at 504. Morel*, likewise, involved the New York state parole statute, which, although creating no legitimate expectancy of release, *Barna, 239 F.3d at 171.* **[*34]** does contain language imposing obligations regarding the review process itself. The parole statute at issue in *Morel* reads, "The state board of parole shall ... have the power *and duty* of determining which inmates ... may be released on parole ...." *N.Y. Exec. Law § 259-c(1)* (McKinney 2001) (emphasis added).

The statute governing the issuance of desk appearance tickets, in contrast, has no such mandatory language: "Whenever a police officer is authorized ... to arrest a person without a warrant ... he *may* ... issue and serve upon such person an appearance ticket." *N.Y. Crim. Proc. Law § 150.20(1)* (emphasis added). The Practice Commentaries do mention a focus upon the individual circumstances of each arrestee. *See Preiser, Practice Commentaries,* at 682-83. As Defendants point out, however, the discussion pertains to the issuance of a desk appearance ticket, and not the denial. (Def. R. Mem. at 8-9.) Both parties agree that Plaintiffs have a constitutionally protected right to due process before

deprived of their liberty. Defendants argue, however, that this right attaches to the arrest as a whole, and not solely **[*35]** to a discretionary procedure designed to ease the burden on the court and corrections system. (Def. R. Mem. at 9.) The Court agrees.

**2. Arbitrary in a constitutional sense**

Plaintiffs also fall short with respect to the second prong of the substantive due process analysis. Even if the Plaintiffs had a right in the issuance of a desk appearance ticket, Defendants' behavior in denying them did not rise to the level necessary to sustain a substantive due process claim. *See Harlen Assoc., 273 F.3d 494, 505* ("Even if it had a cognizable property right, the Board did not deprive it of any such right in an arbitrary manner."). The scope of substantive due process is limited to behavior that "shocks the conscience" and violates "decencies of civilized conduct." *Wantanabe Realty Corp. v. City of New York,* No. 01 Civ. 10137, 2003 U.S. Dist. LEXIS 11617, at *42 (S.D.N.Y. July 10, 2003) (denying summary judgment because jury could potentially find that City decided to tear down roller coaster in order to accommodate owners of the New York Mets, and that would qualify as outrageously arbitrary) (citing *County of Sacramento v. Lewis, 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)).* **[*36]** *Compare Rochin v. California, 342 U.S. 165, 172, 96 L. Ed. 183, 72 S. Ct. 205 (1952)* (forcibly pumping suspect's stomach shocked the conscience), *Riggins v. Nevada, 504 U.S. 127, 135, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992)* (forced administration of antipsychotic drugs absent overriding justification violated substantive due process), *and Johnson v. Newburgh Enlarged School District, 239 F.3d 246, 252 (2d Cir. 2001)* (choking, ramming head into bleachers and against metal fuse box, and punching in face of student by gym teacher shocked the conscience, and violated right to be free from excessive use of force), *with Sundbye v. Ogunleye, 3 F. Supp.2d 254, 261-62 (E.D.N.Y. 1998)* (lewd remarks and coercing plaintiff into signing letter by threatening to take child away not violation of substantive due process because statement that actor had power take child away was accurate), *and McCormack Sand Co. v. Town of N. Hempstead Solid Waste Mgmt., 960 F. Supp. 589, 596 (E.D.N.Y. 1997)* (town's sale of stockpiles of sand when ownership uncertain "not the type of oppression which gives rise to a substantive due **[*37]** process claim").

"An abuse of official authority may violate the substantive guarantees of the *Due Process Clause* when it is 'clearly unjustified by any legitimate objective of law enforcement.'" *Mahase v. City of New York,* No. 96 CV 6105, 2000 U.S. Dist. LEXIS 2046, at *13 (quoting *County of Sacramento v. Lewis, 523 U.S. at 840).* Here, rather than being irrational, the decision not to issue desk

appearance tickets was based in part, according to Anemone, on a decision that the participants in the demonstration were violating police directives, were a threat to police and public safety, would potentially continue their illegal activity, and were part of an uncontrollable group. (Anemone Dep. at 48-49, 56.) Although Plaintiffs question the validity of these reasons (*See infra*: Pl. Mem. at 19-20), Anemone also stated a desire to preserve police manpower resources and to save paperwork, which Plaintiffs do not address. (Anemone Dep. at 70-71.) It cannot be said, without more, when an event leads to the arrest of 115 people, that a decision not to issue desk appearance tickets violates the Plaintiffs' substantive due process rights. It is not "arbitrary [*38] or conscience-shocking in the constitutional sense." *Lowrance*, 20 F.3d at 537.

**B. *First Amendment* Retaliation Claim**

Although grant of a desk appearance ticket is discretionary, as discussed above, both parties agree that a municipality cannot grant or withhold a discretionary privilege with a constitutionally impermissible motive, or use such discretion to otherwise infringe upon constitutionally protected rights. (*See* Pl. Mem. at 13-14; Def. R. Mem. at 7-8, 10.)

A § 1983 action is appropriate where a plaintiff can show that the government took negative action on him for exercising his or her constitutional rights. *Smith v. Metro North Commuter R.R.*, No. 98 Civ. 2528, 2000 U.S. Dist. LEXIS 14168, at *13 (S.D.N.Y. Sept. 29, 2000) (applying *First Amendment* standard to private individual punished by public official for protected speech) (citing *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). Plaintiffs, citing *Speiser v. Randall*, 357 U.S. 513, 526, 2 L. Ed. 2d 1460, 78 S. Ct. 1332 (1958), point out that to deny a desk appearance ticket because an arrestee "would engage in constitutionally-protected [*39] expression" is unconstitutional. (Pl. Mem. at 14.) [6] Defendants do not challenge this. (Def. R. Mem. at 7-8.)

> 6    Plaintiffs also cite *Sherbert v. Verner*, 374 U.S. 398, 404, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963), and *Perry v. Sindermann*, 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972), for the same proposition.

Plaintiffs allege that denial of the desk appearance tickets was in retaliation for speech protected by the *First Amendment*. (Pl. Mem. at 3.) A plaintiff asserting a *First Amendment* claim alleging retaliation for exercise of free speech must prove that (1) they had an interest protected by the *First Amendment*, (2) that defendants' actions were motivated by or substantially caused by the exercise of that right, and (3) defendants' actions effectively

chilled the exercise of that right. *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citing *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)). *See also Posr v. Court Officer Shield # 207*, 180 F.3d 409, 418 (2d Cir. 1998) [*40] (requiring only first two prongs for *First Amendment* retaliation claim) (citing *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)); *Friedl*, 210 F.3d at 85 (same) (citing *Posr*, 180 F.3d at 418).

Neither party argues that Plaintiffs' participation in the event was not constitutionally protected. Such activity is classic *First Amendment* expression. *See Edwards v. South Carolina*, 372 U.S. 229, 237, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1963). The primary issue for the purposes of this motion, therefore, is whether the motivation behind the denial of desk appearance tickets was impermissible.

"Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a *First Amendment* retaliation claim." *Curley*, 268 F.3d at 73 (pointing out that the allegation of mean-spiritedness in plaintiff's complaint would not suffice without further evidence of improper motivation) (citing *Blue v. Koren*, 72 F.3d 1075, 1082-83 (2d Cir. 1995)). In this case, Plaintiffs point to no evidence showing that the motivation behind the denial of desk appearance tickets [*41] was in response to their exercise of *First Amendment* rights.

Plaintiffs point out that Chief Anemone, allegedly the person responsible for the decision not to issue desk appearance tickets, cites a number of reasons for his decision. For instance, Anemone states in his deposition that a decision not to issue desk appearance tickets might have been based on the participants' violation of police directives, possible danger to public and police safety, likelihood that they would continue in their illegal activities, and that they were part of a violent mob. (Pl. Mem. 19-20. Anemone Dep. at 48-49, 56.) [7] Plaintiffs challenge these reasons. First, Plaintiffs point out that only one plaintiff, Gay, was charged with violating a police directive, and that none was arrested for conduct threatening public or police safety. (Pl. Mem. at 19.) They also assert that public safety is listed in neither the statute nor the police policies outlining the criteria for issuing desk appearance tickets. *Id.* at 19-20. Furthermore, Plaintiffs state, Anemone made the decision not to issue the desk appearance tickets well after the event had concluded, thus making his articulated worry that they would engage [*42] in further illegal conduct unreasonable. *Id.* at 20. Finally, Anemone's suggestion that the Plaintiffs were part of a violent mob is unconvincing, as none of the Plaintiffs was accused of violence. *Id.*

> 7    Plaintiffs cite the following passages of Anemone's deposition as proof of improper mo-

tive, saying that they were denied desk appearance tickets specifically to prevent them from continuing in the event and engaging in expressive activity. (Pl. Mem. at 21 n.8.)

> Q. And why would they not be eligible for a desk appearance ticket?
>
> A. Their actions during the course of the demonstration; their violation of police direction; their actions to endanger the public safety, not only of themselves; not only the public that was present in the street, but the police officers that had to maintain order indicated to me that they were very likely to continue to engage in this process.
>
> Q. When you say, very likely to engage in this process; do you mean that they were very likely to continue to demonstrate if they were let out?
>
> A. The decision had nothing to do with the demonstration. It had to do with the illegality of their actions.

(Anemone dep. at 48-49.) Anemone stated later that

> The group, from my perspective, was a violent mob. It was out of control. There was very little leadership, or any, that anyone on the police side could detect .... To me, that was the issue; that, you know, they couldn't be controlled. And until they could and abide by some legitimate police requests, we shouldn't allow them to continue .... To me it was crystal clear that they should be not be [sic] given the privilege of a desk appearance ticket because this would probably end up becoming a bigger problem for us later on that evening, early in the morning, at some other point.

(Anemone Dep. at 56.)

[*43] Although Plaintiffs' criticism of Anemone's rationales for declining to issue desk appearance tickets may question the soundness of his decision, it does not provide the type of evidence tending to establish the crucial link between the denial of desk appearance tickets and Plaintiffs' exercise of *First Amendment* rights. In fact, the depositions submitted suggest that desk appearance tickets would have been denied in any event. For example, Anemone testified that the extra manpower required to issue desk appearance tickets would have made the issuance difficult in a situation in which so many people were arrested at once (Anemone Dep. at 70-72), and that he was reluctant to issue desk appearance tickets, no matter what the surrounding circumstances, stating, "my belief is that the arrest and arraignment process are frustrated by the use of the desk appearance ticket, they're not enhanced." *Id.* at 66.

Plaintiffs suggest that it was the modus operandi of Defendants not to issue desk appearance tickets during demonstrations, which, they claim, would be an impermissible burden on *First Amendment* rights. (Pl. Mem. at 21.) To support this conclusion, they cite Anemone's deposition: [*44] "I think it was my decision because I know the way I've operated in the past at demonstrations." (Anemone Dep. at 51.)

At that point, however, Anemone was recalling what factors he may have used in deciding to deny the desk appearance tickets, and shortly thereafter said specifically that he declined to issue desk appearance tickets during demonstrations that were a threat to public safety. *Id.* at 52. Plaintiffs also point to similar testimony of Inspector Graham, at the time a deputy inspector (Graham Dep. at 31), who was present at the event. In his testimony, however, Graham stated that in some demonstrations desk appearance tickets were given, and in some -- more confrontational ones -- they were not, and that he did consider the Shepard event to be confrontational. *Id.* at 145-46. Later in his deposition, Graham states that the decision to issue a desk appearance ticket or not during a demonstration tended to depend on the number of arrests, and not the number of people at the demonstration. *Id.* at 151. [8]

> 8    Arguably, the most compelling evidence is Gay's assertion that the police told him that they would normally get desk appearance tickets, but that superiors at Central Booking were deliberately slowing the process. (Gay Decl. P 40.) Although this is in their 56.1 statement (Pl. Resp. 56.1 Stmt. P 151H), they do not cite it in their brief, and because it is inadmissible hearsay, it cannot be considered for purposes of this summary judgment motion. *See Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001)* ("Affidavits

submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.")

[*45] A useful contrast to this case is *Black Jack Distributors, Inc. v. Beame*, 433 F. Supp. 1297 (S.D.N.Y. 1977), in which desk appearance tickets were withheld from employees of adult bookstores who were arrested on obscenity charges. *Id. at 1306.* The defendants in that case admitted that the purpose of the denial was to discourage the employees from working in the stores. *Id.* The court determined that the desk appearance ticket issuance procedures could not be used so as to discourage the sale of material protected by the *First Amendment. Id. at 1306-07.* Accordingly, the issuance of desk appearance tickets was specifically mentioned in the granting of the preliminary injunction. *Id. at 1309.* Such motivation is not apparent in this case.

In short, Plaintiffs have not pointed to any evidence showing that the motivation behind the denial of desk appearance tickets implicated their *First Amendment* rights. As a result, Defendants' motion for summary judgment with respect to Plaintiffs' *First Amendment* claims is granted.

## C. Equal Protection

"To establish an Equal Protection violation based on selective enforcement, [*46] plaintiffs must show '(1) the person, compared with others similarly situated, was selectively treated, and (2) that such selective treatment was based on impermissible conditions such as race.'" *Mahase v. City of New York,* 2000 U.S. Dist. LEXIS 2046, at *21 (quoting *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir. 1999)). *See also Harlen Assoc.,* 273 F.3d at 499 (recognizing that equal protection extends to those who do not claim specific class membership but are nonetheless subjected to invidious discrimination); *LaTrieste Rest. & Cabaret v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir. 1994) (adding additional impermissible considerations including religion, exercise of constitutional rights, and malicious intent), *quoted in Harlen Assoc.,* 273 F.3d at 499.

After briefly mentioning their claim, Plaintiffs do not address the merits in their memorandum. Additionally, the evidence submitted does not tend to show that police acted with an intent unconstitutional under the *Equal Protection Clause.* Therefore, Defendants' motion for summary judgment with respect to Plaintiffs' [*47] equal protection claim is granted.

## III. State Claims

The remaining claims in Plaintiff's complaint, arising under New York common law, are for false arrest

and imprisonment and malicious prosecution. Because summary judgment is granted dismissing all Plaintiffs' federal claims, the Court, pursuant to *28 U.S.C. § 1367,* declines to exercise jurisdiction over the remaining state law claims. "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction." *28 U.S.C.A. § 1367(c)(3) (West 1993).* [9]

9  Plaintiffs argue that because the case is old, and because substantial discovery has been conducted and concluded, that the Court should retain jurisdiction, even in the event that all federal claims are dismissed. (Pl. Mem. at 33.) They also make the argument that both parties have submitted lengthy materials pertaining to these claims and arguing them on their merits, and particularly that it was the original motion of Defendants that necessitated this work at this stage. (Pl. Mem. at 33; *see. e.g.,* Pl. Mem. at 21-30 (false arrest and imprisonment), 34-36 (malicious prosecution); Def. R. Mem. at 1-8; Pl. R. Mem. in Support of Cross-Motion for Partial Summary Judgment at 1-9.) However, with the consent of both parties, discovery already undertaken may be used in further state court proceedings, as can the work already completed.

[*48] Defendants have filed a motion for summary judgment dismissing these claims, and Plaintiffs have filed a cross-motion on the false arrest and false imprisonment claims. Both of these motions are denied without prejudice as moot.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Defendants' federal claims, and the Court declines to exercise jurisdiction over Plaintiffs' state law claims of false arrest and imprisonment. Defendants' motion for summary judgment on Plaintiffs' state law claims, as well as Plaintiffs' cross-motion for summary judgment on their claims of false arrest and imprisonment, are therefore denied without prejudice as moot. [10]

10  Plaintiffs motion for class certification, not yet fully briefed, and stayed pending the determination of this motion is also denied as moot.

So Ordered.

Dated: December 1, 2003

Lawrence M. McKenna

U.S.D.J.

LEXSEE 2000 U.S. DIST. LEXIS 1617

**WINSTON CAMPBELL, Plaintiff, - against - RUDOLPH GIULIANI, in his official capacity as Mayor of the City of New York; HOWARD SAFIR, in his official capacity as Commissioner of the New York City Police Department; CHARLES J. HYNES, in his official capacity as the District Attorney for County of Kings in the City of New York; Police Officer/Detective GONZALES of the 70th Precinct of the New York City Police Department; New York City Police Officers "JOHN DOE 1" thru Police Officers "JOHN DOE 10"; and MILTON S. ALTMAN, Defendants.**

**99-CV-2603 (JG)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 1617*

**February 16, 2000, Decided**

**NOTICE:**    [*1]  FOR ELECTRONIC PUBLICATION ONLY

**SUBSEQUENT HISTORY:**    The Name of this Case has been Corrected by the Court July 14, 2000.

**DISPOSITION:**    Defendants' motion to dismiss granted in part and denied in part.

**COUNSEL:** EDWARD A. ROBERTS, ESQ., Brooklyn, New York, for Plaintiff.

Barbara Curtis, Assistant Corporation Counsel, MICHAEL D. HESS, Corporation Counsel of the City of New York, New York, New York, for Defendants.

**JUDGES:** JOHN GLEESON, United States District Judge.

**OPINION BY:** JOHN GLEESON

**OPINION**

*MEMORANDUM AND ORDER*

JOHN GLEESON, United States District Judge:

Plaintiff Winston Campbell commenced this action alleging, *inter alia*, claims of false arrest and malicious prosecution in violation of *42 U.S.C. §§ 1981, 1983,* and *1988* and corresponding supplemental claims under New York law. The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the reasons set forth below, the motion is granted in part and denied in part.

*FACTS*

On March 16, 1997, Winston Campbell, owner of Campbell Home Care Agency, Inc., began providing home care services to defendant Milton A. Altman. Pursuant to their agreement, Campbell assigned one of his employees to tend to Altman at his [*2] home. In July of that year, Campbell discovered that he was being investigated by the New York City Police Department for allegedly signing one of Altman's checks. Campbell claims that he contacted the police and offered information to "exonerate him and show that it was a conspiracy" between Altman and the employee assigned to take care of Altman. (Compl. P 19.)

Detective Gonzales and other police officers arrested Campbell on August 7, 1997, and the Kings County District Attorney's Office subsequently charged and prosecuted him under Docket No. 97K062569, *People of the State of New York v. Winston Campbell*. The charges were dismissed on February 6, 1998.

On May 6, 1999, Campbell filed this complaint for damages. He alleges that his arrest, detention, and prosecution were unlawful, and were the direct result of Mayor Guiliani's, Commissioner Safir's, and District Attorney Hynes's failure to train their officers and prosecutors.

*DISCUSSION*

### A. *The Standard for Dismissal Under Rule 12(b)(c)*

A federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974).* [*3] The inquiry focuses not on whether a plaintiff might ultimately prevail on her claim, but on whether she is entitled to offer evidence in support of the allegations in the complaint. *See id.* "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id. Rule 12(b)(6)* warrants a dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59 (2d Cir. 1997).*

In considering defendants' motion, the Court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Hamilton, 128 F.3d at 59* (citing *Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 740, 48 L. Ed. 2d 338, 96 S. Ct. 1848 (1976)).* The Court should also consider "documents attached to the complaint as an exhibit or incorporated in it by reference," "matters of which judicial [*4] notice may be taken," or "documents either in [plaintiff's] possession or of which plaintiff[] had knowledge and relied on in bringing suit." *Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)* (citing *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)).*

### B. *The Claims of False Arrest and Malicious Prosecution*

#### 1. *Official Capacity v. Individual Capacity Claims*

As an initial matter, I must address the distinction between official-capacity and individual-capacity claims. A suit against a government officer in his or her official capacity is, in essence, a suit against the government entity itself. *See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* Such a claim requires proof that the "the entity's policy or custom played a part in the violation of federal law." *Hafer v. Melo, 502 U.S. 21, 25, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991)* (quoting *Kentucky v. Graham, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985))* (internal quotation marks omitted). In contrast, an individual-capacity [*5] suit seeks to impose personal liability on a government official for actions taken under color of state law. Thus, to establish individual liability, a plaintiff must show that "the official, acting under color of state law, caused the deprivation of a federal right," *id.*

(citing *Graham, 473 U.S. at 166),* and not that a governmental policy or custom caused the violation.

Here, Campbell has brought claims of false arrest and malicious prosecution against Detective Gonzales, unnamed police officers, and District Attorney Charles Hynes in their official capacities. [1] (*See* Compl. PP 6-8.) However, these claims are premised on allegations of personal liability and not on a government entity's official policy or custom. Accordingly, these official-capacity claims are dismissed. [2] I nevertheless construe, as the defendants apparently have done, Campbell's counseled complaint to raise false arrest and malicious prosecution claims against these officers in their individual capacities as well. I now turn to whether Campbell has sufficiently alleged such claims.

> 1 The defendants claim that neither District Attorney Hynes nor Detective Gonzales has been served in this action. Campbell has provided the Court with affidavits of service as to both defendants. (*See* Pl.'s Mem. Opp. Mot. Dismiss Ex. B.)

[*6]

> 2 In addition, all of the claims against District Attorney Hynes in his official capacity must be dismissed on *Eleventh Amendment* grounds. "'In spite of the statutory classification a District Attorney is not an officer or employee of the municipality but is instead a quasi-judicial officer acting for the state in criminal matters.'" *Ying Jing Gan v. City of New York, 996 F.2d 522, 535-36 (2d Cir. 1993)* (quoting *Davis Construction Corp. v. County of Suffolk, 112 Misc. 2d 652, 447 N.Y.S.2d 355 (N.Y. Sup. Ct. 1982), aff'd, 95 A.D.2d 819, 464 N.Y.S.2d 519 (2d Dep't 1983))* (internal citations omitted). As such, District Attorneys sued in their official capacities for damages are immune from liability under the *Eleventh Amendment. See id.*

#### 2. *False Arrest*

Claims brought under *42 U.S.C. § 1983* are guided by the tort law of the forum state. *See Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995); Singer v. Fulton County Sheriff's Dep't, 63 F.3d 110, 118 (2d Cir. 1996).* To state a claim of [*7] false arrest under New York law, the plaintiff must establish that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." [3] *Broughton v. New York, 37 N.Y.2d 451 456-57, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975).*

> 3 The common law elements of false arrest and false imprisonment under New York law are the

same. *See Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991)* (citing *Jacques v. Sears, Roebuck & Co., 30 N.Y.2d 466, 473, 334 N.Y.S.2d 632, 285 N.E.2d 871 (1972)).*

New York courts uniformly recognize that, if the arrest and imprisonment occurred without a warrant, the plaintiff is not required to allege want of probable cause to state a claim. *See Broughton v. New York, 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)* (collecting cases). Rather, the burden is on the defendant to prove the affirmative defense of justification, *i.e.*, that the arrest was based on probable cause. *See id.* In the context of *§ 1983*, however, federal courts have reached the opposite conclusion and have held that the plaintiff bears the burden of establishing the absence of probable cause. *See, e.g., Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); See also Raysor v. Port Authority, 768 F.2d 34, 39-40 (2d Cir. 1985)* (recognizing that the burden of establishing probable cause rests with the defendant under New York law but with the plaintiff under *§ 1983*).

[*8] Generally, "probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).* Where "there is no dispute as to the pertinent events and the knowledge of the officers," "probable cause may be determined as a matter of law. *Id.* Moreover, even if material facts are in dispute, probable cause may be established by the plaintiff's own allegations. *See Mistretta v. Prokesch, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998).*

The defendants contend that Campbell's false arrest and malicious prosecution claims must be dismissed because he alleges in his complaint facts and circumstances which establish that Detective Gonzales had probable cause to arrest him. In support of their argument, the defendants point to the statements contained in the King's County Criminal Court Complaint, Docket No. 97K062569, knowledge of which can reasonably be attributed to plaintiff in this action alleging false arrest. In [*9] the criminal complaint, Detective Gonzales attests to the following facts:

[Gonzales] is informed by Milton Altman that . . . [Campbell] and [Altman] were the only people at [Altman's] house.

[Gonzales] is further informed by [Altman] that [Altman] gave [Campbell's]

check # 111 on May 6, 1997 for [Campbell's] services through [Campbell's] company, the Campbell Agency and that [Altman] left [Campbell] in a room with [Altman's] checkbook for several minutes and that [Altman] had no other visitors on 05.06.97.

[Gonzales] is informed by the official bank records of Citibank that check # 112 was written out to Campbell Agency, on May 6, 1997, in the amount of $ 5,376 and endorsed with Wilton [sic] Altman's signature and that said check was cashed by Campbell Agency on May 7, 1997 for $ 5,376.

[Gonzales] is further informed by [Altman] that [Altman] did not write check # 112 nor did he endorse it, that [Altman] did not give [Campbell] permission or authority to take, use or possess said U.S. currency.

(Curtis Aff. Ex. C.) [4] Thus, the defendants contend that Detective Gonzales's interview of the complaining witness (Altman) before [*10] arresting Campbell establishes probable cause as a matter of law. I disagree. I cannot conclude at this stage in the proceedings that Campbell can prove no set of facts in support of his claim which would entitle him to relief. [5]

4    "Curtis Aff." refers to the affidavit of Barbara Curtis, counsel for the defendants, dated September 24, 1999.

5    As previously explained, Campbell need not allege the absence of probable cause to state a claim for false imprisonment and false arrest under New York law. However, because such a showing is required for his malicious prosecution claim under state law and all of his *§ 1983* claims, I will address the issue.

"When an officer is advised of a crime by a person who claims to be the victim, and that person signs a complaint accusing another, the officer generally has probable cause to arrest." *Mistretta, 5 F. Supp. 2d at 133* (citing *Singer, 63 F.3d at 119).* However, there is a caveat to that general rule: If the surrounding circumstances [*11] give the officer reason to doubt the victim's veracity, then the victim's complaints may not be sufficient to establish probable cause to arrest. *See id.* (quoting *Singer, 63 F.3d at 119).* "The most common situation in which such doubts arise is when there exists

a prior relationship between the victim and the accused that gives rise to a motive for a false accusation." *Id.*

Here, I can conceive of facts which, if proved, would tend to negate the existence of probable cause. First, Altman may have never, in fact, imparted the allegations in the criminal complaint to Detective Gonzales. Second, Campbell may have presented Detective Gonzales with such compelling exonerating evidence that no reasonable person could have found probable cause -- notwithstanding Altman's complaint. Third, the nature of the relationship between Campbell and Altman may have been such that more was required before Altman's allegations could establish probable cause. I do not mean to suggest there is reason to believe that any of the foregoing set of facts can be established. But unless it "appears beyond doubt" that they cannot, I must conclude that Campbell has sufficiently alleged [*12] the absence of probable cause. [6]

> 6   Finally, although Campbell appears to allege as separate claim a "failure to investigate" the exculpatory evidence he presented, there is no such independent claim. Under New York law, "a plaintiff may not recover under broad general principles of negligence [for an inadequate police investigation], . . . but must proceed by way of the traditional remedies of false arrest and imprisonment and malicious prosecution." *Boose v. City of Rochester, 71 A.D.2d 59, 421 N.Y.S.2d 740, 744* (4th Dep't 1979). Thus, in the context of § 1983, allegations of officer's failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution. *See Mistretta, 5 F. Supp. 2d at 135* (allegations of an officer's failure to investigate exculpatory statements prior to arrest addressed in the context of a false arrest claim); *Dukes v. City of New York, 879 F. Supp. 335, 343 (S.D.N.Y. 1995)* (allegations of an officer's failure to interview witnesses and discover addition evidence addressed in the context of a malicious prosecution claim).

[*13] 3. *Malicious Prosecution*

The tort of malicious prosecution has the following elements under New York law "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the plaintiff, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Broughton, 37 N.Y.2d at 456.* Thus, the burden is squarely on the plaintiff to establish the absence of probable cause. *See id.; Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995).*

a. *The District Attorney*

The malicious prosecution claim against District Attorney Hynes is barred by absolute prosecutorial immunity. In *Imbler v. Pachtman, 424 U.S. 409, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976)*, the Supreme Court held that prosecutors have absolute immunity from § 1983 liability for activities "intimately associated with the judicial phase of the criminal process." *Id. at 430.* Such activities include the initiation of prosecution and the presentation of the government's case. *See Barr v. Abrams, 810 F.2d 358, 361 (2d Cir. 1987)* (citing *Taylor v. Kavanagh, 640 F.2d 450, 452 (2d Cir. 1981))*. [*14] In contrast, if a prosecutor acts in an investigative or administrative capacity, *see id.* (quoting *Taylor, 640 F.2d at 452*), or "proceeds in the clear absence of all jurisdiction," *id.*, the doctrine of qualified immunity controls.

Here, Campbell alleges that the District Attorney of Kings County "in wanton disregard for the attendant facts and circumstances, and in spite of having all of the information and evidence tending to clearly exonerate the plaintiff from all wrongdoing alleged by the complainant and having in his possession all of the evidence showing the conspiratorial nature of the false allegations lodge [sic] against the plaintiff, said defendant willfully, unlawfully and wrongfully rejected the evidence and prosecuted the plaintiff under Docket No.: 97K062569, encaptioned the *People of the State of New York v. Winston Campbell*." (Compl. P 21.) Campbell plainly bases his claim on the District Attorney's decision to initiate his prosecution, not on any investigative activity. Indeed, Campbell insists that all of the evidence exonerating him was already before the prosecutor and, thus, no further investigation was necessary. Therefore, the [*15] malicious prosecution claim against District Attorney Hynes must be dismissed. [7]

> 7   In addition, in order to state a claim against a government officer in his or her individual capacity, the plaintiff must allege that the officer had personal involvement with the deprivation of the plaintiff's constitutional rights. *See, e.g., Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994).* As it is highly doubtful that District Attorney Hynes had any personal involvement with Campbell's prosecution, and Campbell does not specifically allege such involvement, the malicious prosecution claim against Hynes may be dismissed for this reason as well.

b. *The Officers*

The malicious prosecution claim is also deficient with respect to Detective Gonzales and the other police officers. As explained above, to state a claim for malicious prosecution, the plaintiff must allege that the prosecution terminated in favor of the [*16] plaintiff. *See Broughton, 37 N.Y.2d at 456.* "Where the prosecu-

2000 U.S. Dist. LEXIS 1617, *

tion did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused." *Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir. 1997)* (collecting cases). Examples of unfavorable terminations are: dismissal for lack of subject matter jurisdiction, dismissal for failure to allege sufficient facts to support the charge, adjournments in contemplation of dismissal, and dismissal in the interests of justice. *See id. at 948-949* (citations omitted). In contrast, the Second Circuit has held that a dismissal for lack of timely prosecution should generally be considered a favorable termination for malicious prosecution purposes. *See id. at 950*. Here, Campbell has alleged that the "charges were dismissed by the Criminal Court of the City of New York, County of Kings." (Compl. P 22.) I find that the bare allegation of dismissal, absent any explanation of the basis on which the case was dismissed, is insufficient to meet the favorable termination requirement. **[*17]** Accordingly, Campbell's common law and § 1983 malicious prosecution claims are dismissed without prejudice to Campbell filing an amended complaint. [8]

    8  Campbell also premises his false arrest and malicious prosecution claim under *42 U.S.C. § 1981. Section 1981(a)* provides:

        All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

    *42 U.S.C. § 1981.* To state a claim under § 1981, a plaintiff must establish the following elements: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1087 (2d Cir.1993)*. As Campbell alleges only the first of these elements, his § 1981 claim is dismissed.

Finally, Campbell claims that the defendants acted in violation of the *Ninth* and *Thirteenth Amendments*. The *Ninth Amendment*, concerning unenumerated rights, and the *Thirteenth Amendment*, concerning slavery and involuntary servitude, simply have no application to this case. Accordingly, these claims are dismissed.

**[*18]  C. *Failure to Train***

Campbell has also brought claims against Mayor Guiliani, Commissioner Safir, and District Attorney Hynes in their official capacities, alleging that they failed to train their officers and prosecutors and thus displayed deliberate indifference to the deprivation of Campbell's constitutional rights. As I previously explained, official-capacity claims are tantamount to claims against the government entity itself. However, because District Attorney Hynes is an officer of the State of New York, the claim as against him is barred by the *Eleventh Amendment*. Mayor Giuliani and Commissioner Safir, in contrast, are officers of the City of New York, not the state, and may be sued in their official capacity to establish liability against the city.

To state a claim against a municipality under § 1983, a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy or custom. "The inference that such a policy existed may arise from 'circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. **[*19]** '" *Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993)* (quoting *Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991))* (upholding district court's dismissal of *Monell* claim under *Fed. R. Civ. P. 12(b)(6)*). "The mere assertion, however, that a municipality has a custom or a policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference. Similarly, the simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal police or custom caused the plaintiff's injury. A single incident alleged in a complaint, especially if it only involved actors below the policy-making level, generally will not suffice to raise an inference of the existence of a custom or policy." *Id.* (internal citations omitted).

Campbell alleges that the City's "policies, practices, and customs are evidenced, *inter-alia*, by the fact that the general orders, training, bulletin and training curriculum and instructions are inadequate to train police officers to refrain from abusing, threatening and assaulting law-abiding citizens and these **[*20]** defendants did not consider the performance of the New York City Police Department and Police Officers to evaluate the adequacy of

the training and supervision; that these defendants do not have and have not properly trained or supervised the vast majority of those officers who have committed the acts of violence and brutality against the citizens of the City of New York, particularly those citizens who are non-white; and there [sic] police academy training as well as their on-the-job training and supervision encourages the unconstitutional use of excessive and deadly force and unlawful actions against black citizens." (Compl. P 42.) I find that these bare and conclusory allegations are insufficient to state a *Monell* claim, notwithstanding the liberal notice pleading standard set forth in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993).* Campbell has not identified any specific facts in support of his assertion of an official policy or custom. Indeed, the reference to excessive and deadly force suggested that Campbell simply cribbed this paragraph from another complaint entirely **[*21]** -- and counsel admitted as much at oral argument. Accordingly, Campbell's *Monell* claim is dismissed.

*CONCLUSION*

For the foregoing reasons, the defendants' motion to dismiss is granted in part and denied in part.

So ordered.

JOHN GLEESON, U.S.D.J.

DATED: February 16, 2000

Brooklyn, New York

LEXSEE 2006 U.S. DIST. LEXIS 25308

**WILLIAM J. CARMODY, Plaintiff, - against - THE CITY OF NEW YORK; POLICE DEPARTMENT CITY OF NEW YORK; THE CIVILIAN COMPLAINT REVIEW BOARD; RAYMOND W. KELLY, Police Commissioner; JOSEPH ESPOSITO, Chief, Chief of Department; MURPHY, Lieutenant, Chief of Department; DARRYL WEIR, Sergeant, Chief of Department; RAFAEL PINEIRO, Chief, Personnel Bureau; ARNOLD S. WECHSLER, Director Employee Management Division; KEVIN KENNEY, Sergeant, Employee Management Division; CHARLES V. CAMPISI, Chief Internal Affairs Bureau; PIGNATARO, Captain, Internal Affairs Bureau Group 22; MATTHEW GRACEN, Lieutenant, Internal Affairs Bureau Group 22; MARLENE BEAMAN, Lieutenant, Internal Affairs Bureau Group 22; RIVERA, Sergeant, Internal Affairs Bureau Group 22; FLORENCE L. FINKLE, Executive Director, Civilian Complaint Review Board; VANESSA J. ROSEN, Investigator, Civilian Complaint Review Board; each defendant being sued in their individual and official capacity, Respondents.**

**05 Civ. 8084 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 25308*

**May 11, 2006, Decided**
**May 11, 2006, Filed**

**SUBSEQUENT HISTORY:**   As Amended.
Summary judgment granted by *Carmody v. City of New York, 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y., Nov. 13, 2006)*

**COUNSEL:** [*1]  For William J. Carmody, Plaintiff: Eric Sanders, Law Office of Jeffrey L. Goldberg, P.C., Lake Success, NY.

[*2]  For The City of New York, Police Department City of New York, The Civilian Complaint Review Board, Police Com-missioner Raymond W. Kelly, individual, Police Commissioner Raymond W. Kelly, in his official capacity, Chief Jo-seph Esposito, Chief of Department, individual, Chief Joseph Esposito, Chief of Department, in his official capacity, Lieutenant Murphy, Chief of Department, individual, Lieutenant Murphy, Chief of Department, in his official capacity, Sergeant Darryl Weir, Chief of Department, individual, Sergeant Darryl Weir, Chief of Department, in his official ca-pacity, Chief Rafael Pineiro, Personnel Bureau, individual, Chief Rafael Pineiro, Personnel Bureau, in his offi-cial ca-pacity, Sergeant Kevin Kenney, Employee Man-agement, individual, Sergeant Kevin Kenney, Employee Management, in his official capacity, Chief Charles V.

Campisi, Internal Affairs Bureau, individual, Chief Charles V. Campisi, Inter-nal Affairs Bureau, in his offi-cial capacity, Captain Pignataro, Internal Affairs Bureau Group 22, individual, Captain Pignataro, Internal Affairs Bureau Group 22, in his [*2] official capacity, Lieuten-ant Gracen, Internal Affairs Bureau Group 22, individ-ual, Lieutenant Gracen, Internal Affairs Bureau group 22, in his/her official capacity, Lieutenant Marlene Bea-man, Internal Affairs Bureau Group 22, individual, Lieu-tenant Marlene Beaman, Internal Affairs Bureau Group 22, in her official capacity, Sergeant Rivera, Internal Affairs Bureau Group 22, individual, Sergeant Rivera, In-ternal Affairs Bureau Group 22, in his/her official capacity, Executive Director Florence L. Finkle, Civilian Complaint Review Board, individual, Executive Director Florence L. Finkle, Civilian Complaint Review Board, in her official ca-pacity, Investigator Vanessa J. Rosen, Civilian Complaint Review Board, individual, Investiga-tor Vanessa J. Rosen, Civilian Complaint Review Board, in her official capacity, Arnold S. Weschler, Defendants: Lawrence John Profeta, New York City Office of Corpo-ration Counsel, New York, NY.

**JUDGES:** HAROLD BAER, JR., District Judge, U.S.D.J.

OPINION BY: HAROLD BAER, JR.

OPINION

### AMENDED OPINION & ORDER

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiff, William Carmody, filed a complaint against the above-named seventeen defendants alleging that they engaged in several incidents of harassment, retaliation, [*3] and conspiracy against him in violation of federal and state civil rights laws while he was a police officer with the New York City Police Department ("NYPD"). [1] Defendants moved to partially dismiss the Amended Complaint pursuant to *Federal Rules of Civil Procedure Rule 12(b)(6)* for failure to state a claim upon which relief can be granted as to seven of the individually-named defendants, Joseph Esposito, "Murphy", Rafael Pineiro, Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria." Additionally, Defendants NYPD (sometimes "Department") and the Civilian Complain Review Board ("CCRB") moved to dismiss the complaint on the basis that they are not suable entities under the New York City Charter. This motion was GRANTED as to these nine defendants.

> 1 Plaintiff brings his claim pursuant to the following federal and state laws: *42 U.S.C. § 2000e-3, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, New York State Executive Law § 296, New York City Administrative Code § 8-502,* and New York State common law.

This [*4] Amended Order addresses whether the conspiracy and state law tort claims should be dismissed as to the remaining eight defendants. For the reasons stated below, this motion to dismiss with regard to these eight defendants is GRANTED in part, and DENIED in part.

### I. BACKGROUND

In a Rule 12(b)(6) motion, the allegations in the Plaintiff's Amended Complaint are taken as true. See *Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995).* Plaintiff recounts the following. He was hired as a NYPD officer around July 2002. Plaintiff's harassment and retaliation by the above-named defendants began when he was transferred to the 43rd Precinct in January 2003. At the 43rd Precinct, Plaintiff, a white male, was assigned to Operation Impact and partnered with Police Officer Manuel Gomez, a Hispanic officer. During their partnership, Gomez filed a discrimination lawsuit against the NYPD. As a result of this lawsuit and Plaintiff's close association with Gomez, Plaintiff alleges

that certain police officers discriminated against and harassed him. Plaintiff alleges that the harassment and retaliation increased after he, along with four other officers, exposed misconduct in the 43rd Precinct and reported such misconduct to the Internal Affairs Bureau ("IAB"). Around February 5, 2004, plaintiff was notified by defendant, Florence Finkle, that certain allegations of misconduct had been found to be substantiated as against [*5] him by defendant Vanessa Rosen, CCRB Investigator.

In March 2004, Plaintiff filed an official complaint with the Department Advocate's Office, Patrolman's Benevolent Association ("PBA") as well as defendant, Finkle, with regard to defendant Rosen's actions during the misconduct investigation. Plaintiff claims that Rosen intentionally omitted crucial information that would have cleared him of all misconduct charges. On approximately December 14, 2004, Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"). [2] Plaintiff was terminated by the Department on February 22, 2005 for misconduct as well as residency fraud. As a result of the actions above, Plaintiff requests compensatory and punitive damages from the above-named defendants.

> 2 Plaintiff received a right-to-sue letter from the EEOC on June 22, 2005.

### II. STANDARD OF REVIEW

Pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* [*6] , the movant must establish that the plaintiff failed to "state a claim upon which relief can be granted." *FED. R. CIV. PRO. 12(b)(6).* In ruling on a Rule 12(b)(6) motion, this Court must construe all factual allegations in the complaint in favor of the non-moving party. See *Krimstock v. Kelly, 306 F.3d 40, 47-48 (2d Cir. 2002).* A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).*

### III. DISCUSSION

Plaintiff brings retaliation and hostile work environment claims against defendants pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 1981, New York State Executive Law § 296,* and *New York City Administrative Code § 8-502.* He brings a conspiracy claim pursuant to *42 U.S.C. §§ 1983, 1985(3)* as well as an intentional infliction of emotional distress and intentional [*7] interference with an employment contract claim pursuant to the New York State common law. For the most part, plaintiff's claims charge that the defendants

engaged in a conspiracy to violate his constitutional rights as well as harassed and retaliated against him while he served as a NYPD officer.

### A. NYPD and CCRB

To begin with, Defense counsel contends that the NYPD and the CCRB are not suable entities in their independent capacities, thus, all claims against these parties should be dismissed. I agree.

NYPD and CCRB are agencies of the City of New York. Pursuant to the explicit terms of the New York City Charter, all actions that allege violations of law against a Department of the City must be brought in the name of the City of New York, and not the Department. See *NEW YORK CITY CHARTER § 396* ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); See also *Montes v. King, 2002 U.S. Dist. LEXIS 4412, 2002 WL 424318, *5 (S.D.N.Y. Mar. 19, 2002)* (providing that the New York City Police Department is not a suable entity). **[*8]** Consequently, all claims against the NYPD and the CCRB are dismissed.

### B. Individually Named Defendants

Joseph Esposito, "Murphy", Rafael Pineiro, Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria" move to dismiss the claims filed against them based on the failure of the plaintiff to allege any personal involvement in the alleged misconduct. [3] Since this is my reading of the complaint as well, the motion to dismiss is granted. An analysis as to these claims follows.

> 3   Defendant does not challenge the sufficiency of the plaintiff's claims in this matter and, correspondingly, this Court does not rule on that basis.

### 1. Title VII Claims Against the Seven Movants

This section will discuss the retaliation and hostile work environment claims plaintiff alleges under Title VII of the Civil Rights Act of 1964. Plaintiff also alleges retaliation and hostile work environment pursuant to the Civil Rights Act of 1866, *42 U.S.C. § 1981*. The § 1981 claim is discussed **[*9]** in Part Two below.

### A. Retaliation

Plaintiff contends that defendants retaliated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. § 2000e-3*. [4] To establish a claim here, the plaintiff must allege the prongs necessary to prove a prima facie case. They include: 1) that plaintiff engaged in a protected activity known to the defen-

dant, 2) suffered an adverse employment action, and 3) there exists a causal connection between the protected activity and the adverse employment action. See *Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000)*. Here, the Amended Complaint clearly alleges the second element, namely, that he suffered an adverse employment action. See *Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)* (providing that an adverse employment action may include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."). Plaintiff was discharged in February 2005.

> 4   This section makes it illegal for an employer to discriminate against an employee based on participation in any Title VII enforcement or investigation action.

**[*10]** However, Plaintiff failed to sufficiently plead the first and third elements required to establish a retaliation claim. Plaintiff states that he filed an official complaint with the PBA in March 2004 as well as an EEOC complaint in November 2004. Amended Complaint P37, P47. Both complaints qualify as protected activities under Title VII. See, e.g., *Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001)*. However, Plaintiff failed to allege that any of the seven defendants knew of either the EEOC complaint or the internal complaint filed with PBA, as required to meet the first element.

Further, the Plaintiff fails to satisfy the third element. Although Plaintiff was fired a couple of months after he filed the EEOC complaint, as mentioned previously, it is not alleged that any of the defendants knew about either complaint. Without this knowledge, the requisite causal connection between the adverse employment action and the protected activity is not made out and the claim must fail.

The motion to dismiss the Title VII retaliation claim is granted as to all seven individual defendants.

### B. Hostile Environment Claim

To state a claim under Title VII for hostile **[*11]** work environment, the Plaintiff must allege that their work environment was "abusive." *Harris v. Forklift, 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*. A work environment is abusive when harassment has reached a level that is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment." *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)* (internal quotation marks omitted). This Court looks at the totality of the circumstances to determine harassment. This includes "the quantity, frequency, and severity of the incidents." *Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 437 (2d Cir. 1999)* (internal

2006 U.S. Dist. LEXIS 25308, *

quotation marks and citations omitted). To succeed, the Plaintiff must show that "either a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)* (internal quotation marks omitted).

The Plaintiff does not allege any instances of abusive behavior or harassment [*12] against the seven individually named defendants. Put another way, there is nothing in the Complaint to suggest that any of the defendants contributed to the hostile work environment Plaintiff contends he endured while employed with the NYPD.

The motion to dismiss this claim too is granted as to all defendants.

*2. § 1981 and § 1983*

*Section 1981* forbids discrimination with regard to the conditions of a contractual relationship while *§ 1983* allows individuals to sue others who violate their constitutional rights. To state a claim against an individual pursuant to *42 U.S.C. § 1981* and *§ 1983*, a plaintiff must set forth facts that establish the personal involvement of the individual in the alleged deprivation of civil rights. See, e.g., *Back v. Hastings on Hudson Union Free School District, 365 F.3d 107, 127 (2d Cir. 2004)* (dismissing *§ 1983* claim against defendant where there was no allegation or material fact that demonstrated that he directly engaged in any discriminatory conduct); *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000)* (dismissing *§ 1981* claim against [*13] individual for failure to demonstrate personal involvement by the defendant). Personal involvement can be demonstrated in any of the following ways: 1) defendant directly participated in the alleged wrongdoing, 2) defendant failed to remedy the wrong after being informed via a report or appeal, 3) defendant created a policy or custom under which unconstitutional acts occurred, or allowed the continuance of such policy, 4) defendant was grossly negligent in supervising subordinates who committed the illegal acts, or 5) defendant exhibited deliberate indifference by failing to act on information indicating unconstitutional acts were occurring. *Back, 365 F.3d at 127.* Merely holding a position of authority or supervision is not enough. See, e.g., *Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).*

With the exception of broad, conclusory allegations stated in the plaintiff's enumerated claims, no factual allegations of wrongdoing are asserted against six of the defendants -- Joseph Esposito, "Murphy", Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria." See Amended Complaint PP79 et seq. Further, nowhere in the Amended Complaint does [*14] the Plaintiff al-

lege that any of these six defendants participated, either directly or in their supervisory capacity, in the alleged illegal acts. [5] Without this, the motion to dismiss the *§ 1981* and *§ 1983* claims must, and hereby are, granted as to these individuals.

     5  Plaintiff's reply brief argues that these defendants were personally involved in the alleged illegal acts, primarily in their supervisory capacities. However, the citations to the Amended Complaint do not discuss any wrongful acts by the defendants, nor even mention any of the defendants by name.

With regard to defendant Rafael Pineiro, identified in the Amended Complaint as Chief of the Personnel Bureau, Plaintiff alleges that he submitted a memorandum to Pineiro outlining the retaliatory actions by officials at NYPD. Amended Complaint P48. Although not plead, Pineiro presumably did nothing upon receipt of the memorandum from plaintiff. This fact, if true, may have been helpful, but even if alleged, and it was not, courts have concluded [*15] that merely sending a letter to a supervisory official does not rise to the level of personal liability. See, e.g., *Garrido v. Coughlin, 716 F. Supp. 98, 100 (S.D.N.Y. 1989)* (finding that defendant's failure to respond to plaintiff's letter of protest or to request an investigation of the plaintiff's allegations was insufficient to establish liability). While clearly this inaction does not posit personal liability for Chief Pineiro, it should not be confused with being a badge of honor either. A system whereby letters, especially letters from members of the force, are answered and answered promptly is obviously to be preferred.

Further, there is no allegation that Pineiro was either grossly negligent or exhibited deliberate indifference in his purported decision not to follow-up on plaintiff's memorandum. See *Gant ex rel. v. Wallingford Bd. of Educ., 195 F.3d 134, 141 (2d Cir. 1999)* ("Deliberate indifference can be found when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'"). Plaintiff does not allege whether or not there was a duty for Pineiro to investigate. In fact, it appears [*16] there was a formal grievance procedure via the PBA by which to adjudicate Plaintiff's grievance and it was never utilized. Without more, I find that Plaintiff's *§§ 1981* and *1983* claims against Pineiro must fail.

*3. Conspiracy Claims*

Plaintiff also contends that the defendants conspired to violate his constitutional rights pursuant to *§§ 1983* and *1985(3).* In order to survive a motion to dismiss on a *§ 1983* conspiracy claim, the plaintiff must allege 1) an agreement between two or more state actors, 2) con-

certed acts to inflict an unconstitutional injury, and 3) an overt act in furtherance of the goal. See, e. g., *Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002)*. A complaint that includes vague allegations and fails to include specific instances of misconduct will not withstand a motion to dismiss. See, e.g., Id. Specifically, plaintiff must provide a factual basis that supports an allegation that the defendants "entered into an agreement, express or tacit, to achieve the unlawful end." *Romer v. Morgenthau, 119 F. Supp. 2d 346, 363* (internal quotations and citations omitted). The same standard applies under both [*17] sections. See *Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003)* (stating that a conspiracy claim under § 1983 "should actually be stated as a claim under *Section 1985*, which applies specifically to conspiracies.") [6]

> 6   To state a claim under *42 U.S.C. § 1985(3)*, a plaintiff must plead: 1) a conspiracy, 2) for the purpose of depriving, either directly or indirectly, any person of equal protection of the law, 3) an act in furtherance of the conspiracy, 4) injury. See*Straker v. Metro. Transit Auth., 333 F. Supp. 2d 91, 98 (E.D.N.Y. 2004)*.

The plaintiff fails to allege the prerequisites needed to sustain a conspiracy claim against any of the individual defendants. As mentioned above, plaintiff fails to allege any agreement in the Amended Complaint between six of the seven defendants (Joseph Esposito, "Murphy", Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria"). With regard to Pineiro, paragraph 48 of the Complaint fails to allege facts that would suggest that Pineiro conspired with anyone to violate the plaintiff's constitutional rights. The extent of the allegation against Pineiro is that he received from Plaintiff a memorandum that outlined the harassment [*18] and retaliatory activity of the other named defendants toward the Plaintiff. There is no allegation to even suggest an agreement by Pineiro with one or more of the individual defendants, or for that matter anyone else, to violate § 1983 or § 1985(3). Thus, the motion to dismiss is granted with respect to the conspiracy claims brought against all seven defendants.

### 4. State Law Claims

Since I have granted the motion to dismiss as to the federal claims over which I had original jurisdiction, I decline to exercise pendent jurisdiction over the state law claims with regard to seven of the individually named defendants (Joseph Esposito, "Murphy", Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria") as well as the NYPD and CCRB. See *28 U.S.C. § 1367(c)(3)*. As such, the state law claims against all of these entities are dismissed.

### C. Remaining Defendants

The remaining eight defendants, City of New York, Darryl Weir, Arnold S. Wechsler, Kevin Kenney, Marlene Beaman, Raymond W. Kelly, Florence L. Finkle, and Vanessa J. Rosen move to dismiss the conspiracy claims brought pursuant to §§ 1983 and 1985(3) as well as the state law tort claims against them. The motion is granted in part, and denied in part.

### 1. Conspiracy Claims

As stated above, the plaintiff must allege 1) an agreement between two or more state actors, 2) concerted acts to inflict an unconstitutional injury, and 3) an overt act in furtherance of the goal to survive a motion to dismiss a § 1983 conspiracy claim. See, e.g., *Ciambriello, 292 F.3d at 324-25*. [7] Even assuming plaintiff sufficiently alleged agreement between these defendants, it is doubtful whether the Plaintiff satisfied the second element and demonstrated that the defendants acted with the purpose to inflict an unconstitutional injury. The U.S. Supreme Court has stated that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" to give rise to § 1985(3) liability. *Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971)*. Plaintiff is a white male. He does not allege that the discrimination he allegedly suffered was motivated by his membership in a protected class. Instead, he appears to base his alleged injury on his police partner's membership in a protected class. His partner is Hispanic.

> 7   As mentioned previously, the same standard applies for a conspiracy claim brought pursuant to § 1985(3).

Even if the Amended Complaint is read to suggest that this is enough, it appears that the conspiracy claims against the remaining defendants is also barred due to the intra-enterprise conspiracy doctrine, also known as the intra-corporate conspiracy doctrine. The doctrine states that individuals of a single entity that act within the scope of their employment cannot conspire with each other. The doctrine originated in the corporate context, but has been applied most recently to public entities. See, e.g. *Straker v. Metro. Transit Auth., 2005 U.S. Dist. LEXIS 30956, at 8-10 (E.D.N.Y. Dec. 5, 2005)* (applying intra-corporate conspiracy doctrine to alleged conspiracy perpetrated by New York City Transit Authority); *Salgado v. City of New York, 2001 U.S. Dist. LEXIS 3196, 2001 WL 290051, at 9 (S.D.N.Y. Mar. 26, 2001)* (finding that § 1985(3) claim is barred under the intra-enterprise conspiracy doctrine because all defendants are agents of the City of New York). Since all defendants are employees or agents of the City of New York, I find that

2006 U.S. Dist. LEXIS 25308, *

the intra-enterprise conspiracy doctrine also bars this claim. [8]

> 8  Plaintiff has not alleged, nor argued, that any of the defendants had an independent, personal motive for their behavior towards the plaintiff, thus, I do not decide whether the "personal interest" exception to this doctrine applies.

For the above reasons, the motion to dismiss is granted with respect to the conspiracy claims brought against these defendants as well.

### 2. State Law Tort Claims

These eight defendants argue that the state common law claims of intentional infliction of emotional distress and intentional interference with an employment contract are barred against them because the plaintiff failed to file a notice of claim as required by New York General Municipal Law. I disagree.

It is undisputed that the plaintiff failed to file a notice of claim in this case. [9] But, I do not think that is required under New York State law when an action is brought against employees of public corporations. New York General Municipal Law provides that:

> Service of the notice of claim upon an officer, appointee or employee of a public corporation *shall not be* a condition precedent to the commencement of an action or special proceeding against such person.

*N.Y. GEN. MUN. § 50e-(1)(b)* (emphasis added). Defense counsel does not argue that this provision is inapplicable to the remaining defendants. As such, the motion to dismiss both the intentional infliction of emotional distress and intentional interference with an employment contract claims are denied with regard to the remaining defendants.

> 9  Plaintiff does not allege that he did so either in his Amended Complaint or in the motion papers submitted to this Court.

## IV. CONCLUSION

For the reasons above, this motion to dismiss all claims was granted with prejudice as to individual defendants Joseph Esposito, "Murphy", Rafael Pineiro, Charles V. Campisi, "Pignataro", Matthew Gracen, and "Riveria" on the grounds of lack of personal involvement. The motion to dismiss was granted without prejudice as to the NYPD and the CCRB. This Opinion is amended to dismiss the conspiracy claim, with prejudice, as to the remaining eight defendants, but the motion to dismiss the state law tort claims, as to these defendants, is denied.

## IT IS SO ORDERED.

New York, New York

May 11, 2006

[*19] Harold Baer, Jr.

U.S.D.J.

LEXSEE 2004 U.S. DIST. LEXIS 25633

**HAROLD CARTER, Plaintiff, -v- PORT AUTHORITY OF NEW YORK AND NEW JERSEY; PORT AUTHORITY POLICE DEPARTMENT; ANDREW IA-DEVAIO, Port Authority Police Officer, Shield No. 322; FRANK VOGRIC, Port Authority Police Officer, Shield No. 2199; CITY OF NEW YORK; PAUL MCCORMACK, NYCPO; and UNIDENTIFIED PORT AUTHORITY AND NEW YORK CITY POLICE OFFICERS, Defendants.**

**03 Civ. 8751 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 25633*

**December 17, 2004, Decided
December 20, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motions for summary judgment granted as to all state law claims, except for claims of malicious prosecution against Iadevaio and Vogric. All claims against City and Port Authority dismissed. *Section 1983* claim against McCormack for malicious prosecution dismissed.

**COUNSEL:** For Plaintiff: Thomas G. Sheehan, Cheda & Sheehan, Jackson Heights, New York.

For Defendants City of New York and Paul McCormack: Michael A. Cardozo, Corporation Counsel of the City of New York, M. Vivian Najib, Assistant Corporation Counsel, New York, New York.

For Defendants Port Authority of New York and New Jersey, Andrew Iadevaio, and Frank Vogric: Milton H. Pachter, Kathleen Gill Miller, The Port Authority of New York and New Jersey, New York, New York.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*OPINION & ORDER*

DENISE COTE, District Judge:

Plaintiff Harold Carter ("Carter") has brought suit pursuant to *42 U.S.C. § 1983* ("*Section 1983*") seeking compensatory and punitive damages against the City of New York ("City"), the Port Authority of New York and New Jersey, the Port Authority Police Department (collectively "Port Authority"), [*2] New York City Police Officer Paul McCormack ("McCormack"), and Port Authority Police Officers Andrew Iadevaio ("Iadevaio") and Frank Vogric ("Vogric"), in connection with his arrest while on duty as a supervisor for a security firm monitoring the arrivals area for Terminal One at John F. Kennedy International Airport.

Following discovery, the defendants have moved for summary judgment. Those motions, which are unopposed, are granted in part.

**BACKGROUND**

The following facts are undisputed or stated in the light most favorable to the plaintiff unless otherwise noted. On August 11, 2002, Carter was on duty at his job as a supervisor for a security firm monitoring the arrivals area for Terminal One at John F. Kennedy International Airport. That evening, McCormack drove up and parked an unmarked vehicle by the curb in front of the arrivals area at Terminal One, placing a New York City Police Department plaque in the windshield. McCormack asserts that he was there on official police business to pick up visiting Irish dignitaries because he speaks Gaelic. McCormack does not recall, however, whether he had a police radio with him, whether he had any weapons or any other police gear [*3] aside from his badge, and he does not recall who the Irish dignitaries were. According to Iadevaio's deposition, McCormack was in plainclothes. There is no evidence in the record to corroborate the existence of such a visit by foreign dignitaries. Carter

states in his deposition that whenever there are visiting diplomats or dignitaries, the security staff of Terminal One are notified in advance, and that there had been no such notification for that evening.

There is no dispute that Carter approached McCormack's vehicle and informed him that he could not park in the restricted area by the curb. Carter asserts in his deposition that McCormack explained that he was a police officer, that he wanted to pick up his girlfriend, who was buying food at the McDonald's restaurant in Terminal One, and that he wished for Carter to extend him a professional "courtesy" to allow him to park in the restricted area briefly. Carter states that he refused to permit McCormack to park in that location pursuant to his understanding of Terminal One police policies, because McCormack was not on official police business. There is no dispute that after a brief conversation between Carter and McCormack, McCormack drove **[*4]** away and parked at a different location outside Terminal One.

According to the defendants' summary judgment papers, Iadevaio and Vogric, in uniform and in a marked Port Authority police car, drove up beside McCormack's vehicle and made contact with McCormack, causing him to identify himself as a police officer. McCormack states in his deposition that when asked why he had not parked in the restricted passenger pickup area, "I told them that a black security guy basically kicked me out of there. They basically said, follow us in and, you know, we'll get to the bottom of this." Iadevaio acknowledges in his deposition that a crime had not been committed at the point when the officers decided to return to Terminal One to confront McCormack. McCormack admits that when following the Port Authority officers back to the Terminal One arrivals area. He states that he parked his car behind the Port Authority squad car, one of the officers got out of the Port Authority car, and "came back to my car to ask me if I see the black security guard and I did see him on the sidewalk down by the indented area. I said, that's him over there. I pointed him out to him."

There is no dispute that Iadevaio then approached **[*5]** and confronted Carter, that a scuffle ensued, that Carter was forced face-down onto the sidewalk, that he sustained injuries to his face and arm, and that he was arrested for disorderly conduct and resisting arrest. There appears to be no dispute that McCormack stayed to observe the scene as Carter was taken down and arrested, although the role Vogric played in using force against Carter is unclear based on the papers submitted to this Court. According to the deposition of McCormack, however, both of the Port Authority officers were at one point on the ground handcuffing Carter.

How the scuffle between Iadevaio and Carter began is a source of dispute. Iadevaio claims that he calmly approached Carter to ask him why he had not extended a courtesy to McCormack, and that Carter began screaming and pointing at Iadevaio the moment Iadevaio began approaching him. He claims that Carter continued to scream, which "caused a crowd to gather, public alarm," which led Iadevaio to the conclusion that he would arrest Carter for disorderly conduct. He also claims that he asked Carter for identification, which Carter refused to give, and that Carter then struck Iadevaio's hand and grabbed onto it, **[*6]** leading Iadevaio to force Carter to the ground. Vogric states that he took the names of two witnesses, but did not gather any witness statements other than the statement of McCormack.

Carter claims that Iadevaio approached in an aggressive and intimidating manner and began to question Carter about why he refused to allow McCormack to park in the restricted area. Carter stated in his deposition that he explained his understanding of Terminal One parking policies, and that McCormack should not have been permitted to park there. He states that Iadevaio responded by stating, "Well, ha, ha, ha, what did you think would happen if you tried to call me to remove the vehicle?" Carter states that he responded: "I don't know what you would do, I just know what my responsibilities are." Carter believes Iadevaio responded: "Well, I don't think you know your job." Carter states that he replied: "I think I know what my procedures and my job is, but I think you're unaware of exactly what your position is." At this point, Carter states that the conversation became heated, and that Iadevaio grabbed Carter's tie, initiating contact with Carter, and that Carter attempted to push Iadevaio's hand away. **[*7]** At this point, Carter claims that Iadevaio threw him to the ground and arrested him. Carter states that he was wearing his identification badge on a chain around his neck, face-out, so that it would have been unnecessary for Iadevaio to ask for his identification. He states that this chain was broken when Iadevaio grabbed his tie and Carter attempted to push his hand away.

There is no dispute that Carter was detained for a number of hours by the Port Authority at Kennedy Airport, and was released at approximately 5:00 a.m. Iadevaio signed the criminal court complaint against Carter, and Vogric signed the corroborating affidavit to the criminal court complaint. McCormack signed a witness statement regarding his observations of the incident. There is no dispute that Carter was forced to make a number of court appearances with regard to the criminal charges that were brought against him. Ultimately, however, on May 2, 2003, all criminal charges against Carter were dismissed. On June 6, 2003, Carter filed a Notice of Claim with the Comptroller's Office of the City, alleging unlawful arrest, seizure, search, and imprisonment, violations of his New York and Federal constitutional rights,

[*8] assault, libel, slander, negligence, reckless conduct, malicious prosecution, and discrimination. On November 5, 2003, Carter filed the civil complaint that initiated this lawsuit.

The Complaint contains six causes of action. First, the Complaint alleges *Section 1983* violations against McCormack, Iadevaio, and Vogric, including false arrest, unlawful imprisonment, malicious prosecution, and assault as deprivations of Carter's *Fourth* and *Fourteenth Amendment* rights under the United States Constitution. Second, the Complaint alleges New York state law intentional tort claims against McCormack, Iadevaio, and Vogric, including false arrest and imprisonment, libel and slander, malicious prosecution, intentional infliction of emotional distress, and invasion of privacy. Third, the Complaint alleges negligent and reckless hiring claims against the City and Port Authority. Fourth, the Complaint alleges negligent and reckless training claims against the City and Port Authority. Fifth, the Complaint alleges state law negligence claims against McCormack, Iadevaio, and Vogric, including negligent and reckless performance of police duties. Sixth, the Complaint alleges claims against the City and [*9] Port Authority based on a policy and pattern of deliberate indifference to violations of constitutional rights by police officers.

Defendants filed motions for summary judgment on October 1, 2004. Plaintiff's opposition to the motion was due on October 22, 2004, but was never filed. As a consequence, the assertions of fact in the defendants' Local Rule 56.1 Statements are taken as true and uncontroverted to the extent they are supported by admissible evidence.

## DISCUSSION

### Legal Standard for Summary Judgment

Summary judgment may not be granted unless all of the submissions to the Court taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rule 56(c), Fed. R. Civ. P.* The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. When the moving party has asserted facts showing that the [*10] non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. *Rule 56(e), Fed. R. Civ. P.*; accord *Burt Rigid Box, Inc. v.*

*Travelers Property Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002).*

### State Law Tort Claims

The defendants move to dismiss the state law claims on the ground that they are barred by the statute of limitations. New York State law applies a one-year statute of limitations to intentional torts:

> The following actions shall be commenced within one year:
>
> . . .
>
> 3. an action to recover damages for assault, battery, false imprisonment, malicious prosecution, libel, slander, false words causing special damages, or a violation of the right of privacy under section fifty-one of the civil rights law . . . .

*CPLR § 215.* This statute also applies to claims for intentional infliction of emotional distress in the context of an alleged false arrest. *See Parker v. Port Auth. of New York and New Jersey, 113 A.D.2d 763, 493 N.Y.S.2d 355, 358 (2d Dept. 1985).* The statute has also been held [*11] to apply to claims of abuse of process and malicious prosecution, although courts have suggested that the time limit could run from the termination of the malicious prosecution, not its initiation. *See Beninati v. Nicotra, 239 A.D.2d 242, 657 N.Y.S.2d 414, 415 (1st Dept. 1997).*

New York statutes also contain a special one-year statute of limitations provision for the Port Authority. *Section 7101 of the Unconsolidated Laws* provides consent to lawsuits against the Port Authority, and *Section 7107* states:

> The foregoing consent is granted upon the condition that any suit, action or proceeding prosecuted or maintained under this act *shall be commenced within one year after the cause of action therefor shall have accrued, and . . . that . . . a notice of claim shall have been served upon the port authority by or on behalf of the plaintiff . . . at least sixty days before such suit,* action or proceeding is commenced.

*McKinney's Unconsolidated Laws of New York § 7107* (emphasis supplied).

*New York's General Municipal Laws* provide special notice of claim and statute of limitations requirements

for personal injury lawsuits against municipalities. *Section 50-i* states: **[*12]**

No action or special proceeding shall be prosecuted or maintained against a city . . . for personal injury . . . alleged to have been sustained by reason of the negligence or wrongful act of such city . . . or of any officer, agent or employee thereof, . . . unless, (a) a notice of claim shall have been made and served upon the city . . . *in compliance with section fifty-e of this chapter,* (b) it shall appear by and as an allegation in the complaint . . . that at least thirty days have elapsed since the service of such notice and that adjustment or payment thereof has been neglected or refused, and (c) *the action . . . shall be commenced within one year and ninety days after the [claim arises] . . . .*

McKinney's Consolidated Laws of *New York, General Municipal Law § 50-i(1)* (emphasis supplied). In addition, *Section 50-i* states that "this section shall be applicable notwithstanding any inconsistent provisions of law, general, special or local." McKinney's Consolidated Laws of *New York, General Municipal Law § 50-i(2)*. *Section 50-e* states:

In any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement **[*13]** of an action or special proceeding against a public corporation, . . . or any officer, appointee or employee thereof, *the notice of claim shall . . . be served . . . within ninety days after the claim arises . . . .*

McKinney's Consolidated Laws of *New York, General Municipal Law § 50-e(1)(a)* (emphasis supplied).

Carter's arrest took place on August 11, 2002. Criminal charges against Carter were dismissed on May 2, 2003. Carter filed a notice of claim with both the City and Port Authority on June 6, 2003. Carter filed this action on November 5, 2003.

To the extent that the Complaint alleges intentional tort claims based on New York state law against McCormack, Iadevaio, and Vogric in the second cause of action, and state law negligence claims against McCormack, Iadevaio, and Vogric in the fifth cause of action, as well as state law negligent hiring, training, and policy of deliberate indifference claims against the City and

Port Authority in causes of action three, four, and six, those claims that stem directly from the physical confrontation between the officers and Carter, or the immediate filing of the criminal charges against Carter, are barred by the ninety day notice **[*14]** of claim requirement in *General Municipal Law § 50-e(1)(a)*. This includes claims based on false arrest and imprisonment, intentional infliction of emotional distress, invasion of privacy, and libel and slander. The only exception is that Carter's claims based on malicious prosecution survive, because such a claim would survive until the termination of the prosecution on May 2, 2003.

*Claims Against the City and Port Authority*

A municipality may not be held liable under *42 U.S.C. § 1983* based on alleged unconstitutional actions by non-policymaking employees solely on the basis of a *respondeat superior* theory. *See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).* In order to establish municipal liability, "a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy." *DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998)* (citation omitted). Although this rule "does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation, a single incident alleged in a complaint, especially if it involved only actors below the policy-making **[*15]** level, does not suffice to show a municipal policy." *Id.* (citation omitted). The Port Authority, although technically a bi-state agency and not a municipality, is treated as a municipality when courts are analyzing claims "against it under the standards governing municipal liability under *Section 1983*." *Mack v. Port Auth. of New York and New Jersey, 225 F. Supp. 2d 376, 382 n.7 (S.D.N.Y. 2002)* (collecting cases).

Under New York State law, an employer will be liable to an injured party for negligent hiring based on the tort of an employee when the employer has either "hired or retained the employee with knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm." *Borden v. Capital Dist. Transp. Auth., 307 A.D.2d 1059, 763 N.Y.S.2d 860, 862 (3d Dept. 2003)* (citation omitted). In a negligent training claim, the plaintiff must demonstrate deficiencies in the training of employees that, if corrected, could have avoided the alleged harm. *See, e.g., Barr v. Albany County, 50 N.Y.2d 247, 406 N.E.2d 481, 428 N.Y.S.2d 665, 671 (1980)*.

In the third, fourth, and sixth causes of action in the Complaint, it alleges negligent and reckless hiring **[*16]** claims, negligent and reckless training claims, and claims based on a policy and pattern of deliberate indifference to violations of constitutional rights by police officers, against the City and Port Authority. To the extent that

these claims are brought pursuant to *Section 1983*, the plaintiff has demonstrated no evidence of any policy or custom leading to the alleged assault by the officers in question. To the extent that these claims are brought pursuant to New York State law, the plaintiff has offered no evidence pertaining to the hiring or training policies of the New York City Police Department or the Port Authority Police Department. Therefore, the plaintiff cannot prevail as a matter of law on these causes of action.

### Section 1983 Claims Against the Individual Officers

To prevail on a claim under *Section 1983, Title 42, United States Code*, a plaintiff must demonstrate "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004)*. A private party may incur liability for his [*17] conduct when he is "a willful participant in joint activity with the State or its agents." *Brentwood Academy v. Tenn. Secondary School Athletic Ass'n, 531 U.S. 288, 296, 148 L. Ed. 2d 807, 121 S. Ct. 924 (2001)* (citation omitted). To establish a *Section 1983* claim based on false arrest, "a plaintiff must show that the defendant intentionally confined him without his consent and without justification." *Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004)* (citation omitted). A claim for false arrest is a type of claim for false imprisonment. *Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996)*. [1] A claim for false arrest or false imprisonment fails when the arresting officer had probable cause to make the arrest. *Escalera, 361 F.3d at 743* (false arrest); *see also Boyd v. City of New York, 336 F.3d 72, 76 & n.6 (2d Cir. 2003)* (false arrest and false imprisonment).

> 1   The elements of a claim for false imprisonment under New York law are "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Curry v. City of Syracuse, 316 F.3d 324, 335 (2d Cir. 2003)* (citation omitted).

[*18] "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera, 361 F.3d at 743* (citation omitted). The existence of probable cause is measured as of the moment of arrest, and is therefore not affected by a later acquittal. *Ricciuti v. New York City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997)*.

Police officers' use of force may be found excessive, in violation of the *Fourth Amendment*, "if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004)* (citation omitted). This determination requires analysis of circumstances specific to the arrest, including "the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. [*19] " *Amnesty America v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2003)* (citation omitted).

In the first cause of action, the Complaint alleges *Section 1983* violations against McCormack, Iadevaio, and Vogric, including false arrest, unlawful imprisonment, malicious prosecution, and excessive use of force, as deprivations of Carter's *Fourth* and *Fourteenth Amendment* rights under the United States Constitution. The malicious prosecution claims are dealt with in a separate section below. Defendants contend that Carter's claims for false arrest and malicious prosecution are defeated by the existence of probable cause for Carter's arrest. Defendants are wrong. There is a material issue of fact as to whether defendants had probable cause to arrest Carter.

When defendants Iadevaio and Vogric initially made contact with Carter, they did not believe Carter had, or was, committing a crime. Given this admission, the issue becomes whether Carter or Iadevaio and Vogric are responsible for the physical confrontation that followed, and whether the officers had probable cause for Carter's arrest. Given that there is conflicting evidence, summary judgment on these issues must [*20] be denied.

McCormack argues that he was not personally involved in Carter's arrest, prosecution, or alleged assault, and that therefore, he cannot, as a matter of law, be held liable for a *Section 1983* violation. A jury could conclude that McCormack was aware that Iadevaio and Vogric intended to harass, provoke, and then arrest Carter on some pretext, and led Iadevaio and Carter back to Terminal One for that specific purpose. If so, McCormack would be personally involved in a *Section 1983* violation.

For similar reasons, McCormack's argument that he was not acting "under color of state law" for the purposes of a *Section 1983* violation, because he did not make physical contact with Carter when Iadevaio and Vogric returned to confront Carter, must also be rejected. A jury could infer that McCormack acted in concert with Iadevaio and Vogric to ensure that Carter was improperly arrested. This would satisfy the "under color of state law" requirement of *Section 1983*.

McCormack also argues that he is immune from liability under the doctrine of qualified immunity, because his actions did not violate any "clearly established" constitutional rights. "Qualified immunity shields public officials [*21] from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were clearly established at the time." *Poe v. Leonard, 282 F.3d 123, 132 (2d Cir. 2002)* (citation omitted). The first step in a qualified immunity analysis is to "determine whether the plaintiff[] has alleged a violation of a constitutional right." *African Trade & Info. Ctr., Inc. v. Abromaitis, 294 F.3d 355, 359 (2d Cir. 2002); see also Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002).* The second step is to "determine whether the right was clearly established at the time of the alleged violation." *African Trade, 294 F.3d at 359.* Thus "a qualified immunity defense is established when . . . the defendant's action did not violate clearly established law." *Poe, 282 F.3d at 133* (citation omitted). Because it was clearly established at the time of the alleged conduct that working in concert with other law enforcement officers to effect an unlawful arrest and detention violates the subject's constitutional rights, the defense of qualified immunity is not available for McCormack.

[*22] With regard to Carter's excessive force claim against Iadevaio and Vogric, this claim must also be submitted to a jury. The jury will be asked to determine whether Carter posed "an immediate threat to the safety of the officers or others" and whether he was actively resisting a lawful arrest, as well as the extent of the force used by the officers, in order to determine whether the force used by the officers was excessive or not.

*Malicious Prosecution Claims*

Malicious prosecution claims may be brought pursuant to New York common law, or as a *Section 1983* claim. The common law tort of malicious prosecution under New York State law requires proof of four elements: (1) the initiation or continuation of criminal process against the plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) the lack of probable cause for commencing the proceeding; and (4) actual malice as the motivation for the defendant's actions. *Rounseville v. Zahl, 13 F.3d 625, 628 (2d Cir. 1995).* For a police officer to be held responsible for malicious prosecution, his role must be to cause the initiation of criminal process against the plaintiff. *See, e.g., Sykes v. James, 13 F.3d 515, 520 (2d Cir. 1993).* [*23] For the termination of the proceeding to be in the plaintiff's favor, the plaintiff must merely show a termination of the proceeding that is "not inconsistent with innocence." *Rothstein v. Carriere, 373 F.3d 275, 286 (2d Cir. 2004).*

A malicious prosecution claim brought pursuant to *Section 1983* requires the plaintiff to allege and prove the same elements as the state law claim, and, as an additional element of his claim, "some post-arraignment deprivation of liberty that rises to the level of a Constitutional violation." *Singer v. Fulton County Sheriff, 63 F.3d 110, 117 (2d Cir. 1995).* Being compelled to attend criminal proceedings suffices as a post-arraignment deprivation of liberty. *Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003).*

Here, it is clear that the defendants Iadevaio and Vogric initiated and continued criminal process against Carter by swearing out the complaining and corroborating affidavits to initiate the case and being available as witnesses to continue the case. There is no dispute, however, that the witness statement that McCormack filled out in connection with Carter's arrest was not one of the required documents [*24] to initiate criminal process against Carter. Therefore, an action against McCormack for malicious prosecution cannot be sustained because a jury could not conclude that McCormack was responsible for the initiation or continuation of criminal process against the plaintiff.

It is a question for the jury as to whether Iadevaio and Vogric engaged in malicious prosecution. A jury could find that the defendants lacked probable cause for commencing the proceeding and acted with malice. Therefore, Carter's malicious prosecution claims against Iadevaio and Vogric survive the defendants' motions for summary judgment.

*Punitive Damages*

"Punitive damages may be awarded for violations of federal law where a defendant acts with reckless or callous disregard for the plaintiff's rights, and intentionally violates federal law." *Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 909 (2d Cir. 1993)* (citation omitted). The Port Authority defendants contend that there is insufficient evidence to support a finding that Iadevaio or Vogric intended to violate federal law, or operated with reckless or callous disregard for the plaintiff's rights. This claim goes to the heart of [*25] the dispute between Carter and the defendants: whether the defendants intended to harass, provoke, or physically attack Carter as a form of retribution for there is sufficient evidence to support a finding that the defendants possessed such an intent when they made contact with Carter, the question of punitive damages is one for the jury to resolve.

**CONCLUSION**

For the reasons stated above, the defendants' motions for summary judgment are granted as to all state law claims, except for the claims of malicious prosecution against Iadevaio and Vogric. All claims against the City and Port Authority are dismissed. The *Section 1983*

2004 U.S. Dist. LEXIS 25633, *

claim against McCormack for malicious prosecution is dismissed. The *Section 1983* claims based on false arrest and unlawful imprisonment against McCormack, Iadevaio, and Vogric, based on excessive use of force and malicious prosecution against Iadevaio and Vogric, and for punitive damages, will proceed to trial.

SO ORDERED:

Dated: New York, New York

December 17, 2004

DENISE COTE

United States District Judge

LEXSEE 2001 U.S. DIST. LEXIS 15380

**THOMAS C. CERRONE, Plaintiff, -against- Michael F. Cahill, Francis A. Defrancesco, Salvatore S. Valvo, Thomas M. Fresenius, Scott L. Brown, Richard G. Morse, Deborah L. Komar, Jonathan Z. Friedman and Gerald W. Connolly, Individually, Defendants.**

95-CV-241

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 15380*

**September 28, 2001, Decided**

**DISPOSITION:**     [*1] Defendants' motion for summary judgment in all respects GRANTED and all claims against Michael F. Cahill, Salvatore S. Valvo, and Richard G. Morse DISMISSED WITH PREJUDICE.

**COUNSEL:** For THOMAS C. CERRONE, plaintiff: Paul M. Collins, John R. Saccocio, Hinman, Straub Law Firm, Albany, NY.

For MICHAEL F. CAHILL, SALVATORE S. VALVO, RICHARD G. MORSE, defendants: Jonathan Lovett, Lovett, Gould Law Firm, White Plains, NY.

For JAMES W. MCMAHON, WAYNE BENNETT, DEBORAH CAMPBELL, RAYMOND G. DUTCHER, WILLIAM FOLEY, JAMES SCHEPPERLY, HARRY CORBITT, GREGORY HARLIN, movants: Richard P. Barrantes, Office Of Attorney General, State of New York, The Capitol, Albany, NY.

**JUDGES:** Hon. Thomas J. McAvoy, U.S. District Judge.

**OPINION BY:** Thomas J. McAvoy

**OPINION**

**DECISION & ORDER**

**McAvoy, D.J.**

**I. BACKGROUND**

**A. Procedural Background**

Plaintiff Thomas Cerrone ("Cerrone"), a New York State Trooper, commenced the instant action asserting claims pursuant to *42 U.S.C. § 1983* as well as state law claims for false arrest, false imprisonment, and inten-

tional infliction of emotional distress. Cerrone's claims arise out of Defendants' investigation of an alleged cover-up by Cerrone and other New York State Troopers of a hit-and-run accident that occurred on April 3, 1993. The case has wound its way through the courts with numerous decisions on substantive matters issued by this Court, see Cerrone v. Cahill, 95-CV-241, Order, Aug. 25, 1995, Dkt. # 21; Cerrone v. Cahill, 95-CV-241, Order, June 24, 1997, Dkt. # 62; Cerrone v. Cahill, 95-CV-241, Stipulation and Order, July 12, 1999 (Smith, M.J.), Dkt. # 94; *Cerrone v. Cahill, 84 F. Supp. 2d 330* [*2] (N.D.N.Y. Jan. 28, 2000), Dkt. # 111, vacated and remanded, 246 F.3d 194 (2d Cir. April 10, 2001); Cerrone v. Cahill, 95-CV-241, Decision and Order, June 7, 2001, Dkt. # 121, and one by the Second Circuit Court of Appeals. *Cerrone v. Cahill, 246 F.3d 194 (2d Cir. 2001).* Familiarity with these decisions is presumed.

At present, only Cerrone's claims against Defendants Michael F. Cahill, Salvatore S. Valvo, and Richard G. Morse remain active. [1] The three defendants remaining in this action (Cahill, Valvo, and Morse), who are all represented by the same counsel, now make a consolidated motion for summary judgment seeking to dismiss all claims against them, and, seeking sanctions against the Plaintiff pursuant to *Rule 11 of the Federal Rules of Civil Procedure.*

   1  On July 12, 1999, Magistrate Judge Ralph W. Smith, Jr. signed a Stipulation and Order which discontinued on the merits claims asserted in the Plaintiff's Amended Complaint against Defendants Defrancesco, Komar, Friedman and Connolly, as well as all claims arising out of the events of January 20, 1995. See Dkt. # 94. In the June 6, 2001 Decision and Order, the Court reviewed the Defendants Brown and Fresenius' mo-

tion for summary judgment on remand from the Second Circuit and dismissed all claims pending against these two defendants. See Dkt # 121.

### [*3] B. Factual Background

For purposes of the pending summary judgment motion, it is important to clarify the remaining defendants' roles in the January 19, 1995 arrest of Mr. Cerrone and to delineate the facts leading up to that arrest which are not in dispute.

After the Superintendent of the New York State Police received a letter in September, 1994 alleging, *inter alia*, that State Trooper Timothy Knapp participated in a cover-up of the afore-mentioned hit-and-run accident, the Superintendent assigned State Police Captain Thomas Fresenius, Lieutenant Scott Brown, Bureau of Criminal Investigations (BCI) Investigator Debra Komar, and BCI Senior Investigator Richard Morse to investigate the involvement of Trooper Knapp and any other officer from Peekskill Barracks Troop K in the potential cover-up. Plt.'s Mem. of Law, p. 2-3. These investigative officers were under the supervision of Inspector Michael Cahill. Id. Inspector Salvatore S. Valvo joined the investigative team at a later date but prior to Cerrone's arrest. See Complaint, PP 5, 24.

As indicated in previous decisions, there is a dispute as to some of the information defendants learned during their investigation [*4] and as to how this information would be viewed by a reasonable fact finder under the parties' varying versions. There is no dispute, however, regarding the following information or, to the extent there is disagreement, the facts are recited in the light most favorable to the non-movant.

The investigative team learned that on April 3, 1993, New York State Trooper Robert Gregory of the Peekskill barracks was the first officer to respond to the hit-and-run accident scene. Cerrone, a New York Police Sergeant and Commander of the Peekskill Barracks' Troop K, also responded to the scene. Information provided to Cerrone at the scene, and which impacts the probable cause determination made by the investigative team on January 19, 1995, is the primary focus of the following facts. Thus, unlike in previous decisions, the information is significant not necessarily from the perspective of what Plaintiff Cerrone did or did not do when he left the scene on April 3, 1993, but rather, from the perspective of what could be inferred from the omission of certain relevant information on police documents which Cerrone undoubtedly had first-hand knowledge about.

### 1. Affidavit of Maureen Frances Hunt

[*5] On October 25, 1994, the investigative team obtained an affidavit from Maureen Frances Hunt, the driver of one of the automobiles involved in the April 3,

1993 accident. Ms. Hunt was not the person believed to have caused the accident and did not flee the scene as did the ostensibly culpable driver. Ms. Hunt's affidavit indicates, *inter alia*, that after the other vehicle struck her, she exited her vehicle and was in a position to observe both the driver and the automobile which struck her. She was able to provide to the police a description of the driver of the other vehicle, [2] a general description of the automobile that struck her, [3] a partial license plate number of that automobile, [4] and the direction that the automobile was traveling when it left the scene. [5] Hunt, Aff., p.1 -2. Ms. Hunt also indicated in her affidavit that while she was at the scene, she saw another vehicle turn around and begin following the hit-and-run vehicle heading south on Route 9. Id. She later learned that the person who followed the hit-and-run driver was a friend named Sharon Ryder. Ms. Hunt recounted for the investigators that Ms. Ryder returned to the scene and reported that she [Ms. [*6] Ryder] had followed the hit-and-run driver south on Route 9 to the Texaco Station at the Annsville Circle. Id. Ms. Ryder reported that she saw the driver out of the car leaning over what she [Ms. Ryder] thought was a telephone. Importantly, Ms. Hunt attests that both she and Ms. Ryder informed the officers at the scene, including Plaintiff Cerrone, that "the guy was right down at the Texaco Station." Hunt, Aff. P. 2. As all parties appear to agree, the Texaco Station on the Annsville Circle was located approximately one mile south on Route 9 from the hit-and-run accident scene and virtually next door to the Troop K barracks. See Brown June 10, 1999 Aff., P 51.

2 "[A] white male with fair hair, light skin and it looked as though his cheeks were hollowed in."

3 "It was a two-tone yellow large car and older model, probably in the seventies."

4 There is some dispute regarding the license plate number. Ms. Hunt's October 25, 1994 affidavit provides as follows:

[EDITOR'S NOTE: TEXT WITHIN THESE SYMBOLS [O> <O] IS OVERSTRUCK IN THE SOURCE.]

Despite [the other driver's] actions [in trying to back into me after I exited my vehicle] I was able to get all six digits of his plate number <M.H.> [O>and I'm pretty sure they were all correct<O]. <M.H.> I know at least the first three digits were definitely TTZ.

Hunt Aff.

The Plaintiff argues that the language that was struck out and initialed by "Maureen Hunt" raises a "significant issue" as to whether or not Ms. Hunt actually was able to recount the six digits accurately.

[*7]

5  "After the other driver backed towards me, he headed south on Route 9. There was another car at the stop sign on highland and I was waiving and yelling about the car leaving the accident. The guy that hit me continued south on route 9. His car had no headlight on the right side but he still had taillights. The car that had been at the stop sign turned to follow him."

**2. Supporting Deposition of Sharon Ryder**

The investigative team also obtained a sworn "Supporting Deposition" dated October 26, 1994 from Sharon Ryder. This recounted essentially the same facts as attested to by Ms. Hunt but from the first-hand perspective. Ms. Ryder indicated that she recognized "Tom Cerrone" at the accident scene because she had "gone to school with" him and therefore knew him personally. Ryder Supp. Dep., p. 2. She also attested that she conveyed to the police the information regarding the hit-and-run automobile which she followed, asserting: "I remember being kind of excited and feeling that no one was very concerned, Tom Cerrone had come up from the south and when he left he went south again so [*8] I figured maybe he was going to check it out and look for the guy." Ryder Sup. Dep., p. 2. Ms. Ryder further attested:

At the scene of the accident, I know I told the first trooper that I had followed the guy and I believed that he was at the Annsville gas station. I don't know if he took my name and phone number. I was not asked to give a statement at any time and was never contacted at a later time. I remember when Tom Cerrone stopped at the scene that the first trooper, the young guy, told him that I followed the guy and that I thought he was right down at the Annsville gas station. The station is about a mile down the road from where the accident was. That's why when Tom Cerrone left the accident I assumed that he went to look for the guy.

Ryder. Sup. Dep., p. 3.

Further investigation yielded a Supporting Deposition dated November 10, 1994 from Dawn Hutchings

Brissett and a Supporting Deposition from Margaret A. Murphy dated January 9, 1995. Both provided further insight into the connection between the hit-and-run driver and a possible cover-up by officers within Troop K.

**3. Supporting Deposition of Dawn Hutchings Brissett**

Ms. Brissett had been involved [*9] in an eight year romantic relationship with Rory Knapp, the person believed to have been the hit-and-run driver on April 3, 1993. She indicated that "one Saturday night in March or April of 1993" she received a telephone call from Rory Knapp. Brissett Sup. Dep., p. 1. Mr. Knapp stated that he had been in an automobile accident and left the scene and went to the Texaco Station on Route 9 where he "called the accident in" but did not report that he was involved in the accident. He indicated further, at least according to Ms. Brissett, that he thought someone had followed him to the Texaco Station and therefore he parked the car behind the gas station.

According to Ms. Brissett, Mr. Knapp advised at a latter time he eventually moved the car and hid it beside his brother, Trooper Timothy Knapp's, house. Id. p. 2. Rory Knapp further indicated to Ms. Brissett that there was damage on the car's right side from "front to back" and that his brother "was nervous about the car being at the house after it was involved in a hit and run accident, and told Rory to get the car out of the driveway." Id. p. 2-3. Mr. Knapp indicated that he then made arrangements to have the automobile destroyed. [*10] Id.

Ms. Brissett provided other information from Mr. Knapp which indicated that Mr. Knapp had received inside information regarding the official investigation into the accident. In this regard, Ms. Brissett's affidavit indicates:

Right after the accident I wanted to turn the plates in because I didn't want to pay insurance on a car I didn't have anymore. Rory kept telling me to wait before I turned the plates in because he was afraid that with them having the plate number that someone might put everything together. Rory knew that someone had gotten his plate number the night of the accident but that they had mixed some of the numbers up so it wasn't exact.

Rory also knew that his hat and shirt, I think it was a Daytona shirt, had flown out of the car at the accident. He also knew that it was given to someone and it was destroyed. I don't know who had the stuff but Rory indicated that it was pur-

posely taken care of so that Rory wouldn't get in trouble.... He also knew that whoever was in the accident supplied a description of my car.

Id., 3 (emphasis added).

### 4. Supporting Deposition of Margaret A. Murphy

Ms. Murphy testified in her Supporting [*11] Deposition that she was a bartender at the Stoneledge Bar and had both a professional and personal relationship with Rory Knapp. Murphy Sup. Dep. p. 1. She indicated that Mr. Knapp was a mechanic at the Annsville Texaco Station, a regular customer at the Stoneledge Bar, and a friend of Zone Sergeant Bob Welsh of the New York State Police. Id. Zone Sergeant Welsh was Cerrone's direct supervisor. ^ Brown Aff., P 60. Ms. Murphy testified that sometime in 1993, shortly after Rory Knapp left the bar one evening, she received a telephone call from him at approximately 11:30 P.M. She described the contents of this telephone call as follows:

Rory sounded very shaken and told me to promise that I wouldn't tell anyone, that he had just gotten into an accident. He told me that the accident happened down the street from the Stoneledge, just over the crest on Route 9. He went on to tell me that he hit someone head on and when he realized what happened he looked out and saw people walking around outside the car so he knew they were okay. After that he took off from the accident and drove to the Texaco station at the Annsville Circle and called Bob Welsh. Rory told me that he told [*12] Welsh about the accident he just had and Welsh told him not to worry about it, that he would take care of it. He told me that he called Welsh at the station, which I took to mean the State Police Station at the Annsville Circle. ... Rory told me that he called Welsh from the Texaco Station and that he thought that someone had followed him there after the accident. He was concerned that the person got his plate number, and told me that he pulled his car behind the Texaco Station where it could not be seen.

Murphy Sup. Dep. p. 2-3 (emphasis added).

6  There is a factual dispute as to whether Zone Sergeant Welsh arrived at the scene with Cerrone. Ms. Hunt asserts that she believes there were three officers at the scene. Hunt. Aff., p. 2. Defendants assert that at the time of the accident, Welsh was at the Troop K Barracks and, based upon evidence linking Welsh to the cover-up, assume that he accompanied Cerrone to the scene after the call from Knapp came in. Thus, they conclude he was the third officer Ms. Hunt refers to. However, because the fact is disputed, the Court concludes for purposes of this motion that he was not at the scene.

[*13] Ms. Murphy also indicates that "I do remember Rory telling me that Timmy [his brother] kept telling him not to tell anyone about the accident, to keep his mouth shut." Id. p. 4. The following day, at the Stoneledge Bar, Ms. Murphy's employer presented her with two items which the employer said were brought to the bar from the accident scene. One item was a part of a car "which I saw was the same color as Rory's, Rory drove a car which was two tone gold and very unusual." Id. p. 5. The other item was a baseball cap which Ms. Murphy assumed belonged to Rory Knapp. Id. At Rory Knapp's request, Ms. Murphy disposed of both items. Id.

Ms. Murphy's supporting deposition then proceeds to state:

Within a week or so I realized that Rory's accident was really taken care of. At first I had though that he would just get off light. But I realized that it was totally covered up. Rory told me that someone did get his plate number but they were told that the plate was run and didn't come back right or wasn't the right car for some reasons. I was told that the people from the accident or their relatives would come to the station looking for results and were told that [*14] there were no leads to the other person involved, and they were always getting frustrated.

Id.; Defs.' Local Rule 7.1 Stat., P 5.

### 5. Supporting Deposition of Keith D. Hunt

The investigative team also obtained a Supporting Deposition from Keith D. Hunt, Maureen Hunt's husband. He attested that, *inter alia*, the morning following the accident he went to the accident scene and, on the far side of the guardrail, found a used baseball hat, a "Daytona" tee shirt, and pieces of both his wife's car and another car. K. Hunt. Sup. Dep., p. 2.

**6. Police Documents Regarding April 3, 1993 Accident**

Following the accident, a Police Accident Report, Form MV-104A, was prepared by Trooper Gregory. This document was provided to and initialed by Plaintiff Cerrone as Trooper Gregory's superior officer. While Cerrone concedes that he did review this form, he asserts that the "subject MV-104A form was properly completed." Cerrone Aff., P 36. He does not dispute, however, that the subject MV-104A form contained numerous "X" marks in areas on the document which indicate, where such "X" marks appear, that the corresponding information is "unknown." Def.'s Local Rule [*15] 7.1 Stat. P 10. He does not dispute that this one-page document, with its numerous "X" marks, indicates to the knowledgeable observer that: (a) no information about the hit-and-run vehicle driver was entered despite Ms. Hunt observing the driver from close range and providing a description; (b) there is no indication of the color, description, or plate number (even the first three letters) of the car despite the fact that this information was conveyed to the officers by at least two witnesses; (c) the document makes no mention at all of Sharon Ryder, the eye witness to the flight of the hit-and-run driver, or of the last sighting of the perpetrator at the nearby Texaco Station, despite the fact that this woman, who knew Cerrone "from school", claims to have imparted the information directly to Cerrone (a point which Cerrone himself corroborates); [7] and (d) there is no indication of any "leads" discovered despite the fact that someone brought parts of Rory Knapp's automobile to the Stoneledge Bar and, the next day, Ms. Hunt's husband was able to find a tee-shirt and hat which, according to witness statements, belonged to Rory Knapp, as well as additional pieces of two automobiles still [*16] at the scene. See Cerrone Aff. P 24.

> 7  Cerrone asserts in his Local Rules Statement, citing to his own deposition, that "Plaintiff did not review the Motor Vehicle Accident Report to determine whether 'an adequate investigation was conducted,' but rather he reviewed same to ensure that the report had been completed accurately." Plt.'s Local Rule 7.1 Stat., P 11. In his affidavit in opposition to the instant motion, Cerrone attests that "in reviewing the MV-104A form, my responsibility is to ensure that it is properly completed, that all boxes are filled out, that the diagram is completed." Cerrone Aff., P 34.

> 8  Further, there is no dispute that once given this information by Ms. Ryder, Cerrone left the scene and proceeded to the Annsville Circle to look for the vehicle. Cerrone Aff. PP 24-27.

In addition, Gregory made two entries in the police log regarding the accident. The first entry was on April 3, 1993. Like the MV-104A, it contained no information regarding the hit-and-run vehicle (e.g. no [*17]  color, model year, plate number [or partial plate number], direction of travel upon leaving the scene, location of, or last sighting), no description of the driver, nor any mention of the eye-witness despite the fact that all of this information had been supplied to Trooper Gregory and most, if not all, supplied to Cerrone.

The second entry, made ten days after the accident, provides that "further investigation revealed no new clues, leads, suspects. Operator of Vehicle 1 could offer no new information, Mv104A submitted." Brown Aff., P 45. Defendants assert that Cerrone, as Station Commander, could reasonably be expected to be aware of activities related to the hit-and-run investigation, especially in light of the fact that he personally participated in the investigation. Cerrone asserts, simply, that "as Station Commander I am not required to read all blotter entries from the Station." Cerrone Aff., P 35.

The record on this motion is unclear whether Cerrone read these entries, [9] or whether a procedure existed for any review of the blotter entries. For purposes of this motion, it is assumed he did not read these two police blotter entries or that he was required to do so. Reference [*18] is made to them only to the extent that they incorporate the MV-104A form (which Cerrone did review and sign) into the official investigative record at the Troop K Barracks, and to the extent that this last fact may indicate to an objective reviewer that there was a concerted effort within Troop K to cover up Rory Knapp's crime.

> 9  See *Cerrone v. Cahill*, 246 F.3d at 197: "Appellant Brown learned from witnesses that the victim had provided Gregory with a description of the car, a partial license plate number, and items of the perpetrator's clothing found at the accident scene. However, it was apparent from a review of Gregory's report that Gregory did not follow up on these leads; instead he wrote in his report that 'further investigation revealed no new clues, leads, suspects. Operator of Vehicle 1 could offer no new information.' Cerrone signed Gregory's report as a supervisor."

**7. Other investigative efforts**

Still further, the uncontroverted evidence indicates that before Cerrone [*19]  was arrested on January 19, 1995, the investigative team engaged in other intensive forms of investigation including intercepting and recording the conversations of Trooper Welsh and Rory Knapp during which there was mention of several offi-

cers being involved in a cover-up scheme. See Collins Aff., Ex. R.

On January 4 & 17, 1995 the investigative team held meetings, one of which included Gerald Connolly of the Westchester County District Attorney's Office, to discuss possible criminal charges arising out of the cover-up. At the January 17th meeting, it was decided that team members would stop Plaintiff Cerrone for questioning regarding Cerrone's possible participation in the cover-up.

### 8. Cerrone's Arrest & Detention

On January 19, 1995, as he was driving home from work, Cerrone was pulled over by an unmarked police car flashing its "grill lights." Inspector Valvo approached Cerrone, ordered him out of car, and took his keys. Plt.'s Mem. of Law, p. 5. Inspector Valvo was joined by Senior Investigator Morse, and Cerrone was then placed in the backseat of the Inspector's vehicle where he was "guarded by Defendant Senior Investigator Richard G. Morse." Plt.'s Mem. of Law, [*20] p. 6. Cerrone was then transported to a local hotel where he was questioned for some six hours by Lt. Brown and Inspector Cahill and then released. Id. [10]

> 10   The Court notes that the defendants assert that Plaintiff was not arrested because he willingly accompanied the officers to the hotel and was repeatedly advised that he was free to leave but insisted he wanted to cooperate with the investigation. For purposes of this motion, the Court accepts Plaintiff's contention that he unwillingly accompanied the investigators and that he did not feel free to leave during the interrogation.

## II. DISCUSSION

Defendants' motion for summary judgment is based on a number of arguments, *inter alia*, that the arrest in issue was made with probable cause and therefore there is no basis for the false arrest and false imprisonment claims; that the defendants are entitled to qualified immunity; and that summary judgment is warranted on the Plaintiff's state law intentional infliction of emotional distress claim [*21] because Plaintiff cannot offer sufficient evidence to sustain such a claim under New York law. Plaintiff opposes the motion and raises numerous arguments countering the Defendants' positions. The Court will address the arguments *seriatim*.

### A. Probable Cause for Arrest

The elements of a cause of action for false arrest brought under the *Fourth Amendment* and state common law are the same. These are: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of

the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996); Broughton v. State of New York, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)*. Because false arrest is a type of false imprisonment, the two claims have identical elements. See *Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)*, cert. denied, *517 U.S. 1189, 134 L. Ed. 2d 779, 116 S. Ct. 1676 (1996)*.

For purposes of this motion only, the defendants have conceded that the Plaintiff has satisfied the first three elements of [*22] these causes of action. Further, the Plaintiff correctly states that under New York law a warrantless arrest is presumptively unlawful. see id. There is no dispute that the defendants did not have a warrant to arrest the Plaintiff. However, as the defendants correctly point out, if there existed probable cause for the arrest, the Plaintiff may not recover on any of these claims. *Smith v. Edwards, 175 F.3d 99, 105 (2d Cir. 1999)*("It is well established that appellant's *Section 1983* claims against appellees for false arrest and false imprisonment must fail if the appellee-officers had probable cause to arrest him."); *Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998); Weyant, 101 F.3d at 852* (probable cause is a complete defense to both federal and state law claims for false arrest and false imprisonment); *Zanghi v. Incorporated Village of Old Brookville, 752 F.2d 42 (2d Cir. 1988)*.

Probable cause exists when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed [*23] or is committing a crime." *Posr v. Court Officer Shield No. 207, 180 F.3d 409, 414 (2d Cir. 1999)*. The existence of probable cause must be determined on the basis of the totality of the circumstances. *Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989)*. The inquiry is an objective one and the subjective beliefs or motivations of the arresting officer are irrelevant. *Whren v. United States, 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996); Martinez v. Simonetti, 202 F.3d 625, 633 (2d Cir. 2000); United State v. Scopo, 19 F.3d 777, 780-82 (2d Cir. 1994)*, cert. denied, *513 U.S. 877, 130 L. Ed. 2d 136, 115 S. Ct. 207 (1994); Broughton, 37 N.Y.2d at 458-459* ("A valid arrest will not be rendered unlawful by malicious motives"); *Restey v. Higgins, 252 A.D.2d 954, 675 N.Y.S.2d 725, 727 (4th Dep't 1998) (same)*.

In evaluating the probable cause determination, the Court "consider[s] the facts available to the officer at the time of the arrest." *Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997)* (citing [*24] *Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996))*.

"It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eye-witness." *Miloslavsky v. AES Eng'g Soc'y, 808 F. Supp. 351, 355 (S.D.N.Y. 1992)*, aff'd, *993 F.2d 1534 (2d Cir. 1993)*.

Where the facts surrounding the arrest are uncontroverted, the determination as to whether probable cause existed may be made by the court as a matter of law. *Weyant, 101 F.3d at 852*. On a motion for summary judgment, however, the court must determine whether there are any "genuine issues" as to any material facts. *Anderson v. Liberty Lobby, 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Therefore, where the question of probable cause is "predominately factual in nature," the determination should be made by a jury. *Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)*, cert. denied, *522 U.S. 1115, 140 L. Ed. 2d 114, 118 S. Ct. 1051 (1998)*.

In contrast to the arguments raised by defendants Brown and Fresenius which [*25] focused primarily on whether the controvertible facts of what Cerrone did during his investigation could form the basis of a probable cause determination (e.g., whether the fact that he did not discover the car at the Texaco Station could form the basis of the probable cause determination), on this motion the defendants focus on the uncontroverted facts leading up to his January 19, 1997 arrest to support their probable cause argument. The Court will address these arguments in the order made.

**1. Probable Cause from Traffic Violation**

Defendants first argue that probable cause existed because at the time of the stop, Cerrone was driving an unregistered motor vehicle in violation of *New York Vehicle and Traffic Law § 401(4)*. Therefore, defendants assert, they had probable cause to stop and arrest Cerrone pursuant to *New York Criminal Procedure Law § 140.10(1)(a)*. [11] Plaintiff counters that, while he was driving an unregistered vehicle in violation of *New York Vehicle Traffic Law § 401*, he was never cited for the infraction and the facts of the case, including the substance of his interrogation, indicate unequivocally that the detention was not for purposes related [*26] to this minor traffic infraction. Further, he argues that the ensuing detention by the defendant officers was in violation of *New York Criminal Procedure Law § 140.20*. [12]

11  *§ 140.10* of the New York State Criminal Procedure Law, entitled Arrest without a warrant; by police officers; when authorized, provides in pertinent as follows:

1. Subject to the provisions of subdivision two, a police officer may arrest a person for:

(a) Any offense when he has reasonable cause to believe that such person has committed such offense in his presence;

*N.Y. Crim. Pro. L. § 140.10*. (West Group, 2001). "'Reasonable cause', as used in the New York statute, is substantially the same as 'probable cause' within the meaning of the *fourth amendment*." *Kruppenbacher v. Mazzeo, 744 F. Supp. 402 (N.D.N.Y. 1990)*.

12  *New York Criminal Procedure Law § 140.20*, entitled Arrest without a warrant; procedure after arrest by police officer, provides in pertinent part as follows:

1. Upon arresting a person without delay all recording, finger-printing and other preliminary police duties required in the particular case, must except as otherwise provided in this section, without unnecessary delay bring the arrested person or cause him to be brought before a local criminal court and file therewith an appropriate accusatory instrument charging him with the offense or offenses in question. The arrested person must be brought to the particular local criminal court, or to one of them if there be more than one, designated in section 100.55 as an appropriate court for commencement of the particular action; except that:

(a) If the arrest is for an offense other than a class A, B, C or D felony or a violation of section

130.25, 130.40, 205.10, 205.17, 205.19 or 215.56 of the penal law committed in a town, but not in a village thereof having a village court, and the town court of such town is not available at the time, the arrested person may be brought before the local criminal court of any village within such town or, any adjoining town, village embraced in whole or in part by such adjoining town, or city of the same county; and

(b) If the arrest is for an offense other than a class A, B, C or D felony or a violation of section 130.25, 130.40, 205.10, 205.17, 205.19 or 215.56 of the penal law committed in a village having a village court and such court is not available at the time, the arrested person may be brought before the town court of the town embracing such village or any other village court within such town, or, if such town or village court is not available either, before the local criminal court of any adjoining town, village embraced in whole or in part by such adjoining town, or city of the same county; and

(c) If the arrest is for an offense committed in a city, and the city court thereof is not available at the time, the arrested person may be brought before the local criminal court of any adjoining town or village, or village court embraced by an adjoining town, within the same county as such city; and

(d) If the arrest is for a traffic infraction or for a misdemeanor relating to traffic, the police officer may, instead of bringing the arrested person before the local criminal court of the political subdivision or locality in which the offense was allegedly committed, bring him before the local criminal court of the same county nearest available by highway travel to the point of arrest.

2. If the arrest is for an offense other than a class A, B, C or D felony or a violation of section 130.25, 130.40, 205.10, 205.17, 205.19 or 215.56 of the penal law, the arrested person need not be brought before a local criminal court as provided in subdivision one, and the procedure may instead be as follows:

(a) A police officer may issue and serve an appearance ticket upon the arrested person and release him from custody, as prescribed in subdivision two of section 150.20; or

(b) The desk officer in charge at a police station, county jail or police headquarters, or any of his superior officers, may, in such place fix pre-arraignment bail and, upon deposit thereof, issue and serve an appearance ticket upon the arrested person and release him from custody, as prescribed in section 150.30.

3. If (a) the arrest is for an offense other than a class A, B, C or D felony or a violation of section 130.25, 130.40, 205.10, 205.17, 205.19 or 215.56 of the penal law, and (b) owing to unavailability of a local criminal court the arresting police officer is unable to bring the arrested person before such a court with reasonable promptness, either an appearance ticket must be served unconditionally upon the arrested person or pre-arraignment bail must be fixed, as prescribed in subdivision two. If pre-arraignment bail is fixed but not posted, such arrested person may be temporarily held in custody but must be brought before a local criminal court without unnecessary delay. Nothing contained in this subdivision requires a police officer to serve an appearance ticket upon an arrested person or release him from custody at a time when such person appears to be under the influence of alcohol, narcotics or other drug to the degree that he may endanger himself or other persons.

4. If after arresting a person, for any offense, a police officer upon further investigation or inquiry determines or is satisfied that there is not reasonable cause to believe that the arrested person committed such offense or any other offense based upon the conduct in question, he need not follow any of the procedures prescribed in subdivisions one, two and three, but must immediately release such person from custody.

[*27] The Court finds that the defendants did have probable cause to stop the Plaintiff's vehicle due to the traffic infraction. *United States v. Scopo, 19 F.3d at 781.* Having had probable cause to stop Plaintiff and because the officers personally observed Plaintiff operating the vehicle in violation of *N.Y. VEH. & TRAFFIC LAW § 410,* they were authorized under state law to make a formal arrest, N.Y. CRIM. PRO. LAW § 140.10(1)(a), and thus had probable cause to reasonably detain him. *Scopo, 19 F.3d at 781-82.*

"The Supreme Court has made clear that, under the *Fourth Amendment,* law enforcement officers may stop an individual for any lawful reason, regardless of the subjective intentions of the individual officers involved." *United States v. Owens, 142 F. Supp. 2d 255, 262 (D. Conn. 2001)*(citing *Whren, 517 U.S. at 813-14*). Likewise, the Second Circuit has held that "an officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance," and that "an observed traffic violation legitimates a stop even if the detectives do not rely on [*28] the traffic violation." *United States v. Dhinsa, 171 F.3d 721, 724-25 (2d Cir. 1998).*

Plaintiff concedes that at the time he was stopped, he was driving an unregistered vehicle. The fact that the defendants may have had a subjective motive for the stop separate from the apparent vehicle and traffic law violation is of no moment. See *Mason v. Town of New Paltz Police Department, 103 F. Supp. 2d 562, 566 (N.D.N.Y. 2000)*(Mordue, D.J.)(Plaintiffs' contention that the police officers were motivated not by complaint but rather by bad faith does not raise a triable issue)(citing *Whren, 517*

U.S. at 813; Scopo, 19 F.3d at 782-83; Broughton, 37 N.Y.2d at 458-459).

Based upon these holdings and the New York statutes, there can be no quarrel that the objective circumstances, quite apart from the subjective intent of the officers, justified the stop and the *initial* arrest of Mr. Cerrone. The Court is not convinced, however, that the ensuing six hours of interrogation was "justified" by the "probable cause" arising from Cerrone's operation of the unlicenced vehicle. Indeed, there is no argument proffered by [*29] the defendants that the session at the hotel was used in any manner to solve the traffic infraction. Rather, the parties agree that whatever the exact nature of the next six hours - whether consensual interview or custodial interrogation - the focus was on the 1993 hit-and-run accident and Cerrone's role in a potential cover-up.

Further, this case is distinguishable from the several "pre-text stop" cases because no probable cause to believe that Cerrone committed any crime arose from circumstances of the stop. That being the case, the defendants must establish an independent basis of probable cause to justify the detention at the hotel that exceeded the authority allowed by *New York Criminal Procedure Law § 140.20.*

**2. Probable Cause to Interrogate**

Defendants argue that even assuming that they did not have probable cause to detain Mr. Cerrone from the unlicenced operation violation, they had probable cause to believe he had committed a crime based upon the facts disclosed in their investigation. In this regard, the defendants argue that at the time of the stop, they possessed probable cause to believe that Plaintiff acted in complicity in the illegal attempt to cover up [*30] the hit-and-run accident. The Court agrees.

Based upon documents submitted previously in this case, the Court is aware that Troopers Gregory and Welsh were charged in Indictment No. 95-0191 out of Westchester County with: Tampering with Public Records in the First Degree in violation of New York State Penal Law *§ 175.25* (Gregory, Count 12); [13] Offering a False Instrument for Filing in the First Degree in violation of New York State Penal Law *Section 175.35* (Gregory, Count 13); [14] Tampering with Physical Evidence in violation of *New York Penal Law Section 215.40(02)*(Gregory, Count 14); [15] and Official Misconduct in violation of *New York Penal Law Section 195.00* (Gregory Count 15; Welsh Count 16). [16] Collins Aff., Jan. 25, 1996, Ex. B [Dkt. No. 37]; See *Cahill v. O'Donnell, 7 F. Supp. 2d 341, 345-46 (S.D.N.Y. 1998).* [17] Based upon the uncontroverted facts, the Court finds as a matter of law that probable cause to arrest Plaintiff existed on January 19, 1995 on charges similar to which Troopers

Gregory and Welsh were eventually charged, or, at a minimum, probable cause existed to believe that Cerrone aided and abetted the illegal acts of Trooper Gregory. See [*31] *NY Penal Law § 20.00.*

13  *§ 175.25* Tampering with public records in the first degree

A person is guilty of tampering with public records in the first degree when, knowing that he does not have the authority of anyone entitled to grant it, and with intent to defraud, he knowingly removes, mutilates, destroys, conceals, makes a false entry in or falsely alters any record or other written instrument filed with, deposited in, or otherwise constituting a record of a public office or public servant.

Tampering with public records in the first degree is a class D felony.

14  *§ 175.35* Offering a false instrument for filing in the first degree

A person is guilty of offering a false instrument for filing in the first degree when, knowing that a written instrument contains a false statement or false information, and with intent to defraud the state or any political subdivision, public authority or public benefit corporation of the state, he offers or presents it to a public office, public servant, public authority or public benefit corporation with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office, public servant, public authority or public benefit corporation.

Offering a false instrument for filing in the first degree is a class E felony.

[*32]

15  *§ 215.40* Tampering with physical evidence

A person is guilty of tampering with physical evidence when:

* * *

2. Believing that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he suppresses it by any act of concealment, alteration or destruction, or by employing force, intimidation or deception against any person.

Tampering with physical evidence is a class E felony.

16  § 195.00 Official misconduct

A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit:

1. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized; or

2. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.

Official misconduct is a class A misdemeanor.

17  In a lawsuit brought in federal court in the Southern District of New York by the three remaining defendants in this action against various members of the New York State Police for conduct involving, in part, these defendants' role in Cerrone's arrest, District Court Judge Barrington D. Parker, Jr. noted as follows:

> In April 1995, Welsh, Gregory, and Knapp were arrested and charged with crimes related to the alleged hit-and-run accident and the subsequent cover-up. None of the three was exonerated. Welsh pleaded guilty to criminal misconduct and agreed to retire from the State Police. Knapp pleaded guilty to criminal charges and received a one year jail sentence. Gregory pleaded guilty to administrative charges, and the criminal charges against him were dismissed.

*7 F. Supp. 2d at 345-46.*

[*33]  The uncontroverted facts reveal that on April 3, 1993, Mr. Cerrone was advised by an eye-witness that the hit-and-run driver was located just a mile down the road. Necessarily, in order to find the vehicle (which Cerrone concedes he attempted to do), he needed to have some description of the vehicle. Yet, despite first hand knowledge of the existence of an eye-witness, a description of the automobile, direction of flight, and last-known location of the hit-and-run vehicle, none of this information was contained on the MV-104A form which Plaintiff tacitly authorized by initialing as a superior officer.

Cerrone asserts that while "Division of New York State Troopers regulations require that a Sergeant review all MV-104A forms," Cerrone Aff. P 37, he fulfilled this obligation by ensuring that all the boxes were filled out. He further claims that the regulations do not require entry "of partial information and investigative leads." Cerrone Aff. P 38. This argument defies logic. Absent entry of pertinent information including witness identification on the MV-104A or the police blotter (which in this case is clearly based upon the MV-104A), the institutional record is void of any indication [*34] of leads in this matter. More importantly, even if the Troopers were not required to include "partial information and investigative leads" in the MV-104A, this does not negate the logical, objective conclusion that the MV-104A is "properly filled out" only when it contained the correct information such as witness identification, description of the car, direction of travel from the scene, and last sighting - none of which is "partial" information.

Nonetheless, even accepting Cerrone's contention that he was required to review the MV-104A only "to ensure that the report had been completed accurately," Plt.'s Local Rule 7.1 Stat., P 11, an objectively reasonable review of the form reveals that he failed in this obligation. Stating on the form that witness identification or vehicle description is "unknown" constitutes an affirmative omission of a "known" fact. Thus, these material omissions, which were known to the investigating officers *via* Ms. Hunt and Ms. Ryder's affidavits, objectively indicates that probable cause existed to believe that Cerrone acted in complicity with Trooper Gregory's attempt to omit material, relevant, and important information from an official document that [*35] would be filed. Further, probable cause existed to believe that by placing the "unknown" designation in place of information that was, in fact, known, the document contained affirmatively false information intended to hamper the investigation and prosecution of Rory Knapp.

This conclusions is even more compelling in light of the plethora of evidence available to the investigating officers in the form of sworn affidavits and supporting depositions, obtained before arresting Cerrone, tending to indicate a concerted effort coming out of the Troop K Barracks to protect Rory Knapp from rightful prosecution as well as to supply him with information regarding the investigation into his crime. Given the connection between the driver of the hit-and-run vehicle and Zone Sergeant Welsh, there were sufficient facts to conclude, from an objective standpoint, that the cover-up was from the ground up, including Cerrone. Whether Welsh accompanied Cerrone on April 3, 1993 to the scene or to search for the vehicle, the objective evidence available to the investigative team revealed that the hit-and-run driver made a telephone call to the station immediately after the

accident, spoke to Welsh who in [*36] turn told Knapp that he would "take care of" the accident. Cerrone had personal knowledge of pertinent information which was omitted from the MV-104A (which Cerrone admittedly reviewed) which might have linked the driver to the crime. Further, there was evidence that the particulars of the investigation, and the efforts, or, more appropriately, the lack of efforts, in the investigation were being conveyed to Knapp.

"A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the *Fourth Amendment*." *Hahn v. County of Otsego, 820 F. Supp. 54, 55 (N.D.N.Y. 1993),* aff'd, *52 F.3d 310 (2d Cir. 1995).* "In fact, the eventual disposition of the criminal charges is irrelevant to the probable cause determination." Id. (citing *Pierson v. Ray, 386 U.S. 547, 555, 18 L. Ed. 2d 288, 87 S. Ct. 1213 (1967)).* The totality of the uncontroverted, reasonably trustworthy facts and circumstances known to the investigative officers at the time of Cerrone's arrest, viewed objectively, lead unequivocally to the conclusion that [*37] the officers possessed information sufficient to warrant the belief of a person of reasonable caution that Cerrone had, at a minimum, aided or abetted Trooper Gregory's crimes.

Therefore, the Court **GRANTS** the Defendants' motion as to all claims premised upon the theory of false arrest or false imprisonment, and these claims are hereby **DISMISSED** with prejudice.

## B. Qualified Immunity

Given the above, the Court need not address the parties' arguments on the issue of qualified immunity. However, precisely because of the concerns for judicial economy which formed the basis of the First Circuit's ruling in *Guzman-Rivera v. Rivera-Cruz, 98 F.3d 664, 667 (1st Cir. 1996),* discussed *infra*, the Court will address the defense as an alternative holding.

Plaintiff has not asserted that Cahill, Valvo, and Morse are not similarly situated to defendants Brown and Fresenius with regard to qualified immunity. Rather, Plaintiff argues that the remaining defendants (Cahill, Valvo, and Morse) have forfeited their right to assert the defense of qualified immunity because they have failed to raise the argument before this time. The Court will address this threshold [*38] argument first.

### 1. Qualified Immunity - When Available/When Waived?

Personal immunity defenses such as qualified immunity protect defendants in *Section 1983* actions who are sued in their individual capacities. See, e.g., *Hafer v.*

*Melo, 502 U.S. 21, 25, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991); Kentucky v. Graham, 473 U.S. 159, 166-67, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985).* The defense "serves important interests in our political system," *Sound Aircraft Servs., Inc. v. Town of East Hampton, 192 F.3d 329, 334 (2d Cir. 1999),* ensuring that damages suits do not "unduly inhibit officials in the discharge of their duties" by burdening individual officers with "personal monetary liability and harassing litigation." *Anderson v. Creighton, 483 U.S. 635, 638, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987);* see *Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998).* [18]

18     Consequently, the Supreme Court has directed that "where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz, 150 L. Ed. 2d 272, 121 S. Ct. 2151, 2155-56 (2001).* "The privilege is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *121 S. Ct. at 2156* (quoting *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985));* see also *Hunter v. Bryant, 502 U.S. 224, 227, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991)*("we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation")(*per curiam*).

[*39]

Qualified immunity is an affirmative defense which must be raised in a responsive pleading and proven by the party asserting it. *McCardle v. Haddad, 131 F.3d 43, 50 (2d Cir. 1997)*(citing *Gomez v. Toledo, 446 U.S. 635, 640, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980)* and *In re State Police Litigation, 88 F.3d 111, 123 (2d Cir. 1996)); Fed.R.Civ.P. 8(c).* The defense may be deemed waived where a party fails to plead it in a responsive pleading, [19] or fails to present proof upon it at trial. [20]

19     See *McCardle, 131 F.3d at 50;* but see *Eddy v. Virgin Islands Water & Power Auth., 256 F.3d 204, 210 (3rd Cir. 2001)*(the defense of qualified immunity is not necessarily waived by a defendant who fails to raise it until the summary judgment stage, courts are granted discretion to allow the defense when taking into account reason for delay and any prejudice caused thereby); *Guzman-Rivera v. Rivera-Cruz, 98 F.3d 664, 667 (1st Cir. 1996)*("because the doctrine of qualified immunity recognizes that litigation is costly to defendants, officials may plead the defense at

various stages in the proceedings."); *Anthony v. City of New York, 2001 U.S. Dist. LEXIS 8923, *22,* 2001 WL 741743, at *7 (S.D.N.Y. July 2, 2001)("Defendants who do not assert qualified immunity in their answer can still raise qualified immunity, or any other affirmative defense, at summary judgment, however, if plaintiffs cannot show that any 'significant prejudice' to them will result.")(citing *Rinaldi v. City of New York, 756 F. Supp. 111, 115 n. 3 (S.D.N.Y. 1990)).*

[*40]

20  See *Provost v. City of Newburgh, 262 F.3d 146, 2001 U.S. App. LEXIS 18726, *36,* 2001 WL 930250, at *11-12 (2d Cir. Aug. 17, 2001)("Because [defendant] did not specifically include a qualified immunity argument in his pre-verdict request for judgment as a matter of law, he could not have included such an argument in his post-verdict motion even had he attempted to do so."); *McCardle, 131 F.3d at 50* ("The defense [of qualified immunity] cannot properly be decided by the court as a matter of law unless the defendant moves for judgment as a matter of law ... in accordance with *Fed.R.Civ.P. 50.*")(collecting cases on waiver situations); *Blissett v. Coughlin, 66 F.3d 531, 538-39 (2d Cir. 1995)*(waived by failure to raise it with sufficient particularity); *Walsh v. Mellas, 837 F.2d 789, 799-800 (7th Cir. 1988)*(where the defendants asserted the qualified immunity defense in their answer but "failed to bring the argument to the [district] court's attention, despite their having had numerous opportunities to do so" in pretrial and post trial motions and in numerous hearings, the "defendants abandoned the defense"), *cert. denied, 486 U.S. 1061, 100 L. Ed. 2d 933, 108 S. Ct. 2832 (1988).*

[*41]  Here, there is no dispute that the qualified immunity defense was pled in the defendants' Answer and that trial has not yet occurred. The defense is raised now in a pre-trial summary judgment motion *albeit* after the close of discovery and outside the time period originally specified by the Court for such dispositive motions. Plaintiff asserts that Defendants forfeited the defense because they failed to raise it in a diligent matter during the post-discovery, pre-trial phase of the case. Plt.'s Mem. of Law, p. 10 (citing *Guzman-Rivera, 98 F.3d at 668*). Plaintiff argues that given the length of time since the commencement of the action and the fact that the motion was not made when Defendants Brown and Fresenius made their motion for summary judgment, [21] the Court should determine that the remaining defendants have forfeited of this defense. The Court disagrees.

21  Plaintiff argues that because these defendants failed to file a simple "me too" motion when Brown and Fresenius filed their motion, the remaining defendants should be deemed to have forfeited their right to do so now.

[*42]  In some situations, a court may exercise its discretion to bar a defendant from rasing a qualified immunity defense at the pre-trial stage, *Guzman-Rivera, 98 F.3d at 668* (discussed *infra*); *English v. Dyke, 23 F.3d 1086, 1090 (6th Cir. 1994)*("trial court has discretion to find a waiver if a defendant fails to assert the defense within the time limits set by the court or if the court otherwise finds that a defendant has failed to exercise due diligence or has asserted the defense for dilatory purposes."). However, Plaintiff's reliance on Guzman-Rivera for the proposition that the Court should deem the defense completely forfeited, or even that it should be forfeited at the pre-trial stage in this case, is misplaced.

In Guzman-Rivera, the defendants asserted qualified immunity after they had been to the First Circuit Court of Appeals on two prior occasions requesting rulings on immunity defenses and were before the Circuit on the third occasion requesting a ruling on their qualified immunity defense - all before the case came to trial. The district court in that case ruled that the defense was completely waived based upon the defendants' delay [*43] in raising the defense. The First Circuit "agreed with the finding of waiver to the extent that the district court found the qualified immunity defense waived for the pretrial stage, and [] reversed to the extent that it found the defense waived for the purposes of trial." *Guzman-Rivera, 98 F.3d at 666.* In reaching this conclusion the First Circuit noted that:

> delay generated by claims of qualified immunity may work to the disadvantage of the plaintiff. Witnesses may become unavailable, memories may fade, attorneys fees accumulate, and deserving plaintiffs' recovery is delayed. See *Apostol v. Gallion, 870 F.2d 1335, 1338 (7th Cir. 1989)* ("Defendants may seek to stall because they gain from delay at plaintiffs' expense, an incentive yielding unjustified appeals."). Delay is also costly to the court system, demanding more time and energy from the court and retarding the disposition of cases.

*Guzman-Rivera, 98 F.3d at 667-68.*

The First Circuit found that when faced by circumstances tending to indicate that the defendant may be stalling the case for tactical reasons, courts must strike a

balance between "the need to [*44] protect public officials from frivolous suits with the need to have cases resolved expeditiously." Id. In employing that balancing test, the First Circuit held that because the defendants in that case failed to raise the defense in a diligent manner and failed to offer an explanation for the delay, "the defense of qualified immunity has been waived for the pre-trial stage." Id. (emphasis added). The First Circuit did not hold that the defense was completely waived, and in fact specifically stated that "our decision thus leaves defendants free to present the qualified immunity defense at trial, despite the fact that the defense is waived for pre-trial purposes." Guzman-Rivera, 98 F.3d at 669.

Clearly, the Guzman-Rivera holding was based upon inherent judicial concerns for managing litigation in a fair and efficient manner so to protect the rights of the litigants and to preserve the scarce resources of the courts and the parties. Here, the considerations of these same factors mitigate against this Court exercising its discretion to deem that the defendants have waived the defense. See Eddy, 256 F.3d 204 at 210 ("In particular, the Court [*45] must inquire whether the defendants violated any scheduling orders in raising the defense for the first time in their summary judgment motions, whether they delayed asserting the defense for tactical purposes or any improper reason, and, most important, whether the delay prejudiced the plaintiff's case.")

It cannot be said that these defendants somehow used the other defendants' trip to the Second Circuit Court of Appeals as a tactical strategy to delay the proceedings. They were not even party to the appeal because they had not joined in the other defendants' summary judgment motion. Based upon the facts of the case as the Court has viewed them, these defendants cannot be imputed with some improper motive aimed at delaying the proceedings simply because they did not join in the other defendants' motion which resulted in the appeal. Until the Second Circuit's April 10, 2001 Decision in this matter, Cerrone v. Cahill, 246 F.3d 194 (2d Cir. 2001), it was this Court's humble opinion that, on the record of the case as presented by the parties, questions of fact prevented the application of qualified immunity. It was only after the clarifying direction of the Circuit Court [*46] that it became apparent that these other defendants were entitled to qualified immunity. See Cerrone v. Cahill, 95-CV-241, Decision and Order, June 7, 2001, Dkt. # 121. It is impossible to draw adverse inferences from the inaction of these defendants in this case.

Further, because it is possible that the defendants were reserving their right to raise the defense at trial, [22] this case does not stand on all fours with Hamilton v. Atlas Turner, Inc., 197 F.3d 58 (2d Cir. 1999), cert. denied, 530 U.S. 1244, 147 L. Ed. 2d 962, 120 S. Ct. 2691 (2000). In Hamilton, the Second Circuit ruled that the

defendant forfeited his right to assert the "lack of personal jurisdiction" defense by not substantively addressing it until after the verdict was rendered. Here, the prospect of a trial at which time the defense could be asserted forecloses the reasoning of Hamilton.

22  The courts have long held that where fundamental factual disputes exist on the reasonableness of an officer's conduct, the question of qualified immunity is for a jury to decided. Kerman v. City of New York, 261 F.3d 229, 2001 WL 845442, at *8 (2d Cir. 2001) ("However, the parties' versions of the facts differ markedly and 'summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.'"(quoting Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999); Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993)(summary judgment available on immunity issues only if undisputed facts); McCardle at 50; Blissett, 66 F.3d at 538.

[*47]  The present motion, likewise, is not raised beyond the time constraints set by the Court. As the parties will recall, the present motion was brought on following a telephone conference with the Court during which leave to file the present motion was granted. This leave was granted out of consideration for the same fundamental concerns that prompted the First Circuit to uphold the waiver of qualified immunity for the pre-trial stages in Guzman-Rivera - namely, judicial concerns for managing litigation in a fair and efficient manner to protect the rights of the litigants and to preserve scarce resources of both the Court and litigants. Inasmuch as the qualified immunity defense would be available to the defendants at trial anyway, and given the likelihood that the remaining defendants were similarly situated with the defendants to whom the Court granted qualified immunity, the Court queried counsel during the aforementioned telephone conference whether the case could potentially be resolved absent a trial thereby preserving the scare resources of both the Court and the litigants. Based upon seemingly affirmative responses, and in an effort to serve the Supreme Court's direction [*48] to decide the defense as soon as practicable, leave was granted for the defendants to file the instant motion. Thus, it cannot be said that the motion is made in contravention of the Court's scheduling directives.

Although other motions were made by other defendants, this appears to the first motion of its kind made by these defendants. See Mitchell v. City of Boston, 130 F. Supp. 2d 201, 209 (D. Ma. 2001)("this is not a situation where, as in Guzman-Rivera, the defendants had filed

previous summary judgment motions that failed to raise the issue.")

Finally, Plaintiff can point to no prejudice that will befall him if the defense, which is otherwise available at the time of trial, is decided now on this motion. See Anthony v. City of New York, 2001 WL 741743, at *7; Eddy 256 F.3d at 210 ("With respect to this last factor, we note that [plaintiff], in his opposition to the summary judgment motion, failed to argue that he was prejudiced in any specific way by the delay.").

Based upon the above, the Court finds that the defendants have not waived, abandoned, or forfeited their affirmative defense of qualified immunity and that it is properly raised [*49] on this motion at this time.

**2. Qualified Immunity - Application**

Turning to the substantive application of qualified immunity, the Plaintiff has not asserted that these defendants were not similarly situated with defendants Brown and Fresenius. In fact, as set forth above, they are similarly situated. Thus, for the reasons set forth in the Court's June 7, 2001 Decision and Order, "arguable probable cause" existed for the arrest and detention of the Plaintiff and, therefore, these three defendants are likewise entitled to qualified immunity. See Cerrone v. Cahill, 95-CV-241, Decision and Order, June 7, 2001, Dkt. # 121.

Further compelling the Court's conclusion in this regard is the fact that the defendants' actions were taken based upon the totality of the circumstances set forth above. Even had the information not formed the basis of an appropriate probable cause determination, it certainly formed the basis of an objectively reasonable belief that same existed. "The question of immunity remains, as it should, distinct from the question of probable cause." Warren v. Dwyer, 906 F.2d 70, 75 (2d Cir.) (citation omitted), cert. denied, 498 U.S. 967, 112 L. Ed. 2d 414, 111 S. Ct. 431 (1990). [*50]

Here, far from acting impulsively or "plainly incompetently," the defendants engaged in a lengthy investigation which yielded numerous affidavits and other evidence which cross-corroborated much of their suspicion that a joint effort within Troop K Barracks was occurring and that Cerrone was intertwined therein. Provost v. City of Newburgh, 2001 U.S. App. LEXIS 18726, *32, 2001 WL 930250, at *10 (2d Cir. Aug. 17, 2001)("This forgiving standard protects 'all but the plainly incompetent or those who knowingly violate the law.'")(quoting Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986)). While the subjective beliefs of the defendants are not to be considered on a qualified immunity determination, Cerrone, 246 F.3d at 202, "for the purpose of qualified immunity and arguable probable cause,

police officers are entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences." Cerrone, 246 F.3d at 203. Put another way, "a court must evaluate the objective reasonableness of the [officer's] conduct in light of clearly established law and the information the officers [*51] possessed." Cerrone, 246 F.3d at 202. Here, based upon all of the information available to the officers at the time of the arrest, it cannot be said that the officer's "judgment was so flawed that no reasonable officer would have made a similar choice." Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995).

Given the totality of circumstances presented to these officers, reasonable officers, if they did not agree that probable cause actually existed, would certainly disagree whether it did. The only conclusion a reasonable jury could make, if it too did not conclude that actual probable cause existed to detain Mr. Cerrone as defendants did, is that reasonable officers would disagree on the constitutionality of the seizure. Cerrone, 246 F.3d at 203. Therefore, the Court finds that each of the three defendants is entitled to qualified immunity on Plaintiff's claims brought under 42 U.S.C. § 1983. Defendants motion is, therefore, **GRANTED** on this basis.

**C. State Law Claim "Intentional Infliction of Emotional Distress"**

Defendants argue that the Plaintiff's cause of action brought under the theory of [*52] intentional infliction of emotional distress should be dismissed because he cannot present facts to satisfy a prima facie case under New York law. The Court agrees.

Under New York law, a claim for intentional infliction of emotional distress requires a showing of: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999). Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance. See id. A litigant can establish a cognizable claim for intentional infliction of emotional distress "'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Howell v. New York Post Co., 81 N.Y.2d 115, 122, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993) (quoting Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) [*53] (citing Restatement (Second) Of Torts, § 46 cmt. d). Because the requirements for sustaining a claim for intentional infliction of

emotional distress "are rigorous, and difficult to satisfy," *Howell, 81 N.Y.2d at 122*, courts have declined to recognize such a claim in cases where alleged conduct was not sufficiently outrageous. See, e.g., *Walentas v. Johnes, 257 A.D.2d 352, 683 N.Y.S.2d 56, 58* (1st Dep't), leave to appeal denied, *93 N.Y.2d 958 (1999); Bunker v. Testa, 234 A.D.2d 1004, 652 N.Y.S.2d 181, 182* (4th Dep't 1996); *Bell v. Slepakoff, 224 A.D.2d 567, 639 N.Y.S.2d 406, 407* (2d Dep't 1996).

Nothing in Cerrone's claim rises to this level of outrageous conduct. Further, he is unable to present any evidence from which a reasonable trier of fact could conclude that he suffered severe emotional distress. Defs.' Local Rule 7.1 Stat., PP 29-33. Therefore, defendants' motion for summary judgment on Plaintiff's intentional infliction of emotional distress claim is **GRANTED** and this claim is **DISMISSED with prejudice.**

**D. Sanctions**

Finally, Defendants move for sanctions against the Plaintiff [*54] pursuant to *Rule 11 of the Federal Rules of Civil Procedure* on the grounds that the action was frivolous and instituted for vexatious reasons. Putting aside whether or not the motion for sanctions is procedurally proper, see *Kron v. Moravia Cent. Sch. Dist., 2001 U.S. Dist. LEXIS 6573, 2001 WL 536274*, at *1 (N.D.N.Y. May 3, 2001), the Court finds that there is no basis for the imposition of sanctions here.

*Rule 11* was created to deter dilatory and abusive tactics in litigation, and to streamline the litigation process by lessening frivolous claims or defenses. "The standard for triggering the award of fees under *Rule 11* is objective unreasonableness." *Margo v. Weiss, 213 F.3d 55, 65 (2d Cir. 2000)*. The imposition of *Rule 11* sanctions is discretionary and should be done with caution. *Knipe v. Skinner, 19 F.3d 72, 78 (2d Cir. 1994)*. A court should impose sanctions only "if 'it is patently clear that a claim has absolutely no chance of success,' and all doubts should be resolved in favor of the signing attorney." *K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co., 61 F.3d 123, 131 (2d Cir. 1995)* (quoting *Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993)).* [*55]

Defendants have put forth considerable evidence that the instant action was something of a *causes celebres* funded and promoted by the Police Benevolent Association, perhaps for the PBA's own institutional purposes. Valvo Aff., Ex. O. The evidence as to whether or not Cerrone himself thought the action was unjustified, however, is contradicted by Mr. Cerrone. Plt.'s Local Rule 7.1 Stat. PP 34-37. Upon this contradiction, the Court must look at the pleadings and the evidence proffered in the case to see whether the action violates the intention of *Rule 11*. The Court finds, without hesitation, that it does not.

Even assuming *arguendo* that Mr. Cerrone might have cast doubt on the merits of his case to his co-workers (and putting aside that he may have done this simply to foster a working relationship with the very people he was suing), the history of the case demonstrates that there was a basis in law for his claim. Further, while he did not ultimately succeed there existed an arguable factual basis for his claim. Indeed, as evidenced by this and the previous Decisions from this Court, the Court has grappled with the many "close calls" arising from the evidence in this matter. [*56] The Court cannot conclude that Plaintiff's claims were "so completely without merit ... that they must have been undertaken for some improper purpose ... ." *Salovaara v. Eckert, 222 F.3d 19, 35 (2d Cir. 2000)*. There is no basis, in this Court's opinion, to impose *Rule 11* sanctions. Defendants' motion, in this regard, is **DENIED.**

**III. CONCLUSION**

Based upon the above, Defendants' motion for summary judgment is in all respects **GRANTED** and all claims against **Michael F. Cahill, Salvatore S. Valvo, and Richard G. Morse** are hereby **DISMISSED WITH PREJUDICE.** The Clerk of the Court is directed to enter judgment for the defendants and to close the case.

**IT IS SO ORDERED.**

September 28, 2001

Hon. Thomas J. McAvoy

U.S. District Judge