24 of 34 DOCUMENTS

KEVIN EYER VERSUS PATRICK EVANS, ET AL

CIVIL ACTION NO. 03-342 SECTION "A"(5)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOU-
ISIANA

*2004 U.S. Dist. LEXIS 1266*

**January 28, 2004, Decided**
**January 29, 2004, Filed; January 30, 2004, Entered**

**DISPOSITION:**    [*1] Plaintiff's Motion for Partial Summary Judgment denied.

**COUNSEL:** For Kevin Eyer, PLAINTIFF: Brett John Prendergast, Brett J Prendergast, Attorney at Law, New Orleans, LA USA.

For Patrick Evans, William McDade, Christian Varnado, Michael Glasser, New Orleans City, DEFENDANTS: James Bryan Mullaly, City Attorney's Office, New Orleans, LA USA.

**JUDGES:** Jay C. Zainey.

**OPINION BY:** Jay C. Zainey

**OPINION**

Before the Court is a **Motion for Partial Summary Judgment (Rec. Doc. 15)** filed by plaintiff Kevin Eyer. Defendants, the City of New Orleans, Officer Patrick Evans, Officer William McDade, Officer Christian Varnado, and Sergeant Michael Glasser, oppose the motion. The motion, set for hearing on January 28, 2004, is before the Court on the briefs without oral argument. For the reasons that follow the motion is DENIED.

**Background**

On February 12, 2002, the defendant officers were on plainclothes patrol in the New Orleans French Quarter for the Mardi Gras festivities. The officers were walking along the Mississippi River on the Moonwalk when they encountered a group of five individuals standing together in a circle. The officers detected the odor of marijuana emanating [*2] from the group as they approached. The officers also noticed that the individuals were passing around a cigarette. The officers observed some of the individuals smoke the cigarette and then pass it on. All five individuals, including Plaintiff, were arrested for possession of marijuana pursuant to *La. R.S. 40:966*. At no time prior to Plaintiff's arrest did the defendant officers observe Plaintiff in actual possession of or physical contact with the marijuana.

Plaintiff filed this lawsuit pursuant to *42 U.S.C. § 1983* and state law against the defendant officers and the City of New Orleans ("Defendants"). Plaintiff alleges that he was arrested in violation of his *Fourth Amendment* rights and state law. He moves for summary judgment on the issue of liability with respect to the *§ 1983* claim and the state false arrest claim.

**The Parties' Contentions**

Plaintiff argues that the officers were not justified in believing that Plaintiff had violated the law because at no time did the officers see the Plaintiff possess the marijuana cigarette for which he was arrested. Plaintiff concedes that constructive possession is sufficient to support a violation of [*3] *La. R.S. 40:966*, but he points out that his mere presence in the group of culpable individuals is insufficient to prove constructive possession. Plaintiff asserts that at no time did the officers observe him exercise dominion or control over the marijuana.

In opposition, Defendants argue that Plaintiff's motion omits several critical facts. Specifically, Defendants assert that Plaintiff was next in line to receive the cigarette but the officers intervened to seize the evidence before it was destroyed. Defendants also assert that Plaintiff's motion fails to address their entitlement to qualified immunity-an issue they will raise via motion after they have an opportunity to depose Plaintiff.

**Discussion**

2004 U.S. Dist. LEXIS 1266, *

To prevail in a § 1983 suit, a plaintiff must overcome an officer's defense of qualified immunity. [1] *Williams v. Kaufman County*, 352 F.3d 994, 1002 (5th Cir. 2003). Qualified immunity shields government officials performing discretionary functions from liability unless their conduct violates clearly established rights of which a reasonable person would have known. *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994) (quoting *Jacquez v. Procunier*, 801 F.2d 789, 791 (5th Cir. 1986)). [*4] A qualified immunity determination requires a two step analysis. First, the court must evaluate whether plaintiff's allegations, if true, establish a constitutional violation. *Williams*, 352 F.3d 1002. Second, if a constitutional violation is found to have occurred, the court must determine whether the defendant's actions violated clearly established rights of which a reasonable person would have known. Id. (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 153 L. Ed. 2d 666, 122 S. Ct. 2508 (2002)).

> [1]  Defendants have not moved for summary judgment on the qualified immunity issue although they pled the defense in their answer. Plaintiff did not address the defense of qualified immunity in his motion.

In suits alleging illegal arrest, the qualified immunity determination turns on whether a reasonable officer could have believed the arrest to be lawful in light of clearly established law and the information the officers possessed. Id. (quoting *Hunter v. Bryant*, 502 U.S. 224, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991)). [*5] Even law enforcement officers who reasonably but mistakenly conclude that probable cause is present are entitled to qualified immunity. Id. The qualified immunity defense protects all but the plainly incompetent or those who knowingly violate the law. Id. (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986)). A qualified immunity defense cannot succeed where it is obvious that a reasonably competent officer would find no probable cause. Id. But if officers of reasonable competence could disagree on the issue the immunity should be recognized. Id. The probable cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *Maryland v. Pringle*, U.S. , 157 L. Ed. 2d 769, 124 S. Ct. 795 (2003) (citing *Illinois v. Gates*, 462 U.S. 213, 232, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983)). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." Id. *Louisiana Revised Statute 40:966* provides in pertinent part:

> It is unlawful for any person knowingly [*6] or intentionally to possess a controlled dangerous substance classified in Schedule I .... [2]

> [2]  Marijuana is classified as a controlled dangerous substance in Schedule I. *La. R.S. 40:964(C)(22)*.

*La. Rev. Stat. Ann. § 40:966(C)* (West Supp. 2004). It is well-established that one need not actually possess the controlled dangerous substance to violate the prohibition against possession thereof, as constructive possession is sufficient. *State v. Porter*, 296 So. 2d 302, 304 (La. 1974). Although the mere presence in an area where drugs are located or the mere association with one possessing drugs does not constitute constructive possession, a person may be deemed to be in joint possession of a drug which is in the physical custody of a companion, if he willfully and knowingly shares with the other the right to control it. *State v. Dowell*, 857 So. 2d 1098, 1104 (La. App. 4th Cir. 2003) (citing *State v. Smith*, 257 La. 1109, 245 So. 2d 327 (1971)); [*7] *State v. Harris*, 647 So. 2d 337 (La. 1994); *State v. Bell*, 566 So. 2d 959 (La. 1990)). Factors to be considered in determining whether a defendant exercised dominion and control sufficient to constitute constructive possession of a controlled substance include such things as his knowledge that the drugs were in the area, his relationship with the person found to be in actual possession, his access to the area where the drugs were found, evidence of recent drug use, and his physical proximity to the drugs. *State v. Anderson*, 842 So. 2d 1222, 1227 (La. App. 2d Cir. 2003).

The Court has little doubt that the State, relying only upon the evidence of record in this case, would not meet its burden of proof to *convict* Plaintiff for possession of marijuana. The issue before the Court today, however, is not whether the prosecution could convict Plaintiff of possession but rather whether the arresting officers had probable cause to arrest him for the crime.

Plaintiff's argument suggests that the probable cause determination turns solely on what the officers actually saw Plaintiff do prior to his arrest. However, *Maryland v. Pringle*, [*8] a recent United States Supreme Court case decided only a month ago, demonstrates otherwise. In Pringle, officers arrested three occupants of a vehicle after they discovered cocaine behind the backseat armrest and rolled up cash in the glovebox. 124 S. Ct. at 798. All three of the vehicle's occupants denied ownership of the drugs and money but the officers arrested each of them. While in custody, Pringle, the frontseat passenger, gave an oral and written confession. Id. at 798. Pringle later argued that the confession was the fruit of an illegal arrest because the officers lacked probable cause to arrest him for possession of the cocaine. Id. at 799.

The Supreme Court unanimously held that the officers had probable cause to arrest Pringle for drug possession. *Id. at 800-01.* The Supreme Court found it "an entirely reasonable inference" that any or all three of the occupants had knowledge of, and exercised dominion and control over the drugs. *Id. at 800.* Pringle was one of three men in the car, the cash was in the glovebox in front of him, and the cocaine in the backseat was just as accessible to him [*9] as to any of the other occupants. Further, none of the men offered information with respect to the ownership of the cocaine or money. *Id. at 800.*

The Court also rejected Pringle's "guilt by association" argument. *Pringle, 124 S. Ct. at 801.* Pringle argued that under *Ybarra v. Illinois, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979),* the officers lacked particularized probable cause to arrest him. In Ybarra, the Court held that officers lacked probable cause to search all the patrons on the premises during the execution of a search warrant directed at a tavern. *444 U.S. at 91.* The Ybarra Court clarified that probable cause requires that the belief of guilt be particularized with respect to the specific person to be searched. *Id.*

The Pringle Court distinguished Pringle's situation from the one in Ybarra. *Pringle, 124 S. Ct. at 801.* Specifically, the Court noted that Pringle was one of three men in a relatively small automobile as opposed to being one of numerous unwitting tavern patrons who just happen to be on the premises when a search warrant is executed.*Id.* Because a passenger in a car will [*10] often be engaged in a common enterprise with the driver and have the same interest in concealing the evidence of their wrongdoing. it was reasonable for the officer to *infer* a common enterprise among Pringle and his companions. Id.

Based on *Pringle,* the fact that the officers did not see Plaintiff in actual possession of the marijuana does not require a finding of no probable cause. As in Pringle, the facts of this case do not suggest that Plaintiff was an unwitting member of the crowd. Rather, he was one of five individuals standing together in a circle. The officers observed some members of the small group passing around what appeared to be an illicit drug. While the officers did not observe Plaintiff in actual possession of the marijuana cigarette prior to his arrest, they had probable cause to believe that he, like any of the other members of the group, had constructive or joint possession or control of the cigarette. Plaintiff points to nothing in the facts of this case to undermine that belief. Consequently, the Court concludes that the officers had probable cause to arrest Plaintiff for possession of marijuana.

Accordingly;

**IT IS ORDERED** that the **[*11] Motion for Partial Summary Judgment (Rec. Doc. 15)** filed by plaintiff Kevin Eyer should be and is hereby **DENIED.**

****

Jay C. Zainey

1 of 3 DOCUMENTS

**JOSEPH FERLITO and ANGELO FERLITO, Plaintiffs, -against- THE COUNTY OF SUFFOLK, and P.O. CHRISTIAN HUBERT; and P.O. MICHAEL S. TURANSKY; and STEVEN A. LEVY a/k/a STEVE LEVY, Defendants.**

Civil Action No. 06-5708 (DRH)(AKT)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*2007 U.S. Dist. LEXIS 85523*

**November 19, 2007, Decided
November 19, 2007, Filed**

**COUNSEL:** [*1] Victor M. Serby, Esq., Attorney for Plaintiffs, Woodmere, NY.

Christine Malafi, Suffolk County Attorney, Attorney for Defendants, Hauppauge, New York, By: Susan A. Flynn, Esq.

**JUDGES:** Denis R. Hurley, Senior District Judge.

**OPINION BY:** Denis R. Hurley

**OPINION**

**MEMORANDUM & ORDER**

   **HURLEY, Senior District Judge:**

   Plaintiffs, Joseph Ferlito and Angelo Ferlito (collectively "Plaintiffs"), commenced this asserting claims pursuant to *42 U.S.C. § 1983*, as well as New York state law. Plaintiffs' claims all have their genesis in an altercation that apparently took place between the Plaintiffs and Defendants Christian Hubert ("Hubert") and Michael Turansky ("Turansky"), who are Suffolk County Police Officers. Presently before the Court is a motion seeking dismissal of (1) all Plaintiffs' state law claims against Suffolk County and (2) Angelo Ferlito's defamation claim against Defendant Steve Levy ("Levy") and Suffolk County. For the reasons set forth below, the motion is granted in part and denied in part.

*Background*

   The relevant facts alleged by Plaintiffs, which are accepted as true for purposes of this motion, are as follows. On July 24, 2005 at East Saltaire Road, Lindenhurst, New York, Plaintiffs were physically assaulted, beaten, [*2] detained and arrested, falsely charged, and incarcerated by Officers Turansky and Hubert. All this occurred in the presence of Angelo Ferlito's child. As a result of the beating and actions of the police officers, the Plaintiffs were injured. Several months later, on November 17, 2005 the Long Island Press published an article about the July 25, 2005 incident in which Levy is quoted as saying "These brothers have a history of disorderly conduct and were resisting arrest." At the time of the statement, Levy was County Executive for Suffolk County. Angelo Ferlito is an attorney and the words are alleged to be harmful to his reputation as an attorney.

   On or about October 19, 2005, Plaintiffs served a notice of claim. Because the content of this notice of claim is at issue on this motion, a description of its content is provided.[1] In its prefatory paragraph, the notice of claim states that the claimants are asserting their claims "against THE COUNTY OF SUFFOLK, New York and Suffolk County Police Officers TURNSKY and HUBERT to the extent said officers are employed or indemnified by THE COUNTY OF SUFFOLK . . . ." Notice of Claim at 1 (capitalization in original).[2] The notice then contains [*3] four sections. The first section contains the name and address of the Plaintiffs and their attorneys. The second section is entitled "nature of the claim(s)" and sets forth the following: "assault, battery, false arrest, defamation, intentional infliction of emotional distress, use of excessive force, malicious prosecution and violations of claimants' rights under *42 U.S.C. § 1983*." *Id.* The third section is entitled "time, place and manner in which the claim arose" and contains a recitation of the events on July 24, 2005. The fourth section sets forth the amount of the claim.

      1  According to the parties' papers, a second notice of claim with respect to the November 17,

2005 article was served. The second notice of claim is not at issue on this motion.

2    The Notice of Claim is Ex. 2 to the Aff. of Susan Flynn.

Thereafter, Plaintiffs filed their complaint asserting the following causes of action: § 1983 claims against Hubert and Turansky (first cause of action) and Suffolk County (second cause of action); battery against Hubert, Turansky and Suffolk County (third cause of action); assault against Hubert, Turansky and Suffolk County (fourth cause of action); negligent, hiring, training and [*4] retaining against Suffolk County (fifth cause of action); "§ 1983 via false arrest" (sixth cause of action); common law false arrest (seventh cause of action) [3]; and defamation against Levy and Suffolk County (eighth cause of action).

3    Not the model of clarity, the complaint does not specify precisely against whom the sixth and seventh causes of action are asserted. Rather, these two causes of action are indiscriminately asserted against "defendants." The Court presumes they are asserted against Hubert, Turansky and Suffolk County.

## Discussion

## I. Motion to Dismiss: Legal Standard

*Rule 8(a)* provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The Supreme Court recently clarified the pleading standard applicable in evaluating a motion to dismiss under *Rule 12(b)(6)*. In *Bell Atl. Corp. v. Twombly, U.S. , 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*, the Court disavowed the well-known statement in *Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which [*5] would entitle him to relief." *Id. at 45-46*. The Twombly Court stated that this language "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *127 S. Ct. at 1969*. Instead, to survive a motion to dismiss under *Twombly*, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id. at 1974*.

While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id. at 1964-65* (citations and internal quotation marks omitted).

The Second Circuit has stated that *Twombly* does not require a universally heightened standard of fact pleading, but "instead requir[es] a flexible [*6] 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)*. In other words, *Twombly* "'require[s] enough facts to 'nudge[plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig., 502 F.3d 47, 2007 WL 2471805, at *2 (2d Cir. 2007)* (quoting *Twombly, 127 S. Ct. at 1974*). [4] As always, the Court must "accept[] all factual allegations in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *ATSI Commn's. Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)*.

4    Although *Twombly* did not make clear whether the plausibility standard applies beyond the antitrust context, the Second Circuit has "declined to read *Twombly's* flexible 'plausibility standard' as relating only to antitrust cases." *ATSI Commn's. Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 n.2 (2d Cir. 2007)*.

## II. The Parties' Contentions

Defendant Suffolk County moves to dismiss the state law claims asserted against it on the ground that Defendant has failed to comply with [*7] the notice of claim requirements of *New York General Municipal Law 50-e*. According to Suffolk County, the notice of claim "does not contain facts or allegations regarding claims against the County arising out of respondeat superior or joint and several liability." Defs.' Mem. at 4. In addition, the Suffolk County argues that "[t]he failure to provide specific factual allegations concerning a municipality's negligent hiring, training or retention practices in the notice of claim bars the Plaintiffs from asserting those claims in the lawsuit." *Id.*

Suffolk County and Levy also move to dismiss the defamation claim. They argue that the statement at issue (1) is not defamatory; (2) does not support a finding of

slander per se and (3) is substantially true. Levy also asserts he is entitled to qualified immunity.

Plaintiffs counter that the complaint states a claim for defamation and the defendants' contentions are best characterized as affirmative defenses. As to the notice of claim. Plaintiffs claim that because state law claims made in § 1983 cases are within the Court's supplemental jurisdiction, the notice of claim requirements do not apply. In addition, Plaintiffs maintain that the notice **[*8]** of claim "need not expound every legal theory on which the claim is based, but rather must give the municipality enough information so that they can investigate the claims . . . ." Pls.' Mem at 14.

## III. Compliance with New York's Notice of Claim Requirements

Under New York law, a notice of claim is a condition precedent to bringing certain tort actions against a municipality such as Suffolk County for damages sustained by reason of the negligence or wrongful act of the municipality or its officers, agents or employees. *See N.Y. Gen. Mun. Law §50-i; Hardy v. New York City Health & Hosp. Corp.,164 F.3d 789, 793 (2d Cir. 1999).* "[T]he general rule [is] that in a federal court, state notice-of-claim statutes apply to state-law claims." *Id.* (citing *Felder v. Casey, 487 U.S. 131, 151, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988)).* Notwithstanding Plaintiffs' argument to the contrary, the law is clear that "[t]he notice of claim requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action." *Warner v. Village of Goshen Police Dept., 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003). Accord Jones v. Nassau County Sheriff Dept., 285 F. Supp. 2d 322, 327 (E.D.N.Y. 2003).*

The Court now turns to Suffolk **[*9]** County's claim that the notice was deficient. The required contents of a notice of claim is set forth in General Municipal Law § 50-e. In determining the sufficiency of a notice of claim, the relevant inquiry is "whether it includes information sufficient to enable the [municipality] to investigate the claim . . . ." *O'Brien v. City of New York, 54 N.Y.2d 353, 357, 429 N.E.2d 1158, 445 N.Y.S.2d 687 (1981).* Specifically, the notice should include a description sufficient to allow the municipality to "locate the place, fix the time [,] and understand the nature of the [claim]." *Brown v. City of New York, 95 N.Y.2d 389, 393, 740 N.E.2d 1078, 718 N.Y.S.2d 4 (2000).* The circumstances of each case will determine whether the notice complies with the content requirement of *section 50-e. See Levine v. City of New York, 111 A.D.2d 785, 786, 490 N.Y.S.2d 533 (2d Dept. 1985).*

Here, the notice of claim is sufficient as to claims asserted against the County arising out of respondeat

superior or joint and several liability. In its prefatory section the notice states that the claims are being asserted against the police officers and Suffolk County "to the extent said officers are employed or indemnified by" Suffolk County. Fairly read, this prefatory statement is sufficient to allege **[*10]** liability on the part of Suffolk County on the basis of respondeat superior or joint and several liability for those state causes of action specified in the notice, i.e., assault, battery, false arrest, defamation, intentional infliction of emotional distress, use of excessive force, and malicious prosecution.

However, the notice does not specify a claim for negligent hiring, training or retaining practices. *Cf. Rivera v. City of New York, 392 F. Supp. 2d 644, 657 (S.D.N.Y. 2005)* (striking cause of action not identified in notice of claim). Moreover, the notice contains no factual allegations with respect to such a cause of action. The facts alleged in the notice of claim are limited to the occurrences of July 24, 2005 and the facts with respect to negligent hiring, training and retention would, of necessity, have occurred prior to that date. Accordingly, the motion to dismiss the claim for negligent, hiring, training and retention for failure to file a notice of claim with respect thereto is granted. *See Urena v. City of New York, 221 A.D.2d 429, 429, 633 N.Y.S.2d 391 (2d Dept. 1995); accord Santoro v. Town of Smithtown, 40 A.D.3d 736, 737, 835 N.Y.S.2d 658 (2d Dept. 2007)* (dismissing claims for which the notice of claim **[*11]** did not contain any factual allegations).

In sum, the motion to dismiss for failure to comply with New York's notice of claim requirements is granted as to the claim for negligent hiring, training and retention (the fifth cause of action) but otherwise denied.

## IV. The Defamation Claim

Angelo Ferlito asserts a claim for defamation based on Levy's alleged statement to a reporter for the Long Island Press that "[t]hese brothers have a history of disorderly conduct and were resisting arrest." According to the complaint, Angelo Ferlito is an attorney and the words spoken by Levy are harmful to his reputation as an attorney, constituting slander per se.

"The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001)* (citations omitted). A defamatory statement of fact is one that "tends to expose the plaintiff to public contempt, ridicule, **[*12]** aversion, or disgrace or induce an evil opinion of him in the minds

of right-thinking people to deprive him of their friendly intercourse in society." *Rinaldi v. Holt, Rinehardt & Winston, Inc., 42 N.Y.2d 369, 379, 366 N.E.2d 1299, 397 N.Y.S.2d 943 (1977)*. "[I]f the language is not of such a nature, that is, if it merely constitutes a general reflection on a person's character or qualitites, it is not a matter of such significance and importance as to amount to actionable defamation even though it may be unpleasant, annoying, or irksome, or may subject the plaintiff to jests or banter so as to affect his feelings." N.Y. Jur. Defam. § 5.

Generally, slander is not actionable unless the plaintiff suffers special damages. *Liberman v. Gelstein, 80 N.Y.2d 429, 434, 605 N.E.2d 344, 590 N.Y.S.2d 857 (1992)*. Here, no special damages are alleged and therefore the claim cannot be sustained unless Angelo Ferlito has stated a claim falling within one of four exceptions collectively referred to as slander per se. A claim for slander per se is limited to allegations that: "(i) charge the plaintiff with a serious crime; (ii) tend to injure the plaintiff in his or her trade, business or profession; (iii) imply that the plaintiff has a loathsome disease; or (iv) impute **[*13]** unchastity to a woman." *Albert, 239 F.3d at 271; Liberman, 80 N.Y.2d at 435*. In determining whether words are slanderous per se, they "should be considered in the context in which they were used and whether they can be readily interpreted as imparting to plaintiff fraud, dishonesty, misconduct or unfitness in his or her business. *Herlihy v. Metropolitan Museum of Art, 214 A.D.2d 250, 261, 633 N.Y.S.2d 106 (1st Dept. 1995)*.

The defamation claim must fail. Even assuming that the statement is one that exposes Angelo Ferlito to public contempt, ridicule, aversion or disgrace, the words are not slanderous per se. The words do not charge Angelo Ferlito with a serious crime. "Not every imputation of unlawful behavior is slanderous per se. With the extension of criminal punishment to many minor offenses, it was obviously necessary to make some distinction as to the character of the crime, since a charge of a traffic violation, for example, would not exclude a person from society, and today, would do little, if any, harm to his or her reputation at all. Thus, the law distinguishes between serious and relatively minor offenses and only statements regarding the former are actionable without proof of damage." *Liberman, 80 N.Y.2d at 436* **[*14]** (internal quotations and citations omitted). Under New York Law disorderly conduct is a violation and resisting arrest is a misdemeanor and do not constitute slander per se. *Cf. id.* (holding statement accusing the plaintiff of harassment is not slanderous per se).

Nor is the statement one that tends to injure Angelo Ferlito in his profession. "That exception . . . is limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon plaintiff's character or qualities." *Id.* The statement at issue here is unrelated to plaintiff's status as an attorney and therefore does not fall into the "trade, business or profession" exception. *Cf. id.* Accordingly, the claim for defamation (the eighth cause of action) is dismissed.

### Conclusion

The motion to dismiss is granted as to the fifth and eighth causes of action but otherwise denied.

**SO ORDERED.**

Dated: Central Islip, New York

November 19, 2007.

/s/

Denis R. Hurley

Senior District Judge

LEXSEE 2000 U.S. DIST. LEXIS 4237

**MARK KOMLOSI, Plaintiff, -against- MELANIE FUDENBERG, Defendant.**

**88 Civ. 1792 (HBP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 4237*

**March 31, 2000, Decided**
**March 31, 2000, Filed**

**DISPOSITION:**    [*1] Defendant's motion for judgment as matter of law granted in part and denied in part.

**COUNSEL:** For MARK KOMLOSI, plaintiff: Robert E. Goldman, Speno Goldman Goldberg Steingart & Penn, P.C., Mineola, NY.

For KENNETH BRODSKY, IVAN CANUTESON, CHARLES DEYOUNGE, JAMES BRENNAH, ARTHUR FOGEL, ELIN M HOWE, LOUIS GANIM, SHELDON KRAMER, NEW YORK STATE OFFICE OF MENTAL RETRADATION, JOSEPH SABATOS, ARTHUR WEBB, ROBERT WITKOWSKY, WALTER DELEONE, defendants: Robert W Abrams, Attorney General, New York, NY.

For MELANIE FUDENBERG, defendant: Mark E. Goldell, Galasso, Langione, Garden City, NY.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge.

**OPINION BY:** HENRY PITMAN

**OPINION**

*OPINION AND ORDER*

PITMAN, United States Magistrate Judge:

*I. Introduction*

Defendant moves for an order directing the entry of judgment in her favor as a matter of law pursuant to *Rule 50(b), Fed.R.Civ.P.* For the reasons set forth below, the motion is granted in part and denied in part. In addition, unless, within thirty days of the date of this Opinion and Order, plaintiff stipulates to remit all compensatory damages to the extent that they exceed $ 1,872,988.00 and all punitive damages to the extent that they exceed $ [*2] 500,000, I grant defendant's motion to the extent of ordering a new trial limited to the issue of damages. [1]

> 1 Defendant has not expressly moved for a new trial under Rule 59. However, defendant's claim concerning the excessive size of the verdict does not appear to be the type of claim on which a new trial could be granted under *Rule 50(b)(1)(B), Fed.R.Civ.P.* An excessive verdict is cured by a new trial or remittitur, *not* by the entry of judgment for the losing party. *See generally* 9A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 2538 at 359 (2d ed. 1994) ("The discretion to order a new trial [under *Rule 50(b)*] exists only if the moving party would be entitled to judgment as a matter of law.") Nevertheless, as discussed at pagea 11-12, below, defendant's notice of motion does expressly raise the issue of excessive damages, a traditional Rule 59 claim. *See generally* 11 Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 2807 (2d ed. 1994). Thus, it appears that the absence of an express reference to Rule 59 may have been an oversight. Accordingly, I deem defendant's notice of motion to be seeking, as alternative relief, a new trial on the grounds of excessiveness of the verdict.

**[*3] II.** *Facts*

*A. Overview*

This is a civil rights action brought pursuant to *42 U.S.C. § 1983* in which plaintiff, a psychologist formerly employed by the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"),

claims that defendant violated his federally protected rights by causing false charges of sexual misconduct to be made against him. With the parties' consent pursuant to *28 U.S.C. § 636(c)*, this matter was tried to a jury from May 24, through June 3, 1999. The case was submitted to the jury on three different theories of liability. The jury returned a verdict in plaintiff's favor on two of the three theories submitted to it and awarded $ 6.6 million in compensatory damages and $ 10 million in punitive damages.

## B. The Evidence at Trial

The facts underlying this action are discussed in some detail in the Court of Appeals' decision dismissing the claims against all defendants other than Melanie Fudenberg. *Komlosi v. New York State Office of Mental Retardation and Developmental Disabilities, 64 F.3d 810 (2d Cir. 1995).* Familiarity with that decision is assumed. I shall review [*4] the facts established at trial to the extent necessary to understand the pending motion.

Plaintiff was born and educated in the Republic of Czechoslovakia and immigrated to the United States in 1970. In 1974, plaintiff obtained permanent employment as a psychologist with the OMRDD. Plaintiff was initially assigned to the Brooklyn Developmental Center ("BDC"); in 1982, he was re-assigned to the Williamsburg Residential Training Center ("WRTC").

WRTC was a residential facility for approximately 46 developmentally disabled male and female adults who were cared for by approximately 60 professional and administrative staff. By 1984, plaintiff had achieved the level of "Psychologist II" and earned approximately $ 32,000 per year. His duties included both administrative and clinical responsibilities. In the early 1980's, he was also working on completing a Ph.D. dissertation in psychology. A doctoral degree would have entitled plaintiff to additional promotions and pay increases.

The defendant, Melanie Fudenberg, was also employed at WRTC. After starting as a switchboard operator, defendant was given a position as a Mental Health Therapy Aide Trainee. She subsequently was promoted to the [*5] position of Therapy Aide. Her duties as a Therapy Aide included assisting the residents of the facility with their activities of daily living and implementing direct care plans prepared by plaintiff and other professional staff members.

In 1984, WRTC had a procedure for its employees to follow to report incidents of suspected abuse of its residents. Any WRTC employee witnessing or suspecting abuse of a resident was required to report the suspected abuse to his or her immediate supervisor and also complete a written incident report. The report of a suspected incident of abuse would trigger an internal investigation into the incident and result in an investigative fact finding report with conclusions, recommendations and, if necessary, action against the employee responsible for the abuse. The incident report and the investigative findings became a permanent record of the facility.

Plaintiff could recall three instances of conflict with his co-employee Melanie Fudenberg at WRTC prior to August 1984. The first involved a resident named Sammy Roche who reported to plaintiff that defendant had struck him in the face. In accordance with WRTC procedure, plaintiff brought Roche to his immediate [*6] supervisor and reported the incident. When confronted by Roche, plaintiff and the supervisor, defendant denied having struck Roche.

The plaintiff and defendant also had a disagreement regarding a treatment plan prepared by the plaintiff for Anthony Ford. Ford had a history of being physically abusive towards staff members and, after determining that restraint and confrontation had not succeeded, plaintiff decided to try a therapy plan that included non-confrontational or passive response to Ford's attacks. Although defendant lacked plaintiff's professional training, she disagreed with and disapproved of plaintiff's approach.

A third incident involved WRTC resident, Marion Greengrass. In August 1984, defendant accompanied Greengrass to WRTC Chief of Services, Arthur Fogel, where Greengrass complained that plaintiff had sexually abused her. Plaintiff was placed on administrative leave and an investigation into the allegation ensued. The investigation concluded that the allegations were unsubstantiated, and that defendant had bribed Greengrass with cigarettes to fabricate the allegation against plaintiff.

During the investigation into Greengrass's allegations, defendant advised Fogel [*7] of other alleged incidents of sexual misconduct by plaintiff directed at other WRTC residents. Investigations of these allegations revealed that these charges were also unfounded. The defendant also accompanied WRTC resident Michael Sakowitz to Fogel's office at which time Sakowitz claimed that plaintiff had sexually abused him. However, after defendant left Sakowitz alone with Fogel, Sakowitz recanted his allegation and stated that defendant had instructed him to make the allegation.

In November 1984, Ivan Canuteson, OMRDD Associate Commissioner of Program Operations visited WRTC. During his visit, defendant approached Canuteson and expressed concerns that the charges of abuse against plaintiff had not been properly investigated. Based upon defendant's complaint to Canuteson, another investigation was ordered by OMRDD. Client's Rights Specialist, Lovetts Joyner, was assigned to conduct the investigation. Following his investigation, Joyner also

determined that the charges were baseless. He prepared a written report dated January 8, 1985 which stated that defendant's charges against plaintiff were unsubstantiated and had been created by defendant with the intent to injure plaintiff's [*8] reputation. He further recommended that a formal letter of exoneration be placed in plaintiff's personnel file and that OMRDD Employee Relations be advised of defendant's wrongful attempt to damage plaintiff's reputation and livelihood.

In March 1985, the defendant threatened WRTC resident David Rosenberg with "trouble" unless Rosenberg accused plaintiff of engaging in acts of sexual impropriety with Rosenberg. These accusations, like the previous allegations the defendant had concocted, were false. As she had done with other residents, the defendant escorted Rosenberg to Fogel's office and caused him to complain that plaintiff had sexually abused him sometime in February or March 1984. The defendant filed the requisite incident report and, again, the investigative process began. The plaintiff vehemently denied that he had sexually abused Rosenberg or any other resident at the facility.

The plaintiff was initially placed on administrative leave and then suspended without pay pending the completion of the investigation. However, the New York City Police Department subsequently started its own investigation, and the BDC's investigation was suspended.

On May 2, 1985, plaintiff was [*9] arrested and charged with nine counts of sexual abuse including rape and forcible sodomy. The alleged victims were all WRTC residents. As a result of the charges, plaintiff was arrested, handcuffed, chained to other suspected offenders, transported to a police station on where he was fingerprinted, photographed, strip searched, booked and jailed. He was later arraigned; bail was set at $ 75,000, which plaintiff was unable to post. He remained in jail for fifteen days; during his incarceration, other inmates threatened him physically and sexually. The New York Post reported the charges against plaintiff under the headline "SHRINK HELD IN SEX ATTACKS ON PATIENTS." During this time, plaintiff was frightened, humiliated, embarrassed and uncertain what his future would hold. He described his emotional state and experiences to the jury as "a nightmare." Due to concerns for his safety, authorities placed plaintiff in administrative segregation.

From March through May, 1985, Rosenberg stated to Detective Catalfumo of the New York City Police Department and to prosecutors from the Kings County District Attorney's Office that he and plaintiff had engaged in acts of sexual impropriety. Those [*10] state-

ments formed the basis for the arrest and indictment of plaintiff.

In May, 1985, the grand jury indicted the plaintiff on two (2) counts of "deviant sexual intercourse." Plaintiff's bail conditions were subsequently reduced, and plaintiff was released on his own recognizance. He was, however, required to surrender his passport and to attend all court appointments including the trial proceedings. Plaintiff remained suspended without pay from his position pending the disposition of the criminal charges.

Plaintiff's criminal trial commenced in May 1986. During the trial, before plaintiff was to testify, Rosenberg recanted his accusations. As a result of Rosenberg's recantation, the charges against plaintiff were dropped and the case was dismissed.

Plaintiff has been seeing a psychiatrist ever since the charges against him were dismissed and has been diagnosed with post-traumatic stress disorder. In addition to therapy, plaintiff has been prescribed anti-depressant and anti-anxiety medications. Plaintiff's treating psychiatrist characterized plaintiff's condition as chronic and permanent and of sufficient severity that it will continue to compromise plaintiff's personal, professional [*11] and social life. Plaintiff's psychiatrist also testified that plaintiff's fear and anxiety of being falsely accused, criminally charged, jailed and prosecuted for sexually abusing a patient will forever prevent him from practicing as a psychologist.

In September 1986, the plaintiff was offered reinstatement to his position at WRTC. Although plaintiff attempted to resume his duties at WRTC, he was unable to do so because defendant and Rosenberg were still at the facility and plaintiff feared a repeat of the past horrific experiences. The day following his attempt to return to work, plaintiff submitted a written resignation to BDC citing "health reasons" for his departure.

Plaintiff testified that, since his resignation from BDC, he attempted to pursue employment as a psychologist on two occasions. Plaintiff was not hired for the first position because the employer found out that he had been charged with sexual abuse of residents at WRTC. Plaintiff was terminated from the second position because he was unable to restrain a patient who attempted to run from a fire drill; plaintiff feared that he would be accused of improper physical contact with the patient if he attempted to restrain [*12] her physically.

Since 1986, plaintiff has been employed in various menial part-time positions but most steadily as a part-time doorman/concierge. During trial, plaintiff's expert economist, Dean W. Morse, testified that plaintiff's economic damages over his work life expectancy are $ 1,372,988, discounted to present value. Professor Morse

further testified that this is an extremely conservative figure. The defendant did not introduce any evidence to controvert this figure.

The case was submitted to the jury on three different theories of *Section 1983* liability: (1) defendant's alleged conduct constituted a violation of plaintiff's right to continued employment; (2) defendant's alleged conduct violated plaintiff's right to pursue the career of his choice (the "stigma plus" claim), and (3) defendant's alleged conduct violated plaintiff's right to be free of malicious and baseless prosecutions. The jury found for defendant on the first theory and returned a verdict for plaintiff on the second two theories. The jury awarded a total of $ 6.6 million in compensatory damages and $ 10 million in punitive damages.

## III. *Analysis*

### A. *Standards Applicable To a Rule 50(b) Motion*

[*13] The standards applicable to a motion for judgment as a matter of law are well settled and require only brief review.

"Judgment as a matter of law may not properly be granted under *Rule 50* unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [his] favor." *Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 289 (2d Cir. 1998); see also Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1039 (2d Cir. 1992); Vasbinder v. Ambach, 926 F.2d 1333, 1339 (2d Cir. 1991).* In ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. *See, e.g., Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d at 289, Vasbinder v. Ambach, 926 F.2d at 1339-40.* Thus, judgment as a matter of law should not be granted unless

(1) there is such a complete [*14] absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there

is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers, 34 F.3d 1148, 1154 (2d Cir. 1994)* (internal quotation marks omitted).

*Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999). See also Fernandez v. North Shore Ortho. Surg. & Sports Med. P.C., 79 F. Supp. 2d 197, 201-02 (E.D.N.Y. 2000); Jarvis v. Ford Motor Co., 69 F. Supp. 2d 582, 590 (S.D.N.Y. 1999); Culp v. Sgt. Zaccagnino, 1999 U.S. Dist. LEXIS 13752, 96 Civ. 3280 (THK), 1999 WL 701394 at *1 (S.D.N.Y. Sept. 8, 1999).*

In an Affirmation annexed to defendant's Notice of Motion, defendant contends that she is entitled to judgment as a matter of law on six different grounds:

6. The defendant respectfully submits that she is entitled to Judgment as a matter of law because: (i) she was not acting under color of state law; [*15] (ii) at the time of defendant's alleged misconduct, there was no clearly established federally protected right to engage in the employment of one's own choosing or to practice the profession of one's own choosing; (iii) because plaintiff was not fired, no liberty interest was implicated by defendant's conduct; (iv) at the time of defendant's alleged misconduct, there was no clearly established federally protected right to be free from malicious prosecution; (v) defendant did not cause plaintiff to be maliciously prosecuted because the chain of causation was broken by the independent police investigation and the District Attorney's prosecution and presentation of the case to the Grand Jury, free of any evidence of pressure, influence or participation by the defendant; and (vi) both the compensatory and punitive damages [awards] are excessive.

(Affirmation of Mark E. Goidell, Esq., dated June 23, 1999 at 6). Notwithstanding the requirements of Local

Civil Rule 7.1 [2], the memorandum of law submitted in support of defendant's motion ignores some of the foregoing claims, and raises other arguments not identified in the affidavit. In her memorandum of law, defendant does not address [*16] her contentions that (1) the plaintiff had no clearly established federal right to pursue the career of his choosing, (2) the plaintiff had no clearly established federal right to be free of malicious prosecutions, and (3) the verdict was excessive. In her memorandum of law, however, defendant does raise the additional claim that she is not responsible for any constitutional injury because she did not have discretionary authority to cause constitutional injury. Defendant offers no explanation for the inconsistency between the affirmation annexed to her notice of motion and her memorandum of law.

> 2    Rule 7.1 of the Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York provides:
>
>> Except as otherwise permitted by the court, all motions and all oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon in support of or in opposition to the motion, and divided, under appropriate headings, into as many parts as there are points to be determined. Willful failure to comply with this rule may be deemed sufficient cause for the denial of a motion or for the granting of a motion by default.

[*17] The inconsistency between defendant's affirmation and memorandum is troubling and ill serves the Court; the mere identification of an issue, without supporting briefing, is singularly unhelpful when the question before the Court is whether defendant is entitled to judgment as a matter of law. Nevertheless, because the issues raised in defendant's affirmation may be dispositive, I shall consider them notwithstanding defendant's failure to brief them in her memorandum of law.

B. *Plaintiff's "Stigma Plus" Claim*

1. *Merits of the Claim* [3]

> 3    Pursuant to *County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)* and *Medeiros v. O'Connell, 150*

*F.3d 164, 169 (2d Cir. 1998)*, I consider the merits of this claim before addressing the immunity issue.

Although it is now well settled that damage to an individual's reputation by a state agent coupled with "the termination of some other legal right or status will suffice to constitute a deprivation [*18] of a liberty interest", *Greenwood v. State of New York, 163 F.3d 119, 124 (2d Cir. 1998)* (inner quotations omitted), it is still not clear what satisfies the additional "plus" factor. *See generally* Martin A. Schwartz, *'Stigma Plus' Claims*, N.Y.L.J., Feb. 15, 2000, at 4 ("Supreme Court decisional law, however, has not resolved whether the plus must be a tangible deprivation, such as loss of a job or inability to pursue a profession, or whether it can be the denial of any right or status recognized by state law.").

Drawing all the inferences in favor of plaintiff, the evidence in this case showed that plaintiff was suspended without pay and subsequently subjected to a criminal prosecution as a result of defendant's causing Rosenberg to make false complaints against plaintiff. After the charges were dismissed, plaintiff was offered reinstatement, but ultimately resigned because the psychological injury he had suffered made it impossible for him to function as a psychologist. The only evidence concerning plaintiff's subsequent efforts to obtain and keep employment as a psychologist showed that one subsequent prospective employer rejected plaintiff when it learned [*19] of the abuse charges and that a second employer terminated plaintiff when he refused to restrain a patient during a fire drill for fear of being charged with inappropriate physical contact.

As a matter of law, however, suspension without pay is not a sufficient "plus" factor to give rise to a protected liberty interest. In *Dobosz v. Walsh, 892 F.2d 1135 (2d Cir. 1989)*, the plaintiff, a Bridgeport, Connecticut police officer, had cooperated in the federal investigation of another police officer, Fitzgerald. Dobosz testified before the grand jury and at trial against Fitzgerald; Dobosz's testimony suggested that Fitzgerald had killed an individual without justification and subsequently "planted" a knife next to the decedent's body in order to fabricate a claim of self defense.

After Fitzgerald was acquitted, Dobosz's employer announced that Dobosz would be suspended and prosecuted for perjury. Although departmental charges were subsequently brought against Dobosz, no criminal proceedings were ever commenced against him. After he was acquitted of the departmental charges, he was reinstated with full back pay and seniority credit.

Dobosz subsequently brought a *Section [*20] 1983* claim against the superintendent of the Bridgeport Police Department, asserting, among other things, a "stigma

plus" claim. The Court of Appeals affirmed the dismissal of this aspect of Dobosz's claim, stating:

> [*Board of Regents v. Roth, 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)*] held that two kinds of liberty concerns trigger due process rights in the public employment context: (i) the employee's interest in good name and reputation; and (ii) the employee's interest in being able to seek other employment opportunities. See *id. at 573-74, 92 S. Ct. at 2707*. Dobosz has alleged that [the Superintendent's] acts and statements were injurious to his reputation. However, under *Paul v. Davis, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976)*, government acts defaming an individual implicate a liberty interest only where the individual suffers a related alteration of his legal status or deprivation of a right recognized under state law. See *id. at 710-12, 96 S. Ct. at 1164-65*. Dobosz suffered no such alteration. He was reinstated with back pay and seniority credit, and his due process claim thus fails [*21] the *Paul* "reputation plus" test. *See Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir.), cert. denied, 493 U.S. 816, 110 S. Ct. 66, 107 L. Ed. 2d 33 (1989); see also Sparks v. City of Atlanta, 496 F. Supp. 770 774 (N.D. Ga. 1980)* ("stigma" suffered by police officer whose suspension was rescinded does not give rise to due process liberty interest).

*892 F.2d at 1140.*

Plaintiff makes no attempt to distinguish *Dobosz* or to explain why it is not controlling here. Indeed, plaintiff's post-trial papers do not address *Dobosz* at all.

Since *Dobosz* clearly holds that a suspension without pay is insufficient to satisfy the "plus" element of a "stigma plus" claim, defendant is entitled to judgment as a matter of law on that aspect of plaintiff's claim asserting liability based on defendant's interference with his right to pursue a career of his choosing. [4] In light of this disposition, it is unnecessary to reach the other arguments asserted by defendant concerning the merits of this aspect of plaintiff's claim.

---

4    I assume the jury concluded that defendant's conduct made it substantially more difficult for plaintiff to find employment as a psychologist.

That fact, however, does not salvage plaintiff's "sigma plus" claim. *Siegert v. Gilley, 500 U.S. 226, 234, 114 L. Ed. 2d 277, 111 S. Ct. 1789 (1991)* ("The statements contained in the letter would undoubtedly damage the reputation of one in [the plaintiff's] position, and impair his future employment prospects. . . . But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action."); *Paul v. Davis, 424 U.S. 693, 697, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976)* (concluding that the plaintiff suffered no violation of a liberty interest, even though his complaint alleged impairment of future employment opportunities).

[*22] *2. Qualified Immunity*

The doctrine of qualified immunity was recently summarized by the Court of Appeals in *McCullough v. Wyandanch Union Free School Dist., 187 F.3d 272, 278 (2d Cir. 1999)*:

> A government agent enjoys qualified immunity when he or she performs discretionary functions if either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights. A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct. The unlawfulness must be apparent.

*See also Anderson v. Creighton, 483 U.S. 635, 638-39, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982); Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir. 2000); [*23] Connell v. Signoracci, 153 F.3d 74, 80 (2d Cir. 1998); Brown v. City of Oneonta, 106 F.3d 1125, 1130-31 (2d Cir. 1997).*

The events giving rise to plaintiff's "stigma plus" claim occurred in 1985. However, except in cases in-

volving a wrongful termination of employment, the elements of a stigma plus claim were not clearly established at that time.

In *Greenwood v. State of New York, supra, 163 F.3d 119 (2d Cir. 1998)*, the issue was whether the elements of a non-termination, "stigma plus" claim had been clearly established as of 1982, and the Court of Appeals concluded that the elements of such a claim were not clearly established as of 1982. *163 F.3d at 124.* In reaching its conclusion concerning the state of the law in 1982, the Court relied on its 1989 statement that "''stigma plus'' is required to establish a constitutional deprivation, but it is not entirely clear what the plus is.'" *163 F.3d at 124, citing Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir. 1989).* Since the contours of the right were not clearly established in 1982, it necessarily follows that they were not clearly established in [*24] 1985.

Thus, defendant is also entitled to judgment as a matter of law on plaintiff's stigma plus claim pursuant to the doctrine of qualified immunity.

*C. Malicious Prosecution*

*1. Merits of the Claim*

Defendant attacks the merits of the malicious prosecution aspect of plaintiff's claim on several grounds. Again, I shall examine each issue relating to the merits of the claim before addressing the qualified immunity defense.

*a. Color of State Law*

Defendant first argues that the verdict cannot stand because there is insufficient proof that she was acting under color of state law. In substance, defendant claims that the evidence established, at most, a personal pursuit by defendant. Since the conduct was personal, says defendant, it is not actionable under *Section 1983*.

"The Supreme Court has broadly interpreted the color of law requirement, concluding that 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of" state law.'" *United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999), quoting United States v. Classic, 313 U.S. 299, 326, 85 L. Ed. 1368, 61 S. Ct. 1031 (1941).* `

[*25]

To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the

State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Ibid.* "State employment is generally sufficient to render the defendant a state actor." *[Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 n.18, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982)].* It is firmly established that a defendant in a *§ 1983* suit acts under color of state law when he abuses the position given to him by the State. *See Monroe v. Pape, [365 U.S. 167, 172, 5 L. Ed. 2d 492, 81 S. Ct. 473 (1961), overruled in part on other grounds, Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 695-701, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)].* Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law. *See e.g., Parratt v. Taylor, [451 U.S. 527, 535-536, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), overruled in [*26] part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-331, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986)]; Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S. Ct. 1598, 1605-1606, 26 L. Ed. 2d 142 (1970). See also Flagg Bros., Inc. v. Brooks, [436 U.S. 149, 157 n.5, 56 L. Ed. 2d 185, 98 S. Ct. 1729 (1978)].*

*West v. Atkins, 487 U.S. 42, 49-50, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).*

5 Although *Classic* defined "color state of law" in the context of a prosecution under *18 U.S.C. § 241*, the definition is equally applicable to a civil action brought under *42 U.S.C. § 1983. West v. Atkins, 487 U.S. 42, 49, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988).*

There was clearly enough evidence in this case to sustain a finding that defendant acted under color of state law when she caused false charges to be made against plaintiff. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable [*27] inferences in his favor, the evidence established that defendant had access to Rosenberg by virtue of her employment by the state as a Therapy Aide. There was no evidence that defendant ever had any relationship with Rosenberg outside the WRTC. It was only by virtue of her access to Rosenberg that she was able to coerce him to make a false charge of sexual abuse against plaintiff.

Thus, contrary to defendant's argument, this is not a case of purely personal animus that erupted into confrontation while the participants merely happened to be on state property. Rather, this is a case in which plaintiff misused the incidents of her state employment, namely her access to and relationship with Rosenberg, to cause false allegations of misconduct to be made against plaintiff by Rosenberg. In other words, this was a case in which the abuse was "made possible only because the wrongdoer [was] clothed with the authority of state law." *United States v. Classic, supra, 313 U.S. at 326.* The notion that Rosenberg would have submitted to defendant's directions, absent her position as Therapy Aide, is an assumption that is not supported by either the record or common sense.

In support [*28] of her argument, defendant cites a number of cases in which direct physical assaults by state employees on another were found not to constitute state action. *Martinez v. Colon, 54 F.3d 980 (1st Cir. 1995); Hughes v. Halifax Co. School Bd., 855 F.2d 183, 187 (4th Cir. 1988); Segreto v. Kirschner, 977 F. Supp. 553 (D. Conn. 1997); Williams v. Josephs, 1993 U.S. Dist. LEXIS 14079, 91 Civ. 8178 (MBM), 1993 WL 403969 (S.D.N.Y. Oct. 7, 1993).* [6] These cases are all distinguishable. In each, although the assault took place on state property, the state employment provided "at most the occasion but not the means for committing the challenged acts." *Williams v. Josephs, supra, 1993 U.S. Dist. LEXIS 14079, *8, 1993 WL 403969 at *3.* In this case, on the other hand, there was sufficient evidence for the jury to conclude that defendant was able to cause Rosenberg to make the false allegation by virtue of her employment-based relationship with him and that it was defendant's state employment that provided the means for the conduct in issue.

> 6    In this regard, defendant also cites an unpublished Summary Order of the Court of Appeals for the Second Circuit. Since defendant's citation of this Summary Order violates Rule 0.23 of Second Circuit's Rules, I have not considered it.

[*29] Thus, defendant is not entitled to judgment as a matter of law on the theory that there was insufficient evidence that defendant acted under color of state law.

*b. Causation*

Because defendant's remaining arguments address the sufficiency of the proof of the malicious prosecution aspect of plaintiff's claim, it is helpful to first identify those elements.

The elements of a *Section 1983* claim based on malicious prosecution are borrowed from state tort law. *Lee v. Edwards, 101 F.3d 805, 810 n.4 (2d Cir. 1996); Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir. 1994).*

In order to state a claim for the tort of malicious prosecution under New York State law, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995);* see *Broughton v. State, 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 95, 335 N.E.2d 310, cert. denied, 423 U.S. 929, 96 S. Ct. 277, 46 L. Ed. 2d 257 (1975).* [*30]

*Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997).* Defendant's challenges here relate to the first and second elements.

Defendant first argues that she is entitled to judgment as a matter of law because the evidence was insufficient to support a finding that she caused the commencement of the criminal prosecution against plaintiff. Specifically, defendant argues that she cannot be found to have initiated the prosecution because plaintiff's indictment was the product of the intervening and independent acts of the grand jury and the Kings County District Attorney (Defendant's Memorandum of Law in Support of her *Rule 50(b)* Motion for Judgment as a Matter of Law ("Def. Memo.") at 19-21).

The direct evidence at trial concerning the commencement and termination of the criminal proceeding against plaintiff consisted primarily of the following stipulated facts:

> David Rosenberg, a resident at the Williamsburg Residential Training Center accused Mr. Komlosi of having sexually abused him.

> An investigation of Mr. Rosenberg's allegation was conducted by the Williamsburg Residential Training Center.

> [In March 1985, through May, 1985, David Rosenberg stated to Detective [*31] Catalfumo of the New York City Police Department and prosecutors of the Kings County District Attorney's Office that he and Mark Komlosi had engaged in acts of sexual impropriety which served as their bases for the arrest and indictment of plaintiff Mark Komlosi, up to the date of dismissal, May 29, 1986.]

Mr. Komlosi was arrested by the New York City Police Department.

During the criminal trial against Mr. Komlosi, before Mr. Komlosi was to testify, Mr. Rosenberg recanted, or took back, his accusations against Mr. Komlosi.

As a result of Mr. Rosenberg's recanting his accusation, the criminal charges against Mr. Komlosi were dropped and the criminal case was dismissed.

(Trial Tr. 727-28).

This evidence, in conjunction with Mr. Rosenberg's testimony that defendant forced him to make false allegations of sexual misconduct against plaintiff, supports the conclusion that it was Rosenberg's false statements, made at defendant's instigation, that brought about the commencement of the criminal proceedings against plaintiff. There was no evidence offered at trial that the District Attorney's Office had evidence concerning the alleged incident between Rosenberg and plaintiff from [*32] any other source.

Where, as here, a defendant willfully and maliciously causes false information to be presented to prosecuting officials, the prosecutor's decision, based on the false information, will not shield the source from liability for malicious prosecution.

*White v. Frank, 855 F.2d 956 (2d Cir. 1988)*, involved analogous facts. In that case, the defendants, two police officers, testified falsely before a grand jury, resulting in the plaintiff's indictment. After the perjury was disclosed, plaintiff sued under *Section 1983*, alleging, *inter alia*, malicious prosecution. In dismissing the defendants' appeal from the District Court's denial of a motion to dismiss, the Court of Appeals squarely held that a witness who intentionally provides false testimony to a grand jury or prosecutor may be liable for malicious prosecution.

Appellants also contend that the role of both the public prosecutor and the grand jury in advancing the prosecution of [plaintiff] necessarily insulated them from liability for malicious prosecution. We disagree. The intervening acts of a grand jury have never been enough to defeat an otherwise viable malicious prosecution claim, [*33] whether or not the grand jury votes a true bill or even returns an indictment ultimately determined to be deficient as a matter of law. . . . And though

an indictment by a grand jury is generally considered *prima facie* evidence of probable cause in a subsequent civil action for malicious prosecution, this presumption may be rebutted by proof that the defendant misrepresented, withheld, or falsified evidence. *See Hopkinson v. Lehigh Valley R.R. Co., 249 N.Y. 296, 300, 164 N.E. 104, 106 (1928); Dennis v. Ryan, [65 N.Y. 385, 388-89 (1875)];* W. Prosser, [*Law of Torts*, (4th ed. 1971)] § 119 at 846; *Restatement (Second) of Torts § 664(2) & comment b* (1977).

The public prosecutor's role in the prosecution likewise does not affect our immunity analysis, though again it may affect appellant's ultimate liability on the merits. No doubt, the availability of the malicious prosecution action has been curtailed with the growth of the office of the public prosecutor. . . . The exercise of independent judgment by the public prosecutor and his active role in initiating criminal prosecutions may decrease the likelihood that a complaining witness will [*34] be considered to have "caused" or "procured" the prosecution, thus defeating grounds for liability under this initial prong of the common law standard. . . .

As with the grand jury, however, the public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false. *See Hopkinson v. Lehigh Valley R.R. Co., supra, 249 N.Y. at 300-01, 164 N.E. at 106; Dennis v. Ryan, supra, 65 N.Y. at 388-89; see also Russo v. New York, [672 F.2d 1014, 1018 (2d Cir. 1982), mod. on other grounds, 721 F.2d 410 (2d Cir. 1983)]* (presumption of probable cause arising from arrest warrant disappears where warrant is issued on the basis of sworn accusations of defendant in malicious prosecution action); W. Prosser, *supra*, § 119, at 837; *Restatement (Second) of Torts, supra, § 653 comment g.* "It is quite clear," wrote two English commentators in the early part of this century, "that a defendant who has misled a tribunal by dishonest evidence and thereby caused it to act to the prejudice of the plaintiff is [*35] liable, even though he

may not have purported to be the prosecutor," J. Clerk & W. Lindsell, [*The Law of Torts*] at 639 [(7th ed. 1921)] (citations omitted).

*855 F.2d at 961-62.* See also *Babi-Ali v. City of New York, 979 F. Supp. 268, 276 (S.D.N.Y. 1997); Morillo v. City of New York, 1997 U.S. Dist. LEXIS 1665, 95 Civ. 2176 (JSM), 1997 WL 72155 at *1-*2 (S.D.N.Y. Feb. 20, 1997); Crespo v. New York City Police Comm'r, 930 F. Supp. 109, 117-18 (S.D.N.Y. 1996).*

> 7  I realize that *Albright v. Oliver, 510 U.S. 266, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994)* significantly altered the law applicable to *Section 1983* actions based on a malicious prosecution theory. However, nothing in *Albright* addressed the causation issue addressed in *White*, and, therefore, I do not read *Albright* as affecting the continuing vitality of *White*.

Since there was sufficient evidence to sustain defendant's liability on the issue of causation, she is not entitled [*36] to judgment as a matter of law on this ground.

> 8  I do not understand defendant to be arguing that she could not have caused plaintiff's prosecution because the evidence showed that it was Rosenberg, not defendant, who actually provided the false information. If this is defendant's argument it is without merit. As noted above, the evidence was sufficient to support a finding that defendant caused Rosenberg to make the false report. This is sufficient personal involvement to sustain liability under *Section 1983. Jeffries v. Harleston, 21 F.3d 1238, 1247 (2d Cir. 1994)* ("a plaintiff may establish causation under *Section 1983* if he shows that the defendant[] participated in, or [was the] 'moving force[]' behind, the deprivation."), *vacated and remanded on other grounds, 513 U.S. 996 (1994).*

### C. Favorable Termination

Finally, defendant claims that she is entitled to judgment as a matter of law because there was insufficient evidence to sustain a finding that the [*37] criminal proceeding terminated in plaintiff's favor. Defendant claims that the termination of the criminal proceeding against plaintiff was "most analogous," (Def. Memo. at 22) to a dismissal in the interests of justice, and, therefore, not a favorable termination on the merits. *See generally Hygh v. Jacobs, 961 F.2d 359, 368 (2d Cir. 1992)* ("as a matter of law" a dismissal in the interests of justice

"cannot provide the favorable termination required as the basis for a claim of malicious prosecution").

The leading case in this Circuit addressing this issue is *Murphy v. Lynn, supra, 118 F.3d 938 (2d Cir. 1997),* in which the Court of Appeals stated:

> Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused. *See, e.g., Restatement § 660 comment a; Halberstadt v. New York Life Insurance Co., 194 N.Y. 1, 10-11, 86 N.E. 801, 803-04 (1909)* ("*Halberstadt*"); *Hollender v. Trump Village Cooperative, Inc., 58 N.Y.2d 420, 426, 461 N.Y.S.2d 765, 768, 448 N.E.2d 432 (1983)* [*38] ("*Hollender*") (quoting Restatement § 660 comment a); *MacFawn v. Kresler, 88 N.Y.2d 859, 860, 644 N.Y.S.2d 486, 486, 666 N.E.2d 1359, (1996)(mem.)(whether "the final disposition of the proceeding involves the merits and indicates the accused's innocence" (citing *Hollender*); *O'Brien v. Alexander, 101 F.3d 1479, 1486-87 (2d Cir. 1996)* (discussing cases); *Russell v. Smith, 68 F.3d [33, 36 (2d Cir. 1995)]* ("In the absence of a decision on the merits, the plaintiff must show that the final disposition is indicative of innocence.") The answer to whether the termination is indicative of innocence depends on the nature and circumstances of the termination; the dispositive inquiry is whether the failure to proceed "implies a lack of reasonable grounds for the prosecution," *Loeb v. Teitelbaum, 77 A.D.2d [92, 101], 432 N.Y.S.2d [487, 494 (2nd Dep't 1980)].*

*118 F.3d at 948.*

In this case, as noted above, the direct evidence concerning the termination of the criminal proceeding against plaintiff consists of several stipulated facts. [9] These stipulated facts show that, during the criminal trial against plaintiff, [*39] Rosenberg recanted his accusations against plaintiff and that, as a result of the recantation, the criminal charges against plaintiff were dropped and the indictment dismissed.

> 9  Although the parties had a transcript of the proceedings dismissing the criminal charges

against plaintiff, (*see* Trial Tr. 17-24), neither side ever offered the transcript in evidence.

The effect of a dismissal resulting from a witness's recantation was discussed in *Russell v. Smith, 68 F.3d 33 (2d Cir. 1995).* In that case, a witness, Viust, gave testimony in the grand jury that implicated Russell, Viust's brother and others. Viust's grand jury testimony was corroborated by another witness and by certain physical evidence. After Russell was indicted, but prior to the criminal trial, Viust recanted his testimony and the state criminal court dismissed the charges against Russell "'with leave to represent.'" *68 F.3d at 35.* Russell subsequently sued for malicious prosecution, and Viust refused to testify [*40] or to provide an affidavit in support of Russell's malicious prosecution claim. *Id.* On the basis of the foregoing evidence, the Court of Appeals affirmed the granting of summary judgment in defendant's favor, concluding that Russell had not established a genuine issue that the criminal proceeding had terminated in his favor. *68 F.3d at 38.*

*Russell* does not purport to establish a *per se* rule that dismissal based on recantation cannot be favorable to the accused. Moreover, several factual differences demonstrate that *Russell* is not controlling here. First, the dismissal in *Russell* was "'with leave to represent.'" Thus, there was no legal bar to Russell's subsequent re-indictment and conviction. In contrast, the charges in this case were dismissed after the criminal trial had commenced. Thus, any subsequent attempt to reprosecute plaintiff would be barred by the *Double Jeopardy Clause.* Second, Viust's grand jury testimony inculpating Russell was corroborated by other testimony and physical evidence. In this case, it appears that there was no corroboration whatsoever of Rosenberg's testimony inculpating plaintiff. Third, the Court of Appeals noted in [*41] *Russell* that Viust's recantation was suspect because the grand jury testimony he recanted had inculpated his own brother. *68 F.3d at 36.* Thus, the recantation in *Russell* assisted a family member. In this case, Rosenberg's recantation benefitted neither Rosenberg nor a family member. Fourth, Viust was unwilling to testify in support of Russell's malicious prosecution case. Rosenberg, on the other hand, did testify in support of plaintiff's claim and re-affirmed that his prior accusations against plaintiff were false and were instigated by defendant. Finally, the fact that plaintiff here was offered reinstatement and provided with back pay for the full period of his suspension evidences a belief by the state that the charges were groundless. If the state believed that plaintiff was, in fact, a sexual predator, it is inconceivable that it would have offered him reinstatement as a psychologist caring for developmentally disabled patients. In view of these distinctions, *Russell* is not controlling here.

The evidence discussed in the foregoing paragraph provided a sufficient basis for the jury to conclude that the charges were dismissed for reasons "indicative of [*42] innocence." Thus, defendant is not entitled to judgment as a matter of law on the theory that plaintiff failed to establish a favorable termination.

### 2. Qualified Immunity

Without citing any authority, defendant claims she is entitled to qualified immunity from plaintiff's malicious prosecution claim because there was no clearly established federal right to be free of malicious prosecutions at the time of her conduct. This argument, however, is clearly incorrect.

In *Lennon v. Miller, 66 F.3d 416 (2d Cir. 1995),* plaintiff asserted a Section 1983-malicious prosecution claim based on conduct alleged to have occurred in 1991. Although the Court of Appeals ultimately held that the defendants in that case were entitled to qualified immunity because their actions met the standard of objective reasonableness, it noted:

> There is no question that the rights at issue in this case -- to be free from false arrest, malicious prosecution, and excessive force --were clearly established at the time of the incident. *See e.g., Carroll v. United States, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925)* (recognizing constitutional right not to be arrested [*43] or prosecuted without probable cause) . . . .

*66 F.3d at 423. See also Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)* (right to be free of malicious prosecution clearly established as of 1984-87); *Walker v. New York City Police Dep't,* 94 CV 3608, 1996 WL 391564 at *5 (E.D.N.Y. June 24, 1996) (citing *Carroll v. United States, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280 (1925)* for the proposition that the right to be free of malicious prosecution is clearly established); *Kampfer v. Pitcher,* 1996 U.S. Dist. LEXIS 858, *15, 95- CV-214, 1996 WL 31161 at *5 (N.D.N.Y. Jan. 19, 1996) ("A person's right to be free from . . . malicious prosecution has long been clearly established," citing *Carroll v. United States, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280 (1925)), aff'd mem., 112 F.3d 504 (2d Cir. 1997); Janetka v. Dabe,* 1993 U.S. Dist. LEXIS 2797, 89-C V-3721, 1993 WL 72358 at *3 (E.D.N.Y. Feb. 24, 1993) (right to be free of malicious prosecution clearly established at least as of 1986).

The relevant conduct in this case occurred in 1985. In view of the foregoing authorities and the repeated reliance [*44] by Courts in this Circuit on *Carroll v.*

2000 U.S. Dist. LEXIS 4237, *

*United States* -- a case decided in 1925 -- for the proposition that the right to be free of malicious prosecution has long been clearly established, defendant's qualified immunity argument is without merit.

#### D. *Damages*

##### 1. *Excessiveness of the Compensatory Damages*

Although defendant claims that the jury's awards of compensatory and punitive damages are excessive, she has submitted no authorities addressing these issues. Nevertheless, the sheer size of the awards warrants their examination.

As a threshold matter, defendant claims plaintiff is not entitled to recover any damages for the period after the criminal proceedings against plaintiff terminated. Defendant argues that a damages remedy must be tailored to the constitutional injury suffered by plaintiff and that the constitutional injury terminated when the criminal charges against plaintiff were dismissed.

Defendant's argument does not withstand analysis. Although the constitutional violation ended when the charges against plaintiff were dropped, the sequelae of this violation did not. There was evidence at trial that plaintiff suffered substantial psychological injury as a [*45] result of his criminal prosecution. This psychological injury was established not merely by plaintiff's subjective testimony, *see generally Annis v. County of Westchester, 136 F.3d 239, 248-49 (2d Cir. 1998)*, but also by the testimony of his treating psychiatrist, Dr. Gorzynski. In addition, there is circumstantial corroboration of plaintiff's psychological injury in plaintiff's employment history after the termination of the criminal proceedings. Prior to the criminal prosecution plaintiff was able to function as a psychologist; after the termination of the prosecution, concerns about recurring allegations of sexual misconduct limited plaintiff's employment to relatively menial positions. [10] Viewing the evidence in the light most favorable to plaintiff, there was sufficient evidence for the jury to conclude that the baseless and malicious prosecution had consequences that lasted beyond the termination of the violation, and *Section 1983* clearly permits recovery for these consequences. *Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307, 91 L. Ed. 2d 249, 106 S. Ct. 2537 (1986); Carey v. Piphus, 435 U.S. 247, 264, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978)* [*46] ("mental and emotional distress . . . is compensable under *§ 1983*"); *Burka v. New York City Transit Auth., 747 F. Supp. 214, 224 (S.D.N.Y. 1990)* (permitting recovery of wages plaintiffs would have earned prospectively but for the constitutional violation).

10   Although it might be argued that plaintiff intentionally limited his employment to low-paying positions to enhance his recovery at trial, the jury obviously did not reach this conclusion, and there is no basis to disturb its findings in this regard.

The jury here awarded $ 6.6 million in compensatory damages. There was uncontradicted evidence that plaintiff's economic loss resulting from his inability to pursue his career as a psychologist totaled $ 1,372,988, reduced to present value (Trial Tr. 410). Thus, it appears that the jury awarded $ 5,227,012 as compensatory damages for plaintiff's mental anguish, including the loss of enjoyment resulting from his inability to pursue the career of his choice.

Where, as here, the issue is whether [*47] damages awarded on a federal claim are excessive, the jury's verdict is not to be disturbed unless it shocks the conscience.

It is well established in this Circuit that in *section 1983* cases "the standard for appellate review of damages awards, whether compensatory or punitive, 'is whether the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988)* (quoting *Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978))* . . . .

As we have noted, the determination of whether a damages award exceeds a reasonable range "should not be made in a vacuum," *Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990)*, but should include consideration of the amounts awarded in other, comparable cases, *see, e.g., id. at 186-87; Raucci v. Town of Rotterdam, 902 F.2d 1050, 1058 (2d Cir. 1990); Zarcone, 572 F.2d at 54-55; Hogan v. Franco, 896 F. Supp. 1313, 1326 (N.D.N.Y. 1995)* . . . .

*Mathie v. Fries, 121 F.3d 808, 813 (2d Cir. 1997)*. In addition, if the verdict is found to be excessive, [*48] it should be reduced only to the maximum amount that could be upheld. *Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328-29 (2d Cir. 1990); accord Peterson v. County of Nassau, 995 F. Supp. 305, 321 (E.D.N.Y. 1998)*.

The evidence in this case sustains a substantial verdict for mental anguish. Prior to the assertion of defendant's fabricated charges, plaintiff had had no involvement with the criminal justice system. As a result of de-

2000 U.S. Dist. LEXIS 4237, *

fendant's misconduct, plaintiff was arrested on charges that bear an extremely high level of disgrace, namely, the sexual abuse by a mental health professional of a developmentally disabled individual placed in his care. [11] The baseless charges against plaintiff were publicized in the New York Post under the headline "SHRINK HELD IN SEX ATTACKS ON PATIENTS"; there is no evidence that the dismissal of the charges received any publicity whatsoever. Plaintiff was incarcerated for two weeks with sex offenders and murderers as a result of the charge. At the time these events were unfolding, plaintiff had a minor child, and the assertion of the charges adversely affected plaintiff's relationship with this child. Plaintiff required [*49] psychiatric intervention and years of psychotropic medication as a result of the defendant's acts. Before defendant's acts, defendant had the self-confidence and strength to come to a new country, without friends or family, and start a life as a health care professional. After defendant's acts, however, plaintiff was so demoralized and concerned about the possibility of a recurrence of false allegations that he was unable to resume his career as a psychologist and was limited to employment far below his former capabilities.

11   The special opprobrium society has for sex offenders is evidenced by *New York Corrections Law § 168-c et seq.* which requires the registration of sex offenders and public notice of their presence in a community. No similar requirements are applicable to convicted murderers, contract assassins, bombers, robbers, arsonists, burglars, violent muggers or narcotics traffickers who sell drugs to minors.

Although these tribulations are great, an award of more than $ 5 million is clearly excessive. [*50] Indeed, a review of other malicious prosecution and false arrest cases fails to disclose any verdict that exceeds $ 1 million. [12]

*King v. Macri, 993 F.2d 294 (2d Cir. 1993)* - affirming award of $ 75,000 compensatory damages.

*Hygh v. Jacobs, 961 F.2d 359 (2d Cir. 1992)* - compensatory damages of $ 65,000 awarded; new trial ordered.

*Ismail v. Cohen, 899 F.2d 183 (2d Cir 1990)* - malicious prosecution coupled with beating that caused two displaced vertebrae, cracked rib and serious head trauma; compensatory damages of $ 650,000 upheld.

*Garner v. Meoli, 19 F. Supp. 2d 378 (E.D. Pa. 1998)* - jury awarded compensatory damages against two defendants aggregating $ 153,250.

*Martinez v. Gayson, 1998 U.S. Dist. LEXIS 12281, 95-C V-3788 (ILG), 1998 WL 564385 (E.D.N.Y. June 30, 1998)* - remitting award of $ 310,000 in compensatory damages to $ 150,000.

*Peterson v. County of Nassau, supra, 995 F. Supp. 305 (E.D.N.Y. 1998)* - compensatory damages of $ 160,000 reduced to $ 15,000.

*Mason v. City of New York, 949 F. Supp. 1068 (S.D.N.Y. 1996)* - compensatory damages of $ 100,000 reduced [*51] to $ 10,000.

*Vitale v. Hagan, 132 A.D.2d 468, 517 N.Y.S.2d 725 (1st Dep't 1987), modified on other grounds, 71 N.Y.2d 955, 524 N.E.2d 144, 528 N.Y.S.2d 823 (1988)* - affirming award of $ 750,000 for malicious prosecution.

12   Obviously, every case is different, and the results in other cases constitute, at best, a rough guide to the range or appropriate verdicts.

One qualitative difference between the foregoing cases and the present case is that none of the foregoing cases involved conduct that either effectively drove plaintiff out of his career or made it extremely difficult for plaintiff to pursue his career. A review of the cases involving such a consequence yields the following results:

*Ortiz-Del Valle v. National Basketball Ass'n, 42 F. Supp. 2d 334 (S.D.N.Y. 1999)* - Title VII case; female plaintiff barred from career as NBA referee; $ 750,000 in emotional distress damages reduced to $ 20,000.

*Davis v. City of New York, 264 A.D.2d 379, 693 N.Y.S.2d 230 [*52] (2d Dep't 1999)* - as a result of lead poisoning, infant plaintiff required to undergo remedial instruction to advance in school and likely to have difficulty throughout his life with

personal relationships and work - and school-related pursuits; verdict of $ 1 million reduced to $ 150,000 for future pain and suffering, no award for lost earning capacity.

*Osiecki v. Olympic Regional Dev. Auth.,* 256 A.D.2d 998, 682 N.Y.S.2d 312 (3rd Dep't 1998) - plaintiff unable to pursue career as architect as a result of physical injury; award of $ 495,000 for future pain and suffering reduced to $ 243,000.

*Gallo v. Supermarkets General Corp.,* 112 A.D.2d 345, 491 N.Y.S.2d 796 (2d Dep't 1985) - plaintiff suffered severe burning, scarring and disfigurement in an industrial accident; as a result of his physical appearance, plaintiff was unable to work, feared contact with other people, was unable to look at himself in the mirror, was unable to lead normal life and required ten years of psychotherapy; award of $ 1.4 million for pain and suffering affirmed.

Although none of these cases involved facts identical to the facts in this case, they all underscore [*53] the excessiveness of the $ 5.2 million awarded as non-economic compensatory damages in a case where plaintiff suffered no physical injury. *See generally Mathie v. Fries, supra,* 121 F.3d at 813-14 (surveying range of compensatory damages awarded in cases of rape, sexual assault and police misconduct; awards ranged from $ 80,000 to $ 1.75 million).

Based on the foregoing and giving appropriate weight to the profound impact that defendant's misconduct had on plaintiff's life, I conclude that the appropriate measure of compensatory damages for non-economic loss is $ 500,000.00. Although this figure is at the high end of the range of verdicts awarded in the foregoing cases, it is proper here primarily because the false charge against plaintiff involved the highest level of moral turpitude, implicated his professional fitness in the most serious manner possible and destroyed his ability to practice his profession. Although plaintiff suffered no physical injury, his serious psychological injury was confirmed by his physician, circumstantially corroborated by plaintiff's employment history and may be of longer duration than many physical injuries.

Accordingly, to the extent [*54] defendant seeks a new trial on the issue of compensatory damages, the motion is granted unless plaintiff stipulates within thirty

(30) days of the date of this Opinion and Order to remit all compensatory damages awarded by the jury to the extent those compensatory damages exceed a total of $ 1,872,988.00.

### 2. Excessiveness of the Punitive Damages

The standards relevant to judging the excessiveness of punitive damages in a *Section 1983* were comprehensively set forth in *Lee v. Edwards,* 101 F.3d 805 (2d Cir. 1996). Because the opinion in *Lee* is such a comprehensive statement of the relevant principles, I quote it at length.

> Punitive damages are available in a *§ 1983* action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S. Ct. 1625, 1640, 75 L. Ed. 2d 632 (1983). Although a jury has wide discretion, a district court may refuse to uphold a punitive damage award when the amount is "so high as to shock the judicial conscience and constitute a denial of justice." *Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc.,* 850 F.2d 876, 883 [*55] (2d Cir.) (quoting *Zarcone v. Perry,* 572 F.2d 52, 56-57 (2d Cir. 1978)), cert. denied, 488 U.S. 967, 109 S. Ct. 495, 102 L. Ed. 2d 532 (1988). "If the district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir. 1995).

> We review for abuse of discretion a district court's ruling that a punitive damage award does not "shock the judicial conscience." *Hughes,* 850 F.2d at 883. "'We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.'" *Gasperini v. Center for Humanities,* [518 U.S. 415, 435], 116 S. Ct. 2211, 2223-24, 135 L. Ed. 2d 659 (1996) (quoting *Dagnello v. Long Island R.R. Co.,* 289 F.2d 797, 806 (2d Cir. 1961)).

In gauging excessiveness, [*56] we must keep in mind the purpose of punitive damages: "to punish the defendant and to deter him and others from similar conduct in the future." *Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992)* (citing *Smith, 461 U.S. at 54, 103 S. Ct. at 1639)*. Thus, our task is "to make 'certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.'" *Id. at 121* (quoting *Pacific Mut. Life Ins. co. v. Haslip, 499 U.S. 1, 21, 111 S. Ct. 1032, 1045, 113 L. Ed. 2d 1 (1991))*; *see also BMW of North America, Inc. v. Gore, [517 U.S. 559, 568], 116 S. Ct. 1589, 1595, 134 L. Ed. 2d 809 (1996)* (punitive damages vindicate a state's legitimate interests in punishment and deterrence).

The Supreme Court [has] erected three guideposts that should assist us in the application of our standard, by which we deem excessive a punitive damage award that "shocks our judicial conscience," *Hughes, 850 F.2d at 883.* These guideposts include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of [*57] punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Gore, [517 U.S. at 575], 116 S. Ct. at 1598-99.*

*101 F.3d at 808-09. See also Mathies v. Fries, supra, 121 F.3d at 816-17; Fernandez v. North Shore Ortho. Surg. & Sports Med., P.C., supra, 79 F. Supp. 2d at 207; Del Valle v. National Basketball Ass'n, supra, 42 F. Supp. 2d at 344-46; Ettinger v. State University of New York, 1998 U.S. Dist. LEXIS 2289, 95 Civ. 9893 (RWS), 1998 WL 91089 at *10 (S.D.N.Y. March 2, 1998).*

Applying the three *Gore* factors identified in *Lee* demonstrates that the jury's award of $ 10 million in punitive damages is far beyond the range of reasonableness and shocks the conscience.

*Reprehensibility.* Reprehensibility is the most important of the *Gore* factors. *Lee v. Edwards, supra, 101 F.3d at 809.* The Supreme Court has identified three aggravating sub-factors to be considered in evaluating reprehensibility: "(1) whether a defendant's conduct was violent or presented a threat of violence; (2) whether

[*58] a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant engaged in repeated instances of misconduct." *Lee v. Edwards, supra, 101 F.3d at 809.* The third sub-factor requires inquiry into whether defendant has engaged in similar conduct aimed at individuals other than plaintiff. *Fernandez v. North Shore Ortho. Surg. & Sports Med., P.C., supra, 79 F. Supp. 2d at 207 n. 15; Del Valle v. National Basketball Ass'n, supra, 42 F. Supp. 2d at 345.*

Although only one of the aggravating factors identified in *Gore* is present in this case, to wit, malice, I find that defendant's conduct involved the highest degree of reprehensibility. First, the nature of the charge she caused to be made against plaintiff -- sexual assault on a developmentally disabled patient entrusted to plaintiff's care -- is the most serious charge that can be made against a mental health professional. It not only goes to the heart of plaintiff's profession, it also constitutes an allegation that plaintiff has abused his position of trust with a particularly vulnerable victim to satisfy the basest of desires. A mental [*59] health care professional may engage in a wide range of professional misconduct -- from bill-padding to malpractice. However, a charge of sexual misconduct with a developmentally disabled patient is qualitatively different and carries with it a stigma that is unlike that resulting from any other form of professional misconduct.

Second, the means plaintiff used exhibited not only malice toward plaintiff, but the most callous disregard for her own responsibilities as a Therapy Aide. Defendant did not directly allege that she saw plaintiff engaging in misconduct. Instead, she manipulated a patient into doing her sinister deed for her. Rather than care for the patients who were entrusted to her, defendant instead made them tools to carry out her malicious plan. Thus, in implementing her scheme, plaintiff not only caused plaintiff profound injury, she abused her own position of trust with a vulnerable patient.

Accordingly, defendant's misconduct here was extremely reprehensible.

*Ratio of Punitive to Compensatory Damages.* Prior to the remittitur determined above, the award of punitive damages was less than twice the jury's award of compensatory damages. If plaintiff accepts the remittitur, [*60] the jury's award of punitive damages is approximately 5.2 times the reduced award. Neither ratio is conscience-shocking.

*Comparison with Other Awards.* A survey of the punitive damages awards in other malicious prosecution cases clearly demonstrates the excessive nature of the punitive damages awarded against defendant.

*Lee v. Edwards, supra, 101 F.3d 805* - reducing verdict of $ 200,000 to $ 75,000.

*King v. Macri, supra, 993 F.2d 294 (2d Cir. 1993)* - punitive damages awards against two defendants aggregating $ 250,000 reduced to an aggregate of $ 150,000.

*Garner v. Meoli, supra, 19 F. Supp. 2d 378 (E.D. Pa. 1998)* - declining to reduce punitive damages awards of $ 500,000 and $ 250,000 against two defendants.

*Martinez v. Gayson, supra, 1998 U.S. Dist. LEXIS 12281, 95-C V-3788 (I.G.), 1998 WL 564385 (E.D.N.Y. 1998)* - jury award of $ 10,000 in punitive damages found appropriate.

As noted in the discussion above concerning compensatory damages, every case involves factual distinctions. The verdicts in other cases are, therefore, probably best viewed as suggesting the dimensions of the range of reasonableness [*61] than as establishing any firm rules.

In light of all the foregoing factors, I conclude that the maximum amount of punitive damages that a reasonable jury could have awarded in this case is $ 500,000.00. Again, I believe this amount is toward the upper end of the range of reasonableness, but I find that it is warranted by the high degree of reprehensibility of the defendant's conduct. It is difficult to conceive of a more infernal and hateful scheme for demolishing a life than that hatched and executed by defendant in this case. The outrageous nature of her conduct requires a substantial award of punitive damages.

## IV. Conclusion

Accordingly, for all the foregoing reasons, defendant's motion for judgment as a matter of law is granted to the extent that it seeks judgment in defendant's favor on plaintiff's "stigma plus" theory. Defendant's motion is denied to the extent it seeks judgment in defendant's favor on plaintiff's malicious prosecution theory. Defendant's motion addressed to plaintiff's 1983 malicious prosecution claim is granted to the extent that a new trial limited to the issue of damages is granted unless, within thirty (30) days of the date of this Opinion and [*62] Order, plaintiff stipulates to accept a total award of compensatory damages of $ 1,872,988.00 and a total award of punitive damages of $ 500,000.00.

Dated: New York, New York

March 31, 2000

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

**ALEJITA ROMAN MARCIA [1] v. CHARLES MICEWSKI, et al.**

1  Although the Complaint identifies plaintiff as "Alejita Roman Marcia" (Document No. 1), she stated at her deposition that her last name is actually "Garcia".

CIVIL ACTION NO. 97-5379

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1998 U.S. Dist. LEXIS 13243*

**August 24, 1998, Decided**
**August 24, 1998, Filed**

**DISPOSITION:**    [*1] Defendants' motion for summary judgment (Document No. 15) GRANTED. Judgment is entered in favor of all defendants and against plaintiff on all counts of the complaint.

**COUNSEL:** For ALEJITA ROMAN MARCIA, PLAINTIFF: ANTHONY L. CIANFRANI, LAW OFFICES OF ANTHONY L. CIANFRANI, PHILA, PA USA. ISAAC H. GREEN, JR., PHILA, PA USA.

For CHARLES MICEWSKI, MARK ITZKO, JOSEPH SCHRANK, WALTER DAVIS, JOHN SUNDERHAUF, DEFENDANTS: JOHN O.J. SHELLENBERGER, III, OFFICE OF ATTORNEY GENERAL, PHILA, PA USA.

**JUDGES:** THOMAS J. RUETER, United States Magistrate Judge.

**OPINION BY:** THOMAS J. RUETER

**OPINION**

   *MEMORANDUM OF DECISION*

   THOMAS J. RUETER

   United States Magistrate Judge

**I. *INTRODUCTION***

   Presently before the court is defendants' motion for summary judgment. (Document No. 15.) Plaintiff's lawsuit arises out of her arrest on August 25, 1995. In her complaint, plaintiff alleges that, at all relevant times, defendants Charles Micewski, Mark Itzko, Joseph Schrank, and Walter Davis were agents for the Pennsylvania Attorney General's Bureau of Narcotics Investigations (collectively, the "Agents") (Complaint at P2), and defendant John Sunderhauf was the "Zone Commander [*2] of the Philadelphia Region of the Attorney General of Pennsylvania's Bureau of Narcotics Investigations and Drug Control". (Complaint at P3). [2] The complaint is brought pursuant to *42 U.S.C. §§ 1983* and *1985* and alleges violations of the *First, Fourth, Fifth,* and *Fourteenth Amendments of the U.S. Constitution.* (Complaint PP4, 19, 20, 24.) The complaint also alleges a claim of malicious prosecution under state law (Count III), and requests an award of attorneys' fees (Count II) and punitive damages (Count IV).

   2  The Complaint also named Robert Grous as a defendant. Mr. Grous was never served and the Court dismissed all claims against him by Order dated January 12, 1998. (Document No. 9.)

   The defendants are sued in their individual as well as official capacities. Plaintiff alleges that the defendant Agents "were engaged in a joint venture" and "assisted each other in performing the various actions" described by plaintiff in her complaint. (Complaint at P16.) For all the following reasons, [*3] defendants' motion for summary judgment shall be granted.

**II. *FACTUAL BACKGROUND***

   The undisputed facts in this case are as follows. [3] On August 21, 1995, defendant Micewski received information from an informant that heroin sold on Cambria and Mutter Streets in North Philadelphia, and stamped "ATNT" was being stored at a house at 2906 N. Mutter Street. (Micewski Decl. Ex. 1.) On August 24, 1995, defendant Micewski witnessed a transaction during which a man entered 2906 N. Mutter Street and exited

with blue colored packets that he handed to a "buyer". *Id.* The buyer left in a car with two other people. Defendant Micewski stopped the car and found in the possession of the buyer ten blue glassine packets stamped "ATNT", the contents of which field tested positive for heroin. *Id.* The following day, defendant Micewski applied for a search warrant for 2906 N. Mutter Street. The warrant was issued by Municipal Court Judge Louis G.F. Retacco on August 25, 1995. (Defs.' Req. for Admissions Ex. 5.) Plaintiff does not contend that the search warrant was obtained improperly.

> 3  The recitation of facts is taken primarily from defendants' memorandum of law in support of their motion for summary judgment. It is consistent with plaintiff's version of the facts. (Defs.' Mem. of Law Supp. Summ. J. at 2-8.)

[**4] At around 11:00 a.m. on August 25, 1995, defendant Micewski, and the other Agents, went to 2906 N. Mutter Street to execute the search warrant. (Pl.'s Dep. at 63-65, 79, 80; Complaint at P9; Micewski Decl. at P7.) Upon entry, defendant Micewski found plaintiff sitting on a chair to the right of the door and two other women seated on a couch in the same room. (Pl.'s Dep. at 59-63; Micewski Decl. at P9.) The chair upon which plaintiff was seated was wooden and had a seat cushion and a back cushion. (Pl.'s Dep. at 61-63; Micewski Decl. at P10.) At defendant Micewski's request, plaintiff rose from the seat and Micewski found two wrapped packages each containing large numbers of blue tinted glassine packets stamped "ATNT" containing an off-white powder. (Pl.'s Dep. at 65, 66-69, 71, 72; Micewski Decl. at PP10, 11, Ex. 3, 4.) The packets that defendant Micewski found under the chair on which plaintiff was sitting were identical in appearance to the ones he had seen sold at 2906 N. Mutter Street the previous day, the contents of which had tested positive for heroin. (Micewski Decl. at P11.)

Defendant Micewski also found under the seat cushion of plaintiff's chair $ 351.00 in cash (8 twenties, [**5] 9 tens, 17 fives, and 16 ones) and a paper containing names and numbers. (Pl.'s Dep. at 75; Micewski Decl. at P12, Ex. 5.) On a table in the same room, defendant Micewski found a purse containing plaintiff's welfare card and $ 480.00 in cash (22 tens, 37 fives, and 75 ones). (Pl.'s Dep. at 54, 66, 70, 71; Micewski Decl. at P13.) Defendant Micewski knew that at that time in that area, heroin sold at $ 10.00 per bag. (Micewski Decl. at P5.) Defendant Micewski found at the premises a letter from Bell Atlantic addressed to Natividad Quiala, one of the other women defendant Micewski found at 2906 N. Mutter Street. Ms. Quiala identified herself as the resident of the house.

The defendants arrested Ms. Quiala and plaintiff, and they were taken to the Task Force Office. (Pl.'s Dep. at 78-80, 85, 86; Micewski Decl. at P16.) At the Task Force Office, the substance inside some of the blue packets field tested positive for heroin. (Micewski Decl. at P18.) In total, the two wrapped packages found under the seat cushion of the chair on which plaintiff was seated contained 92 packets of heroin with a street value of $ 920. (Micewski Decl. at PP5, 19.) On September 27, 1995, the Pennsylvania [**6] State Police Laboratory reported that the contents of the blue packets seized by defendant Micewski at 2906 N. Mutter Street were heroin. (Req. for Admissions at 15-16, Ex. 6.)

Next, plaintiff was taken to the Philadelphia Police Administration Building. (Pl.'s Dep. at 86-87.) On August 26, 1995, the District Attorney filed a criminal complaint charging plaintiff with knowing and intentional possession of a controlled substance; possession of a controlled substance with intent to deliver; and conspiracy, all in violation of Pennsylvania law. (Req. for Admissions at 1-3, Ex. 1.) At 6:00 a.m. on August 26, 1995, a preliminary arraignment was held pursuant to Pa. R. Crim. P. 140 at which the charges were presented to plaintiff. Plaintiff signed her own bond and she was immediately released; plaintiff was not required to post any cash or other security. (Req. for Admissions at 4-7, Ex. 2; Pl.'s Dep. at 8, 90-92.) The only condition of the bond was that plaintiff appear in court as required to defend the charges. The terms of plaintiff's release did not change prior to the disposition of the charges. (Req. for Admissions at 2, 8-9.)

On November 27, 1995, a preliminary hearing was held [**7] for plaintiff and Ms. Quiala at which defendant Micewski testified. (Req. for Admissions at 10, Ex. 3.) Plaintiff was held for court on the charges of knowing and intentional possession of a controlled substance and possession with intent to deliver. *Id.* Plaintiff's bail remained unchanged. On December 11, 1995, the District Attorney filed informations against plaintiff on these charges. (Req. for Admissions at 11-13, Ex. 4a and 4b.) On April 12, 1996, before the charges came to trial, the District Attorney nolle prossed them. *Id.* (Pl.'s Dep. at 99.)

Plaintiff argues that defendant Micewski, and the other Agents, arrested her without probable cause in violation of her rights under state and federal laws. Plaintiff contends that she was visiting 2906 N. Mutter Street in order to clean the house. (Pl.'s Dep. at 34, 54.) Plaintiff claims that she did not know the drugs and other items were under the chair cushion (Pl.'s Dep. at 66, 71), and she stood next to the chair while defendant Micewski searched it. (Micewski Decl. at 38.) Defendant Micewski could not see the drugs or other items until he removed the seat cushion. *Id.* No drugs or money were found on

Case 1:07-cv-04795-NRB    Document 6-3    Filed 07/21/2008    Page 26 of 51

Page 3
1998 U.S. Dist. LEXIS 13243, *

plaintiff's person. **[\*8]** Plaintiff maintains that she intended to use the money found in her purse to pay the utility bills also found in her purse. (Pl.'s Dep. at 54, 66, 71, 106-07.)

Plaintiff further argues that she was charged with the crimes as a result of a misleading Complaint Fact Sheet prepared by defendant Micewski and submitted to the District Attorney listing plaintiff as the defendant and stating that "proof of residence" and "tally work" were taken from the premises indicating that plaintiff was the resident of 2906 N. Mutter Street. (Pl.'s Mem. of Law Opp. Summ. J. at 6.) Plaintiff also contends that she was held on the charges because defendant Micewski gave false testimony at her November 27, 1995 preliminary hearing. *Id.* Plaintiff claims that Micewski falsely testified on direct examination at that hearing that the heroin packets, tally work and monies were found directly underneath plaintiff, not underneath the seat cushion. *Id.*

### III. DISCUSSION

#### A. *Standard for Summary Judgment.*

*Fed. R. Civ. P. 56(c)* provides that summary judgment shall be properly granted if "the pleadings, depositions, answers to interrogatories, and admissions, on file, together with **[\*9]** the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the burden of showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* If the moving party sustains its burden, the non-moving party must then "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).* The "non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact," *Pastore v. Bell Tel. Co. of Pennsylvania, 24 F.3d 508, 511 (3d Cir. 1994),* or replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. In assessing whether the non-moving party has met its burden, the court must focus on both the genuineness and the materiality of the factual issues raised by **[\*10]** the non-movant. An issue is "genuine" only if there is sufficient evidence from which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id. at 248.* A factual dispute is only "material" if it might affect the outcome of the

case. *See id.* A dispute over irrelevant or unnecessary facts will not preclude summary judgment. *Id.*

When considering a motion for summary judgment, "inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore, 24 F.3d at 512.* The court may not make credibility determinations or weigh the evidence. *Anderson, 477 U.S. at 252.* If the record thus construed could not lead the trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* **[\*11]**

#### B. *Plaintiff's Claims Against Each Defendant in His Official Capacity.*

Plaintiff has sued each defendant in his individual as well as official capacity. Defendants argue in their motion for summary judgment that they are not subject to suit in their official capacities under *42 U.S.C. §§ 1983* or *1985*. In her response, plaintiff does not appear to dispute this argument but, rather, argues that defendants are also sued in their individual capacities. (Pl.'s Resp. to Defs.' Mot. at P1; Pl.'s Mem. of Law Opp. Summ. J. at 8-9.) This court finds independently that defendants cannot be sued in their official capacities under *42 U.S.C. §§ 1983* or *1985*.

The Supreme Court has held that state agencies and state employees in their official capacities are not "persons" subject to actions under *§ 1983*. *Will v. Michigan Dep't of State Police, 491 U.S. 58, 70-71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989). See also Jones v. Horn, 1998 U.S. Dist. LEXIS 8431, 1998 WL 297636,* at *\*3 n.3 (E.D. Pa. June 4, 1998)* ("Persons acting in their official capacity are not persons subject to suit under *42 U.S.C. § 1983*. **[\*12]** ") This holding also applies to *42 U.S.C. § 1985*. *Wright v. Philadelphia Housing Auth., 1994 U.S. Dist. LEXIS 15596, 1994 WL 597716,* at *\*2 (E.D. Pa. Nov. 1, 1994). See also Rode v. Dellarciprete, 617 F. Supp. 721, 723 n.2 (M.D. Pa. 1985)* (The definition of "person" is the same for *Section 1983* and *Section 1985*.)

In the instant matter, at the time of plaintiff's arrest, defendants Micewski and Sunderhauf were employees of the Commonwealth of Pennsylvania. Defendants Davis, Schrank, and Itzko were Philadelphia Police Officers assigned to the Office of the Attorney General. According to defendants, under the agreement between the Office of Attorney General and the City and under state law, for purposes of allocating liability these officers were employees of the Commonwealth. Affidavit of James A. Caggiano (attached to Defs.' Mem. of Law Supp. Summ. J.) and *42 Pa. Cons. Stat. Ann. § 8953(d).*

The Office of the Attorney General was an administrative department of the Commonwealth. *71 Pa. Cons. Stat. Ann. §§ 61, 732-201.* Consequently, judgment must be entered against plaintiff and in favor of all defendants in their official capacities.

**[*13]** C. *First Amendment, Fifth Amendment and § 1985 Claims.*

In her complaint, plaintiff alleges that the defendant Agents violated her *First Amendment* and *Fifth Amendment* rights, as well as *42 U.S.C. § 1985.* Defendants argue in their motion that nothing in the complaint or the summary judgment record supports these claims. Plaintiff does not attempt to support these claims in her summary judgment response. Consequently, summary judgment will be entered in favor of the Agents and against plaintiff on her First *Amendment, Fifth* Amendment and *§ 1985* claims.

This court finds independently that defendants' motion should be granted with respect to these claims. The *First Amendment* protects a person's right to the free exercise of religion and speech, and the right of assembly. *U.S. Const. amend. I.* The *Fifth Amendment* applies to the federal government and its officials, some provisions of which are applicable to the states through the *Fourteenth Amendment's* due process clause. Nothing in the complaint or the summary judgment materials alleges any facts that would support claims that the defendant Agents violated these Amendments. Consequently, judgment will be **[*14]** entered in favor of defendants and against plaintiff on these claims.

Plaintiff also alleges that the Agents' actions violated *42 U.S.C. § 1985. Section 1985* authorizes an "action for the recovery of damages" against "two or more persons" who conspire to (1) prevent federal officers from performing their duties, *42 U.S.C. § 1985(1)*; (2) intimidate parties, witnesses or jurors in federal cases (or in state cases where the conspiracy is motivated by an intent to deny equal protection), *42 U.S.C. § 1985(2)*; or *(3)* deprive other persons of equal protection of the laws, *42 U.S.C. § 1985(3)*. Plaintiff alleges no facts and presents no evidence that would support a claim under *§§ 1985(1)* or *(2)*. If plaintiff alleges any *§ 1985* claim, it would be under subsection (3). A claim under *§ 1985(3)*, however, requires that there must be "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action". *United Bhd. of Carpenters and Joiners of Am. v. Scott, 463 U.S. 825, 834, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983)* (quoting *Griffin v. Breckenridge, 403 U.S. 88, 102, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971))*. **[*15]** *See also Bedford v. Southeastern Pennsylvania Transp. Auth., 867 F. Supp. 288, 294 (E.D. Pa. 1994)* (same). Plaintiff has not pled any class-based discriminatory animus as the motivation of defen-

dants' actions, nor presented any evidence that would support such a claim. Consequently, judgment is entered in favor of defendants and against plaintiff on her claim under *42 U.S.C. § 1985.*

**D.** *Fourteenth Amendment Claim.*

Plaintiff alleges in her complaint that the defendants violated her *Fourteenth Amendment* rights. (Complaint at PP4, 20.) Plaintiff claims that the defendant Agents arrested her without probable cause and maliciously caused the institution of criminal charges against her. Defendants argue that plaintiff must pursue these claims under the *Fourth Amendment*, not the *Fourteenth Amendment* and, therefore, their motion must be granted with respect to plaintiff's *Fourteenth Amendment* claim. In her response to defendants' motion, plaintiff does not defend her *Fourteenth Amendment* claim. Consequently, judgment will be entered in favor of defendants and against plaintiff with respect to the *Fourteenth Amendment* claim.

This court **[*16]** independently finds that defendants' motion must be granted with respect to plaintiff's *Fourteenth Amendment* claim. In *Albright v. Oliver, 510 U.S. 266, 271, 274, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994)*, the Court held that the petitioner's claim in that case, i.e., the respondents' actions "infringed his substantive due process right to be free of prosecution without probable cause", presented a claim under the *Fourth Amendment*, not the *Fourteenth Amendment*. The Supreme Court clearly stated that there is no *Fourteenth Amendment* right to be free from malicious prosecution, however, it did not foreclose the possibility that a malicious prosecution claim could be brought under the *Fourth Amendment. Id. at 269-71.* The Third Circuit Court of Appeals in *Mosley v. Wilson, 102 F.3d 85, 94-95 (3d Cir. 1996)* considered a *§ 1983* claim alleging use of excessive force and arrest without probable cause to be one implicating the *Fourth Amendment. See also Singer v. Fulton County Sheriff, 63 F.3d 110, 114 (2d Cir. 1995)* (The *Fourth Amendment*, not the *Fourteenth Amendment*, will support a federal claim for malicious prosecution. **[*17]** ), *cert. denied, 517 U.S. 1189, 134 L. Ed. 2d 779, 116 S. Ct. 1676 (1996); Merrero v. Micewski, 1998 U.S. Dist. LEXIS 10889, 1998 WL 414724, at *5-6 (E.D. Pa., July 22, 1998)* (same). Consequently, judgment will be entered in favor of defendants and against plaintiff with respect to plaintiff's claim under the *Fourteenth Amendment.*

**E.** *Supervisor Liability.*

Plaintiff alleges that defendant Sunderhauf, in his individual capacity as the defendant Agents' supervisor, is liable under *42 U.S.C. § 1983* for the wrongful acts of the Agents. In *Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)*, the Third Circuit held that "a 'person' is

1998 U.S. Dist. LEXIS 13243, *

not the 'moving force' [behind] the constitutional violation' of a subordinate, unless that 'person' ... has exhibited deliberate indifference to the plight of the person deprived." To hold a supervisor liable under § 1983, the plaintiff must: 1) identify with particularity what the supervisory official failed to do that demonstrates his deliberate indifference; and 2) demonstrate a close causal relationship between the identified deficiency and the ultimate injury. [*18] *Id. at 1118* (citing *City of Canton v. Harris, 489 U.S. 378, 389-90, 392, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989)*). See also *Hawkins v. Micewski, 1998 U.S. Dist. LEXIS 39, 1998 WL 51290*, at *2 (E.D. Pa. Jan. 6, 1998) and *Torres v. McLaughlin, 1996 U.S. Dist. LEXIS 17189, 1996 WL 680274*, at *8 (E.D. Pa. Nov. 21, 1996) (same, both quoting *Kis v. County of Schuylkill, 866 F. Supp. 1462, 1474 (E.D. Pa. 1994)*).

A plaintiff may also demonstrate supervisory liability by showing that the supervisor had personal involvement in the alleged wrongs; "liability cannot be predicated solely on the operation of respondeat superior." *Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)*. See also *Rizzo v. Goode, 423 U.S. 362, 377, 46 L. Ed. 2d 561, 96 S. Ct. 598 (1976)* (same). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Id.* See also *Hawkins*, 1998 WL 51290, [*19] at *2 and *2 n.4 (citing *Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995)*) (same). The Third Circuit recently restated this general principle as follows: "Where a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997)* (footnote omitted).

In the instant matter, plaintiff alleges the following regarding Sunderhauf in his Complaint:

> 17. Defendant John Sunderhauf, knew or should have know [sic] that Defendant agents [sic] conduct of arresting innocent citizens without proper legal basis to justify such acts. The Defendant John Sunderhauf had actual and/or constructive notice that Defendant agents routinely made wanton, malicious, and improper arrests. Despite this actual and/or constructive notice, Defendant Sunderhauf failed to act accordingly to correct said actions and protect the Constitutional rights of private citizens [*20] against such police action.

> 21. Defendant John Sunderhauf failed to properly investigate the circumstances regarding arrests made by agents in the Bureau of Narcotics Investigations, including Defendant Agents, thereby causing and encouraging said agents to engage in unlawful conduct.

> 22. Defendant John Sunderhauf, failed to sanction or discipline agents of the Bureau of Narcotics Investigations, including defendant Agents, for making arrests without probable cause or legal justification, thereby causing or encouraging said agents to engage in unlawful conduct.

(Complaint PP 17, 21, 22.) In her response to defendants' motion for summary judgment, plaintiff argues that defendant Sunderhauf stated in a deposition taken on January 9, 1997 with respect to another lawsuit, *Torres v. McLaughlin*, 97-CV-5865, that Sunderhauf became aware in May of 1995 that the Philadelphia District Attorney's office would begin an investigation of several Bureau of Narcotics Investigations cases. (Pl.'s Resp. to Mot. Summ. J. at 16-17 and Ex. A.) Plaintiff also asserts that in May of 1995 Sunderhauf received a memorandum listing several cases that the District Attorney wanted to review and [*21] that defendant Micewski was an officer involved in at least four of those cases. *Id.* Plaintiff claims that this evidence demonstrates that Sunderhauf became aware of the District Attorney's investigation into defendant Micewski's cases three months before the plaintiff was arrested, and that he failed to "investigate, train, sanction, or discipline" Micewski, creating a substantial risk that Micewski would continue to violate the rights of other citizens. *Id.* at 17.

After careful review of Sunderhauf's deposition transcript (Pl.'s Resp. to Mot. for Summ. J. Ex. A), this court concludes that Sunderhauf's testimony does not support plaintiff's argument. Sunderhauf does not specifically identify defendant Micewski as an agent involved in the cases being investigated by the District Attorney. On page 93 of the deposition [4], Sunderhauf was asked for each case to name "the agent or agents involved." (Pl.'s Resp. to Mot. for Summ. J. Ex. A at 93.) Sunderhauf identified several agents, but did not name Micewski. The evidence offered by plaintiff, therefore, does not show that Sunderhauf knew that Micewski was acting improperly. See also Sunderhauf Declaration at PP5, 6. [5] Consequently, [*22] this court finds that judgment should be entered in favor of defendant Sunderhauf and against plaintiff with respect to her claims against Sunderhauf.

4  Plaintiff did not submit a complete copy of the deposition transcript.

5  Plaintiff also submits as part of her response to defendants' motion, a memorandum to John T. Kelly, Regional Director from the Office of Attorney General dated September 30, 1996, sent via electronic mail on October 1, 1996, which stated that Micewski, among others was not to be a witness, complainant, or affiant. Sunderhauf no longer held the position of Regional Director after May 20, 1996. (Sunderhauf Decl. at P1.)

### F. *Fourth Amendment Claims.*

Plaintiff presents two claims under the *Fourth Amendment*: (1) malicious prosecution, i.e. institution of criminal charges without probable cause; and (2) arrest without probable cause. (Complaint at PP10, 12, 15, 19, and 20.)

**a.  *Malicious Prosecution.***  Plaintiff's malicious prosecution claim arises from her allegations [*23] that defendant Micewski prepared a misleading report for the District Attorney and gave false testimony at plaintiff's preliminary hearing. ⁶ (Pl.'s Resp. to Mot. for Summ. J. at 11-12.) In particular, plaintiff contends that Micewski listed her welfare card on the Complaint Fact Record submitted to the District Attorney as proof that plaintiff resided at 2906 Mutter Street, and falsely testified at her preliminary hearing that the cocaine packets and tally work were found directly underneath plaintiff's buttocks, as opposed to underneath the chair cushion. *Id.* at 6.

6  In addition to the elements necessary to establish a claim under *§ 1983*, i.e. deprivation of rights secured by the United States Constitution and defendants were acting under the color of state law, a plaintiff alleging malicious prosecution must also show that "(1) the defendant initiated a criminal proceeding, (2) which ended in plaintiff's favor, and (3) which was initiated without probable cause, and that (4) the defendant acted with actual malicious purpose or for a purpose other than bringing the defendant to justice." *Torres v. McLaughlin, 1996 U.S. Dist. LEXIS 17189, 1996 WL 680274,* at *6 (E.D. Pa. Nov. 21, 1996). *See also Hilfirty v. Shipman, 91 F.3d 573, 579 (3d Cir. 1996)* (same). "Actual malice in the context of malicious prosecution is defined as either ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose." *Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir. 1988).*

[*24] Defendants argue that defendant Micewski is immune from all claims arising out of his testimony at the preliminary hearing, and that no *Fourth Amendment* claims arise out of the initiation of the prosecution against plaintiff because the initiation of charges did not cause a seizure of plaintiff.

**1.  Micewski is Absolutely Immune from Claims Arising Out of Alleged Perjured Testimony.**  In *Briscoe v. LaHue, 460 U.S. 325, 75 L. Ed. 2d 96, 103 S. Ct. 1108 (1983),* the Supreme Court held that police officers are entitled to absolute immunity from claims under *§ 1983* for giving perjured testimony at trial. The Supreme Court concluded that

> [a] police officer on the witness stand performs the same functions as any other witness; he is subject to compulsory process, takes an oath, responds to questions on direct examination and cross-examination, and may be prosecuted subsequently for perjury.

*Id. at 342. Section 1983,* the Court explained, "did not abrogate the absolute immunity existing at common law." *Id.* at 334. The Court declined to decide whether immunity applies for perjured testimony at pretrial proceedings. [*25] *Id. at 328 n.5.* The Third Circuit Court of Appeals extended this protection to pretrial proceedings in *Williams v. Hepting, 844 F.2d 138, 140-41 (3d Cir.), cert. denied, 488 U.S. 851, 102 L. Ed. 2d 107, 109 S. Ct. 135 (1988).* In *Williams,* the plaintiff alleged that a witness gave perjured testimony at the preliminary hearing, suppression hearings, and trial. The Court of Appeals reviewed the policy arguments supporting common law witness immunity and concluded that they "support the extension of the absolute immunity doctrine to a witness at the pretrial stage of the judicial process." *Id. See also Kulwicki v. Dawson, 969 F.2d 1454, 1467 n.16 (3d Cir. 1992)* (same); *McArdle v. Tronetti, 961 F.2d 1083, 1085 (3d Cir. 1992)* (same); *Torres, 1996 WL 680274,* at *7 (same).

Plaintiff, however, like the plaintiff in *Torres,* argues that under *Malley v. Briggs, 475 U.S. 335, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986),* and the Second Circuit's interpretation of that decision in *White v. Frank, 855 F.2d 956 (2d Cir. 1988).* Micewski was a complaining [*26] witness at his preliminary hearing and thus is not entitled to absolute immunity. ⁷ Complaining witnesses have generally not been afforded immunity under the common law. Our Court of Appeals reconciled *Briscoe* and *Malley* as follows:

7   Plaintiff contends that Micewski was a complaining witness at her preliminary hearing because his false testimony caused the prosecution against plaintiff to go forward. (Pl.'s Resp. to Mot. for Summ. J. at 11-12.)

In *Malley*, the Supreme Court noted, in the context of rejecting immunity for a police officer's baseless application for an arrest warrant, that complaining witnesses were not afforded immunity at common law. The Court was not addressing the issue of testimony at trial, as it did in *Briscoe*. We decline to interpret the language in *Malley* as overriding the broad witness protection announced in *Briscoe*.

*Kulwicki*, 969 F.2d at 1467 n.16. Consequently, this court rejects plaintiff's argument and finds that Micewski is absolutely [*27] immune from suit under § 1983 for any alleged false testimony he may have given at plaintiff's preliminary hearing.

**2. Initiation of Prosecution Protected by *Fourth Amendment* When a "Seizure" Results.** Plaintiff alleges that Micewski, and the other defendant Agents, unlawfully arrested her and caused false criminal charges to be filed against plaintiff. Plaintiff claims that misleading statements Micewski placed in the Complaint Fact Record caused the District Attorney to file charges against her. (Pl.'s Resp. to Mot. for Summ. J. at 11.) Defendants argue that the institution of criminal charges is "not an event of constitutional significance." (Defs.' Mem. of Law Supp. Mot. for Summ. J. at 18.) Defendants cite to *Gerstein v. Pugh*, 420 U.S. 103, 119, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975) for the proposition that "the initiation of the criminal process, by itself, is not subject to constitutional standards or judicial oversight." *Id.*

In *Albright*, the Court recognized that malicious prosecution under § 1983 is actionable under the *Fourth Amendment*. 510 U.S. at 270-71 n.4. An individual can be liable for malicious prosecution if he [*28] "fails to disclose exculpatory evidence to prosecutors, makes false or misleading reports to the prosecutor, omits material information from the reports, or otherwise interferes with the prosecutor's ability to exercise independent judgment" in deciding whether to prosecute. *Torres v. McLaughlin*, 966 F. Supp. 1353, 1364 (E.D. Pa. 1997) (citing *Rhodes v. Smithers*, 939 F. Supp. 1256, 1273 (S.D.W.Va. 1995), aff'd, 91 F.3d 132 (4th Cir. 1996)). By contrast, where a police officer "presents all relevant probable cause evidence to an intermediary, such as a prosecutor, ..., the intermediary's independent decision to seek a warrant, ..., or to return an indictment breaks the causal chain and insulates the officer from a *section 1983* claim based on lack of probable cause for an arrest or prosecution." *Rhodes*, 939 F. Supp. at 1274. See also *Merrero v. Micewski*, 1998 U.S. Dist. LEXIS 10989, 1998 WL 414274, at *6 (E.D. Pa. July 22, 1998) ("A police officer may only be held to have 'initiated' a criminal proceeding if he knowingly provided false information to the prosecutor or otherwise interfered with [*29] the prosecutor's informed discretion.") (citations omitted). Here, plaintiff argues that she was charged with crimes based upon a misleading Complaint Fact Sheet prepared by Micewski and submitted to the District Attorney. Even assuming that plaintiff's allegations are true, she still would not succeed on her § 1983 claim based on malicious prosecution because she cannot prove that she suffered a "seizure", after she was arraigned.

Because plaintiff's malicious prosecution claim implicates the *Fourth Amendment*, the defendants' actions must have resulted in a "seizure" of plaintiff after her initial appearance before a judicial officer. "The *Fourth Amendment* right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person - i.e., the right to be free of unreasonable or unwarranted restraints on personal liberty. To maintain a § 1983 claim for malicious prosecution under the *Fourth Amendment*, "the deprivation of liberty -- the seizure -- must have been effected 'pursuant to legal process.'" *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) (quoting *Heck v. Humphrey*, 512 U.S. 477, 484, 129 L. Ed. 2d 383, 114 S. Ct. 2364 (1994)), [*30] cert. denied, 517 U.S. 1189, 134 L. Ed. 2d 779, 116 S. Ct. 1676 (1996). Generally, this "legal process" will be in the form of a warrant, in which case the arrest may constitute the seizure, or a subsequent arraignment, in which case any post-arraignment deprivations of liberty might satisfy the constitutional requirement of a seizure. *Id.* In this case, as in *Singer*, plaintiff's arrest cannot serve as the predicate deprivation of liberty because it occurred without a warrant and prior to the arraignment, and therefore was not pursuant to legal process. [8]

8   Plaintiff had a preliminary arraignment and was released within 24 hours of her arrest. This time frame satisfies the promptness requirement of the *Fourth Amendment* as articulated by the Court in *Gerstein v. Pugh*, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975). See *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991).

In this case, the charges were [*31] instituted against plaintiff by a complaint filed by the District Attorney the day after she was arrested. Plaintiff was notified of the charges and released that same day without having to post bail. (Req. for Admissions 4-7.) The bond plaintiff signed contained no conditions other than she appear in court as directed and to submit herself to all

orders of the court. (Req. for Admissions Ex. 2.) The conditions of plaintiff's release never changed and she was never incarcerated again on the charges. (Req. for Admissions 8, 9.) Courts have held that these types of conditions do not constitute a "seizure" sufficient to establish a claim under *Section 1983. See Gallo v. City of Philadelphia. 975 F. Supp. 723, 727-28 (E.D. Pa. 1997); Torres. 966 F. Supp. at 1364.* In *Torres*, plaintiff was released on the same day he was arrested. His bond did not contain any travel restrictions. The plaintiff in *Torres* was required to appear in court for his preliminary hearings, arraignment, and trial. *966 F. Supp. at 1364.* The court, considering his malicious prosecution claim under *§ 1983* concluded that "absent any constitutionally-significant [*32] pretrial restraints on [plaintiff's] liberty, the weight of federal authority ... holds that [plaintiff] may not maintain a *§ 1983* claim for malicious prosecution. " *Id.* (citing cases). The Supreme Court has stated that

> Because the probable cause determination is not a constitutional prerequisite to the charging decision, it is required only for those suspects who suffer restraints on liberty other than the condition they appear for trial. There are many kinds of pretrial release and many degrees of conditional liberty. (citations omitted) We cannot define specifically those that would require a prior probable cause determination, but the key factor is significant restraint on liberty."

*Gerstein v. Pugh. 420 U.S. 103, 125 n.26, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975). See also Gallo. 975 F. Supp. at 727, 731* (Plaintiff released on the following conditions: $ 10,000 own-recognizance bond, prohibited from traveling beyond Pennsylvania and New Jersey, and required to "check in" with Pretrial Services weekly; did not suffer restraints on liberty sufficient to constitute a "seizure" under the *Fourth Amendment*.) Consequently, plaintiff [*33] has not suffered a seizure sufficient to make a malicious prosecution claim under *Section 1983*, and judgment must be entered against plaintiff and in favor of defendants on her claim for malicious prosecution under *§ 1983*.

### b. *Arrest Without Probable Cause.*

Plaintiff argues that her arrest was not supported by probable cause. Plaintiff was charged with possession of a controlled substance and possession of a controlled substance with intent to deliver. Plaintiff argues that nothing at the time of the arrest indicated that she knew the drugs were under her seat cushion - i.e., she did not

reside in the house, the chair was not usually accessible only to plaintiff, plaintiff did not attempt to escape, and she was never observed in prior drug related activity. Plaintiff further maintains that "it was not reasonable for Defendant Micewski to conclude that Plaintiff had committed, or was committing, a crime, given the totality of the circumstances" and, therefore, plaintiff's arrest was without probable cause. (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 14-15.) Defendants argue that judgment should be entered in their favor because plaintiff cannot prove that defendants lacked [*34] probable cause to arrest her.

The general principles that govern this claim are well settled.

The *Fourth Amendment* prohibits a police officer from arresting a citizen except upon probable cause. *Papachristou v. City of Jacksonville, 405 U.S. 156, 169, 31 L. Ed. 2d 110, 92 S. Ct. 839 ... (1972).* Probable cause for arrest requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt. *See United States v. Glasser, 750 F.2d 1197, 1205 (3d Cir. 1984).* Rather, probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested. *United States v. Cruz, 910 F.2d 1072, 1076 (3d Cir. 1990)* (citing *Dunaway v. New York, 442 U.S. 200, 208 n.9, 60 L. Ed. 2d 824, 99 S. Ct. 2248 ... (1979)).*

*Orsatti v. New Jersey State Police. 71 F.3d 480, 483 (3d Cir. 1995). See also Sharrar v. Felsing. 128 F.3d 810, 817-18 (3d Cir. 1997)* [*35] (Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'") (quoting *Gerstein v. Pugh. 420 U.S. 103, 111, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975)*) (citation omitted). A court must look at the totality of the circumstances and use a common sense approach to the issue of probable cause. *128 F.3d at 818.* Probable cause does not depend on the ultimate determination of guilt or innocence. *Orsatti. 71 F.3d at 482-83.* [9] Probable cause may even be based upon erroneous information if at the time of the arrest, a reasonable officer would not have known of the error. *Illinois v. Rodriguez. 497 U.S. 177, 184, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (1990).*

> 9    *See Draper v. United States, 358 U.S. 307, 312, 3 L. Ed. 2d 327, 79 S. Ct. 329 (1959)* ("There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine

them, and therefore a like difference in the quanta and modes of proof required to establish them." (citing *United States v. Heitner*, 149 F.2d 105 (2d Cir. 1945) (Hand, L., J.))

[*36] "In a § 1983 action the issue of whether there was probable cause to make an arrest is usually a question for the jury, but 'where no genuine issue as to any material fact exists and where credibility conflicts are absent, summary judgment may be appropriate.'" *Sharrar*, 128 F.3d at 818 (quoting *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 192 (3d Cir. 1984)). The question of probable cause is for the jury only "if there is sufficient evidence whereby a jury could reasonably find that the police officers did not have probable cause to arrest." *Id.* (citing *Deary*, 746 F.2d at 190.)

In the instant matter, the facts surrounding plaintiff's arrest are not in dispute. *See infra* pp. 2-5. No credibility determinations are required. Rather, plaintiff argues that defendants' motion for summary judgment should not be granted with respect to her *Fourth Amendment* claim because she was not in constructive possession of the narcotics found by defendant Micewski under the seat cushion of the chair on which she was seated and, therefore, her arrest was without probable cause. Plaintiff claims that constructive possession has [*37] been defined "as the power to control the contraband and the intent to exercise that control." (Pl.'s Mem. of Law Opp. Summ. J. at 13 (citing *Commonwealth v. Macolino*, 503 Pa. 201, 206, 469 A.2d 132 (1983)). [10] A prerequisite for intent to control is proof that the defendant knew of the existence and location of the narcotics. Plaintiff further argues that presence alone is insufficient to implicate a party in a crime of possession. She contends that no facts existed proving that she had knowledge of the narcotics: plaintiff did not reside in the house, the chair was not usually accessible only to plaintiff, she did not make any furtive movements or attempt to escape, she had not been observed in any other drug activity, and the narcotics were not visible until the cushion was removed. (Pl.'s Mem. of Law Opp. Summ. J. at 14.) Given these undisputed facts, plaintiff argues that it was unreasonable for defendant Micewski to conclude that she had committed, or was committing, a crime and, therefore, her arrest was without probable cause. *Id.* at 14-15.

10  Defendants agree with plaintiff's definition of constructive possession. (Defs. Mem. of Law Supp. Summ J. at 29.) This is a correct definition under Pennsylvania law. *See generally Jackson v. Byrd*, 105 F.3d 145, 148 (3d Cir. 1997).

[*38] Considering the same facts, defendants argue that a police officer could reasonably have believed that plaintiff was in constructive possession of the narcotics.

Defendants argue that the following factors were evidence of knowing and intentional possession: proximity to the controlled substance, ready access to the controlled substance, a large degree of control over the area where the controlled substance was found, a large amount of controlled substance, packaging, cash, writings or paraphernalia consistent with an intentional activity, and observations of use or distribution activity at place where the controlled substance was found. *Id.* at 29-31 (citing cases).

In the instant matter, defendant Micewski witnessed a drug transaction at 2906 N. Mutter Street the day before plaintiff's arrest. The drug packets from that drug transaction were stamped "ATNT". The drug packets found under plaintiff's seat cushion were stamped "ATNT". Defendant Micewski also found cash and sheets of papers with names and numbers under the seat cushion. The denominations of the bills were consistent with the sale of bags of heroin at $ 10.00 per bag. Defendant Micewski knew that at that time [*39] heroin sold at $ 10.00 per bag. (Micewski Decl. at P5.) Moreover, Micewski found $ 480.00 in cash in plaintiff's purse in small denominations that also were consistent with the sale of $ 10.00 bags of heroin. Defendants further maintain that by sitting on the drugs, a reasonable officer could think that she was preventing others from having access to the drugs, keeping them hidden, and keeping them safe from street sellers and addicts. Based upon the undisputed facts and the circumstances as they appeared to Micewski at the time he decided to arrest plaintiff, this court finds that probable cause existed for Micewski and the other defendant Agents to arrest plaintiff. [11] Consequently, summary judgment is granted in favor of defendants and against plaintiff with respect to her *Fourth Amendment* claim alleging arrest without probable cause.

11  This court need not reach defendants' alternative argument that defendants have qualified immunity from plaintiff's *Fourth Amendment* claim.

**G. *State Law Claim - Malicious* [*40]    *Prosecution.***

Plaintiff has alleged a state law claim of malicious prosecution. The defendants have statutory immunity with respect to this claim. *1 Pa. Cons. Stat. Ann. § 2310.* [12] Inasmuch as defendants were acting within the scope of their duties as state employees or officers when they arrested and initiated prosecution against plaintiff, and plaintiff's claim does not fall within any category in which sovereign immunity is waived, defendants are protected by immunity in this matter. *See Hawkins*, 1998 WL 51290, at *2; *La Frankie v. Miklich*, 152 Pa. Commw. 163, 171-72, 618 A.2d 1145, 1149 (1992). Accordingly, judgment will be entered in favor of the de-

1998 U.S. Dist. LEXIS 13243, *

fendants and against plaintiff with respect to her state law claim for malicious prosecution.

> 12   The governmental and sovereign immunity waivers set forth in *42 Pa. Cons. Stat. Ann. § 8522(a)(b)*, being exceptions to the rule of immunity, are to be given narrow construction. *Snyder v. Harmon, 522 Pa. 424, 433-34, 562 A.2d 307, 312 (1989).*

[*41]  For the reasons set forth above, summary judgment is granted in favor of the defendants and against plaintiff on all counts in the complaint. An appropriate order follows.

BY THE COURT:

THOMAS J. RUETER

United States Magistrate Judge

*ORDER*

AND NOW, this 24th day of August, 1998, upon consideration of defendants' motion for summary judgment (Document No. 15), and plaintiff's response thereto, it is hereby **ORDERED** that the motion is **GRANTED**. Judgment is entered in favor of all defendants and against plaintiff on all counts of the complaint.

BY THE COURT:

THOMAS J. RUETER

United States Magistrate Judge

LEXSEE 2003 U.S. DIST. LEXIS 2886

**HENRY U. OBILO, Plaintiff, - against - CITY UNIVERSITY OF THE CITY OF NEW YORK; COLLEGE OF STATEN ISLAND of the City University of New York; Police Office/Detective BURGESS # 3107, Tax Registry No.: 885309 of the 122nd Precinct of the New York Police Department; Public Safety Officer/Director GENE MARTINEZ; Public Safety Officer/Asst. Director, ROBERT YURMAN; and Vice President CAROL JACKSON of the College of Staten Island of the City University of New York, and Police Officer "JOHN DOE 1", thru "JOHN DOE 5", Defendants.**

Civil Action No. CV-01-5118 (DGT)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*2003 U.S. Dist. LEXIS 2886*

**February 28, 2003, Decided**

**SUBSEQUENT HISTORY:**    [*1] As Corrected April 7, 2003.

**DISPOSITION:**    Defendants' motion to dismiss complaint granted and plaintiff's complaint dismissed.

**COUNSEL:** For HENRY U. OBILO, plaintiff: Edward [*2] A. Roberts, Brooklyn, NY.

For CITY UNIVERSITY OF THE CITY OF NEW YORK, GENE MARTINEZ, ROBERT YOUMAN, CAROL JACKSON, defendants: Bruce B. McHale, Esq., NYS Atty General's Office, New York, NY.

**JUDGES:** David G. Trager, United States District Judge.

**OPINION BY:** David G. TragerTrager

**OPINION**

*CORRECTED OPINION*

TRAGER, J.

Plaintiff Henry Obilo brings this civil rights action against defendants City University of New York ("CUNY"), the College of Staten Island ("CSI"), [1] "Police Officer/Detective" Burgess ("Burgess"), "Public Safety Officer/Director" Gene Martinez ("Martinez"), "Public Safety Officer/Asst. Director" Robert Yurman ("Yurman"), [2] Vice President of CSI Carol Jackson

("Jackson"), and Police Officer "John Doe 1" thru "John Doe 5", alleging that plaintiff's arrest and subsequent prosecution for an alleged sexual assault violated various of his constitutional rights. In both his initial and amended complaint, plaintiff sued Burgess. Martinez and Yurman in their official capacity and Jackson in both her official and individual capacity. *See* Compl. PP 8-9, 11-12; Am. Compl. P 7-8, 10-11. [3]

1    Under New York Education Law, CUNY is a distinct corporate body. *See N.Y. Educ. Law § 6203*. In addition, CUNY is considered to include "each senior college and each community college." *Id. § 6202(2)*. CSI is a senior college within the CUNY system. *See id. § 6205(5)*. A senior college, such as CSI, is not a legally cognizable entity apart from CUNY. *See id. §§ 6202(2) & 6202(5)*. Consequently, CUNY appears to be the only properly named institutional defendant in this action.

[*3]

2    In his complaint, plaintiff misspelled Yurman's name as "Youman".

3    In his complaint, plaintiff also sued Rudolph Guliani, in his official capacity as Mayor of the City of New York ("Guliani"), and Bernard B. Kerik, in his official capacity as Commissioner of the New York City Police Department ("NYPD") ("Kerik"). At a February 5, 2002 conference, plaintiff's counsel agreed to withdraw all claims against Guliani and Kerik. Accordingly, those de-

fendants will be treated as dismissed from this case and Count III of plaintiff's original complaint (which alleges a claim of municipal liability against Guliani and Kerik) and other allegations against the City of New York and the NYPD will be considered as effectively withdrawn. As discussed in more detail below, plaintiff has submitted an amended complaint with his opposition memorandum. In the amended complaint, plaintiff has withdrawn Count III and all allegations against Guliani and Kerik, although plaintiff still asserts allegations of failure to train and investigate police officers against the City of New York, NYPD and "the City of Staten Island." These claims will be addressed *infra* in the context of plaintiff's claims against Burgess in his official capacity.

[*4]   Plaintiff's four count initial complaint is not the most artful pled. In Count I, plaintiff appears to allege claims against defendants CUNY, CSI, Martinez, Yurman and Jackson (collectively, "state defendants") under *42 U.S.C. § 1981* and *§ 1983*, arguing that his detention by Martinez and Yurman, and their subsequent call to the NYPD, violated his rights under the *Fourth Amendment to the Constitution. See* Compl. P 36. [4] Plaintiff also alleges that "the Board of Trustees of [CUNY], nor the Executive Department of [CSI] nor the Executive Department of the City of New York nor the [NYPD] caused an investigation to be made to ascertain the conduct of the defendant Polices Officers." *Id.* P 34. In Count II, plaintiff seems to assert another *§ 1983* claim against Burgess and the state defendants, alleging that his arrest and prosecution violated his *Fourth Amendment* rights. [5] *See id.* PP 37-39. In Count IV, plaintiff asserts against Burgess pendent state law claims under New York law for false arrest and malicious prosecution. *See id.* PP 49-51. In addition, it appears that Count IV contains allegations of, *inter alia,* assault and intentional [*5]   and negligent infliction of emotional distress against the unnamed police officers for failure to intervene and stop "the abuse" they were witnessing. *Id.* P 50. As relief, plaintiff seeks $ 1 million in compensatory damages for each of Counts I and II, $ 500,000 in compensatory damages for Count IV, and $ 1 million in punitive damages for each of Counts I and IV.

4   Except as otherwise indicated, citations to paragraphs in plaintiff's original complaint correspond to the identical paragraphs in plaintiff's amended complaint and vice versa.

5   Actually, in Counts I and II, plaintiff asserts that the alleged false arrest and malicious prosecution for which his *§ 1983* claim is premised violated his rights under the *First, Fourth, Fifth*

and *Fourteenth Amendment. See* Compl. P 36. However, the Second Circuit has found that "the *Fourth Amendment* provides the source of a *§ 1983* claim premised on a person's arrest." *Singer v. Fulton County Sheriff, 63 F.3d 110, 115 (2d Cir. 1995)* (footnote omitted).

[*6]   Burgess moves to dismiss plaintiff's original complaint pursuant to *Rule 12(b)(6)* for failure to state a claim, arguing that (1) probable cause existed for plaintiff's arrest and subsequent criminal prosecution; (2) Burgess is entitled to qualified immunity; and (3) with regard to plaintiff's pendent state law claims, except malicious prosecution, plaintiff failed to comply with conditions precedent to suit. In a separate motion, state defendants move to dismiss the original complaint pursuant to *Rules 12(b)(1)* and *12(b)(6)*, claiming that (1) *Eleventh Amendment* immunity bars the *§ 1981* and *§ 1983* claims for money damages; (2) state defendants do not constitute "persons" subject to suit within the meaning of *§ 1981* and *§ 1983*; and (3) the complaint fails to allege a viable claim against defendant Jackson.

## Background

Plaintiff, a black male student matriculating at CSI, alleges that on October 6, 1999, [6] he was escorted from class by campus security officers Martinez and Yurman and accused of criminal activity -- sexually assaulting Kathleen Tomey ("Tomey"), [7] a white female college student who plaintiff alleges was his girlfriend. *See* Compl. PP 3, 16-18. At CSI, Plaintiff [*7]   was "fully interrogated" by defendants Martinez and Yurman. *Id.* P 20. During the interrogation, plaintiff "attempt[ed] to plead his innocence regarding the criminal allegations." *Id.* Nonetheless, Martinez and Yurman contacted the 122nd Precinct of the NYPD, and plaintiff was subsequently arrested and transported to the precinct. *See id.* PP 21-22. While in police custody, plaintiff spoke to Burgess and others, "pleading his innocence and informing them that he was not involved in the alleged criminal activity." *Id.* P 22. Plaintiff was charged, arraigned and subsequently prosecuted by the District Attorney under Indictment No. 301/99 encaptioned *People of the State of New York v. Henry Obilo. See id.* PP 23-24. Plaintiff was acquitted of all charges on or about May 2, 2000, after a jury trial in the Supreme Court of the State of New York, County of Richmond. *See id.* P 25.

6   Plaintiff's complaint alleges that he was escorted from class and detained by Martinez and Yurman on "October 6, *2001.*" Compl. P 16 (emphasis added). Based on the time sequence of the other allegations contained in the complaint, it is fairly evident that plaintiff meant to assert that he was escorted from class on October 6, 1999. *See*

Compl. P 21 (alleging plaintiff was arrested on or about October 6, 1999); *see also* Am. Compl. P 17 (alleging plaintiff was escorted from class on or about October 6, 1999).

**[*8]**

7 The parties' submissions to the court contain various spellings of the complaining victim's last name. For purposes of this memorandum, the spelling in plaintiff's complaint will be adopted.

On July 17, 2000, [7] plaintiff filed a Notice of Claim with the Comptroller of the City of New York. *See id.* P 26. In the Notice of Claim, plaintiff indicated that the nature of his claim against the City of New York and CUNY was false arrest, unlawful detention, and malicious prosecution in that New York City police officers "fail[ed] to observe proper standards of investigation" when arresting him and, in concert with the District Attorney's office, "wrongfully prosecute[d] him." Notice of Claim P 2. Plaintiff also stated that these alleged crimes were at the "urging" of CUNY and CSI officials. [8] *Id.* In addition, plaintiff indicated that his claim arose on or about May 3, 2000 when he was acquitted by a jury. *See id.* P 3. According to plaintiff, a 50-h hearing was conducted on April 18, 2001, *see* Compl. P 26, during which plaintiff was orally examined under oath about the occurrence and **[*9]** extent of the injuries presented in his Notice of Claim. *See* Notice of 50-h hearing, attached to Notice of Claim.

8 In his complaint, plaintiff alleges that he served a Notice of Claim on the Comptroller on July 27, 2000. A review of the Notice of Claim, a copy of which is attached to, *inter alia*, the Declaration of Conception A. Montoya in support of Burgess' motion to dismiss indicates that it was received by the Comptroller's office on July 17, 2000. *See* Decl. of Conception A. Montoya ("Montoya Decl."), Ex. G. A copy of the Notice of Claim is also attached to plaintiff's opposition memorandum, but it did not contain the "Received City of New York" stamp indicating the date filed with the Comptroller. *See* Pl.'s Opp'n. Ex. B ("Notice of Claim"). The Notice of Claim and its contents can properly be considered since it was expressly referred to in paragraph 26 of plaintiff's original and amended complaint. *See Brass v. Am. Film Techs., 987 F.2d 142, 150 (2d Cir. 1993) (citing Cortec Indus., Inc v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)).*

**[*10]**

9 Interestingly, plaintiff makes no such discernible allegation in either his original or amended complaint.

Plaintiff filed a timely complaint against all defendants on August 1, 2001. At a February 5, 2002 pre-motion conference, it was ordered that in lieu of permitting Burgess and the state defendants to proceed on their respective motions to dismiss, plaintiff was to file an amended complaint by March 8, 2002. *See* Tr. at 12-13, Attached to Decl. of Bruce McHale. When plaintiff failed to submit an amended complaint by early May 2002, a briefing schedule was approved for motions directed to the original complaint.

Plaintiff attached an amended complaint to his opposition memorandum dated June 13, 2002. The amended complaint seeks to sue Burgess, Martinez and Yurman in their individual as well as official capacity. *Compare* Am. Compl. PP 8, 10-11 *with* Compl. PP 9, 11-12. In addition, the amended complaint contains allegations that Jackson "coerced and forced and threatened the plaintiff and in effect disbarred and unlawfully removed the plaintiff as a student of [CSI] , even though **[*11]** the plaintiff was duly qualified to be in attendance at [CSI]" in violation of unspecified constitutional rights. Am. Compl. P 37. Count III of the amended complaint appears to assert a claim against Jackson for inadequate training and supervision of campus security officers. *See id.* PP 41-47. In all other respects, plaintiff's amended complaint is virtually identical to his original complaint.

To the extent that plaintiff seeks to belatedly introduce the amended complaint, state defendants argue that this request should be denied as futile because the amended complaint is subject to dismissal on the basis that (1) Martinez and Yurman had probable cause to detain plaintiff and/or (2) Martinez and Yurman are entitled to qualified immunity. State defendants do not, however, address the new claims asserted against Jackson. Burgess asserts that the amended complaint should be dismissed for the same reasons he argues with regard to the original complaint. For purposes of the current motions to dismiss, plaintiff's request will be entertained for the limited purpose of analyzing Burgess and state defendants' arguments on their respective motions with respect to the amended complaint **[*12]** to determine whether the amendment is futile.

## Discussion

### Standard of Review

A complaint cannot be dismissed under *Rule 12(b)(6)* unless "it appears beyond reasonable doubt that the plaintiff can prove no set of facts in support of his claim which entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957).* However, a complaint should be dismissed if an affirmative defense, or other defense barring relief, is apparent from the face of the complaint. *See Pani v. Empire Blue*

2003 U.S. Dist. LEXIS 2886, *

Cross Blue Shield, 152 F.3d 67, 74-75 (2d Cir. 1998) (citations omitted). When determining the sufficiency of a plaintiff's claim, "consideration is limited to the factual allegations in [the] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in [plaintiff's] possession or of which [plaintiff] had knowledge and relied on in bring suit." Brass, 987 F.2d at 150 (citing Cortec, 949 F.2d at 47-48).

With Burgess' Notice of Motion, he attached a declaration [*13] from his lawyer, Conception A. Montaya, to which seven lettered exhibits were attached. These exhibits are as follows: (A) a copy of plaintiff's summons and original complaint; (B) a copy of the incident report filed by Tomey with CSI on October 2, 1999 ("incident report"); (C) a copy of the complaint filed by Tomey with the 122nd Precinct on October 2, 1999 ("police complaint"); (D) a copy of Burgess' complaint follow-up report (commonly referred to as a "DD5") dated October 3, 1999, which contains details about a conversation with Tomey ("October 3, 1999 DD5"); (E) a copy of Burgess' DD5 dated October 6, 1999, which contains details about a conversation with plaintiff ("October 6, 1999 DD5"); (F) a copy of plaintiff's handwritten statement to Burgess dated October 6, 1999 ("plaintiff's statement"); and (G) a copy of plaintiff's Notice of Claim filed with the Comptroller on July 17, 2000. [10] Plaintiff's complaint can obviously be considered as can plaintiff's Notice of Claim because, as indicated above, it was specifically referenced in his original and amended complaint. See Compl. P 26.

    10    State defendants have attached to their memorandum an excerpt of the transcript from the February 5, 1999 pre-motion conference, of which judicial notice may be taken. State defendants do not appear to request consideration of documents outside the complaint for purposes of their motion.

[*14] Other exhibits may also properly be considered because they too were referenced (albeit implicitly) in plaintiff's complaint and/or are central to plaintiff's allegations. [11] First, plaintiff asserts that the allegations against him were of a "conspiratorial nature" and that he was therefore arrested and prosecuted without probable cause. Compl. P 23-24; see also Compl. P 35 (alleging actions were done "without any probable cause"). This is an implicit reference to the incident report and police complaint filed by Tomey, and the October 3, 1999 DD5, all of which set forth her allegations against plaintiff. Accordingly, these exhibits may be considered because they are incorporated by reference in the complaint.

    11    In fact, at oral argument, plaintiff's counsel conceded that the exhibits were incorporated in plaintiff's complaint by reference.

Moreover, these documents are "central" to plaintiff's claims. See AdiPar Ltd. v. PLD Int'l Co., 2002 U.S. Dist. LEXIS 23375, CV-01-0765, 2002 WL 31740622, at * 4 & n.1 (S. [*15] D.N.Y. Dec. 6, 2002) (citing Brass, 987 F.2d at 150); see also Cortec, 949 F.2d at 48 (determining that documents not publicly filed, attached to complaint nor incorporated by reference to it could be considered on 12(b)(6) motion because plaintiff did not lack notice of the documents and the documents were integral to its complaint); 5 C. Wright & A. Miller, Federal Practice & Procedure § 1327, at 489 & n. 15 (stating that when "plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading"). Indeed, the Second Circuit has indicated that notice to the pleader is the critical element in determining whether extrinsic documents may properly be considered on a motion to dismiss. See Cortec, 949 F.2d at 48. If assertions in plaintiff's complaint are based on allegations of sexual assault by Tomey, it should come as no surprise to plaintiff if the documents that initiated those allegations are considered when determining whether to dismiss plaintiff's claims. Alternatively, at the very least, judicial notice can be taken of the fact that Tomey [*16] filed an incident report with CSI and a complaint with the NYPD, both on October 2, 1999, and that Burgess interviewed Tomey on October 3, 1999.

Second, plaintiff asserts that after being accused of sexual assault, he repeatedly proclaimed his innocence and that, while in police custody, he spoke to Burgess and informed the police that he was not involved in the alleged criminal activity. See Compl. PP 20, 22. Plaintiff also makes vague and generalized allegations about "clear and unequivocal evidence" of the conspiratorial nature of the allegations against him, id. P 23, and "evidence tending to clearly exonerate" him. Id. P 24. It appears that the "evidence" that plaintiff claims exonerates him is, or includes, the report from his conversation with Burgess and his written statement to the police. [12] If so, plaintiff's malicious prosecution claim is based on plaintiff's assertion that certain of the defendants and the state prosecutors rejected this evidence when determining whether to prosecute him. Accordingly, the October 6, 1999 DD5 and plaintiff's handwritten notes can properly be considered. As with consideration of the incident report and police complaint, consideration [*17] of these documents should not surprise plaintiff in light on the allegations of his repeated pronouncements of innocence to Martinez, Yurman, Burgess and others.

12  This assumption is supported by plaintiff's opposition memorandum, in which he argues that defendants failed to consider "statements and proofs submitted to the investigating officers." Pl.'s Opp'n, Point II. As plaintiff's opposition memorandum did not contain any page numbers, sections of the memorandum will be referred to by point headings.

Lastly, Burgess also submitted an affidavit in support of his motion to dismiss in which he attests that he testified at neither the grand jury proceedings nor the trial proceedings in the criminal matter underlying plaintiff's lawsuit. *See* Burgess Aff. PP 3, 4. However, plaintiff's complaint does not reference his grand jury proceedings, although he does allege that he was indicted (presumably by the grand jury). Accordingly, it appears to be improper to consider Burgess' affidavit. [13]

13  It should be noted, however, that at oral argument, plaintiff's counsel conceded that Burgess did not testify at trial, although counsel was not certain whether he testified at the grand jury proceedings.

**[*18]**  In sum, at the very least the contents of the Notice of Claim can be considered and judicial notice can be taken of the incident report, police complaint and two DD5s completed by Burgess. There is a strong argument that the contents of the incident report, police complaint, the two DD5s and plaintiff's handwritten statement can properly be considered as integral to plaintiff's complaint.

**Defendant Burgess**

**(1)**

**Individual Capacity Claims**

An individual capacity suit seeks to impose personal liability on an official for actions taken under color of state law. In his amended complaint, plaintiff seeks to assert a *§ 1983* claim for false arrest and malicious prosecution against Burgess, alleged to be an NYPD officer, in his official capacity. To assert a *§ 1983* claim, plaintiff must allege that Burgess "acting under color of state law, caused the deprivation of a federal right." *Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 362, 116 L. Ed. 2d 301 (1991)* (citing *Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985)*). In his complaint, plaintiff alleges that Burgess was acting under color of state law. *See* Compl. **[*19]** P 15. Therefore, the critical issue is whether plaintiff adequately alleges a claim for false arrest or malicious prosecution against Burgess.

1. False Arrest

Probable cause to arrest is a complete defense to an action for false arrest, whether the action is brought under state law or *§ 1983. See Singer, 63 F.3d at 118* (citing *Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)); Broughton v. State, 37 N.Y.2d 451, 458, 335 N.E.2d 310, 315, 373 N.Y.S.2d 87, 95 (1975)*. Burgess maintains that he had probable cause to arrest plaintiff because he relied on (1) Tomey's complaint and her identification of plaintiff, (2) his own observations, which corroborated Tomey's allegations that she was accosted by plaintiff, and (3) information provided by Martinez and Yurman, who were investigating the same complaint. [14] In response, plaintiff argues that Burgess' "exclusive reliance" on Tomey's statements as a basis for probable cause is without merit.

14  Burgess also contends that the fact that the grand jury indicted plaintiff, *see* Compl. P 24, creates a presumption of probable cause to arrest. Burgess is correct in his recitation of the law; however, the presumption created by plaintiff's indictment applies only to a malicious prosecution action, not a false arrest action. *See Broughton v. State, 37 N.Y.2d at 456, 335 N.E.2d at 313, 373 N.Y.S.2d at 93*; but see *Montes v. King, 2002 U.S. Dist. LEXIS 4412, CV-00-4707, 2002 WL 424318, at *3 (S.D.N.Y. March 19, 2002).*

**[*20]**  Plaintiff also incorrectly asserts that the "critical element of the tort [sic] of false arrest and malicious prosecution is not whether there was probable cause to effectuate the arrest, but rather whether there was a 'reckless disregard'" by defendants for plaintiff's constitutional rights. Pl.'s Opp'n, Point II. Plaintiff then asserts that "malice can be inferred from the fact that the defendant may have acted with reckless disregard for the rights of another party." *Id.* In support of this position, plaintiff cites two cases from the State of Mississippi. Plaintiff appears to have confused the tort of false arrest with that of malicious prosecution and to have introduced a subjective determination into the analysis of probable cause in the false arrest context.

Actual malice is not an essential element of an action for false arrest; it is, however, an essential element of an action for malicious prosecution. **[*21]** *Broughton, 37 N.Y.2d at 457-58, 335 N.E.2d at 314-15, 373 N.Y.S.2d at 93-94. , 335 N.E.2d at 314.* Moreover, "probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe the plaintiff guilty," an objective standard. *Colon v. City of New York, 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 1250, 468 N.Y.S.2d 453, 455 (1983); see also Maryland v. Macon, 472 U.S. 463, 470-71, 105 S. Ct. 2778, 2782-83, 86 L. Ed. 2d 370 (1985);*

*Lee v. Sandberg*, 136 F.3d 94, 103, n.5 (2d Cir. 1997); 1 *LaFave and Israel, Criminal Procedure* § 3.3, at 188 (stating the probable cause test is an objective one"). Thus, the crucial issue is whether the facts in Burgess' possession at the time he arrested plaintiff [*22] were sufficient to establish probable cause for the arrest and not whether he acted in "reckless disregard" given the facts at hand. Burgess contends that probable cause is established by the allegations in plaintiff's complaint and the supporting documents.

"In general, probable cause exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2nd Cir. 1996). Moreover, "a finding of probable cause can be made based on the 'totality of the circumstances.'" *Bernard*, 25 F.3d at 102 (quoting *Ill. v. Gates*, 462 U.S. 213, 230, 103 S. Ct. 2317, 2328, 76 L. Ed. 2d 527 (1982)). In evaluating probable cause to arrest, the court should consider the information available to the arresting officer at the time of arrest. *See Peterson v. County of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3040, 97 L. Ed. 2d 523 (1987)).

In this case, Burgess relied [*23] on several factors in reaching probable cause to arrest plaintiff. First, Burgess relied on information provided by the security officers at CSI, including Martinez and Yurman, who were investigating the same complaint filed by Tomey in a CSI incident report. Plaintiff's complaint establishes that, as part of Martinez and Yurman's investigation, they "fully interrogated" plaintiff before contacting the NYPD. To establish probable cause to effect an arrest, officers are allowed to rely on information provided to them by fellow officers. *See Bernard*, 25 F.3d at 102-03; *see also Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citing *Bernard*, 25 F.3d at 102-03). Even if the information relied upon turns out to be false, there is still probable cause to arrest if the arresting officer acted reasonably and in good faith in relying on the information. *See Bernard*, 25 F.3d at 102-03 (citing *Colon*, 60 N.Y.2d at 82, 455 N.E.2d at 1250, 468 N.Y.S.2d at 455). Here, Burgess investigated Tomey's complaint after she filed an incident report at CSI and after CSI investigated the same complaint. Plaintiff's [*24] complaint asserts no viable challenge to Martinez and Yurman's investigation. Thus, Burgess had every right to rely on the CSI investigation in establishing probable cause to arrest plaintiff.

Second, Burgess interviewed the complainant, Tomey, one day after she filed her police complaint. [15] *See* October 3, 1999 DD5. It is well-established law in

the Second Circuit that "an arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint . . . charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119; *accord Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998); *Miloslavsky v. AES Eng'g Soc'y, Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992), *aff'd without opinion*, 993 F.2d 1534 (2d Cir. 1993). In addition, "the veracity of citizen complaints who are the victims of the very crimes they report to the police is assumed." *Lee*, 136 F.3d at 103 (quoting *Miloslavsky*, 808 F. Supp. at 355)); *see also* 2 *Wayne LaFave, Search and Seizure*, [*25] § 3.4(a), at 205 (noting that the Supreme Court has "proceeded as if veracity may be assumed when information comes from the victim of . . . criminal activity"). In this case, the veracity of Tomey's complaint was bolstered when, during Burgess' interview of Tomey, he observed bruises on her left and right arms that were consistent with her allegations that plaintiff physically accosted her. *See* October 3, 1999 DD5. Moreover, Tomey identified plaintiff in person as her assailant. *See* October 6, 1999 DD5.

> 15  Burgess also emphasizes that he conducted an interview of plaintiff, an action that he maintains further supports his claim of probable cause to effectuate plaintiff's arrest. However, plaintiff's complaint appears to allege that plaintiff was interviewed by Burgess after being arrested. *See* Compl. P 22 ("Plaintiff, *after being arrested* by Police Officers from the 122nd Precinct, the plaintiff [sic] was transported to the 122nd Precinct. While in custody of the arresting officers the plaintiff spoke to Police Officer/Detective Burgess. . . . (emphasis added). For purposes of this motion, plaintiff's version of the events will be credited and it will be assumed that Burgess' interview of plaintiff occurred after plaintiff's arrest.

[*26] While plaintiff alleges that Tomey was his girlfriend,' his complaint is devoid of any allegations that Tomey was an incredible complainant. C.f. *Mistretta*, 5 F. Supp. 2d at 133 ("The most common situation in which [doubts as to veracity] arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation."). In fact, all plaintiff appears to assert is that he was arrested despite his repeated protestations of innocence. *See* Compl. PP 20 (alleging Martinez and Yurman contacted police despite plaintiff's proclamations of innocence), 22 (alleging Burgess detained, charged and arraigned plaintiff despite his pronouncements of innocence). In his opposition papers, plaintiff also asserts that all defendants in this case failed to investigate further the allega-

tions of sexual abuse before arresting plaintiff. " *See* Pl.'s Opp'n, Point II. However, the Second Circuit has rejected the argument that conflicting accounts from an alleged victim and an arrestee should have prompted a more thorough investigation by police. Indeed, a finding of probable cause is not foreclosed where a police officer is [*27] presented with different stories from an alleged victim and an arrestee. *See Curley v. Village of Suffern, 268 F.3d 65, 70 (2d Cir. 2001)* (citing *Singer, 63 F.3d at 113, 119); Ricciuti v. New York City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997).* In any event, despite plaintiff's assertion, Burgess did not merely rely on Tomey's complaint and identification of plaintiff; he also relied on CSI's investigation and his own observations which corroborated Tomey's allegations.

16    To the extent that plaintiff maintains that his allegations regarding Burgess, Martinez and Yurman's respective "failure to investigate" Tomey's allegations set forth an independent claim, plaintiff is mistaken. Instead,

allegations of an officer's failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution. *See Mistretta, 5 F. Supp. 2d at 135* (allegations of an officer's failure to investigate exculpatory statements prior to arrest addressed in the context of a false arrest claim); *Dukes v. City of New York, 879 F. Supp. 335, 343 (S.D.N.Y. 1995)* (allegations of an officer's failure to interview witnesses and discover addition [sic] evidence addressed in context of a malicious prosecution claim).

*Campbell v. Giuliani, et al., 2000 U.S. Dist. LEXIS 1617,* at *11, n.6, CV-99-2603 (E.D.N.Y. Feb. 16, 2000); *c.f Stone v. Dept. of Investigation of New York, 1992 U.S. Dist. LEXIS 1120,* CV-91-2471, 1992 WL 25202, at *2, (S.D.N.Y. Feb. 4, 1992) ("There is . . . no constitutional right to an investigation by government officials.") (citations omitted).

[*28] Moreover, "once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti, 124 F.3d at 128* (finding probable cause even though police officer chose to believe claimed victim's version of a fight based on visible injuries, notwithstand-

ing the alleged assailants cries of innocence); *see also Curley, 268 F.3d at 70* ("Although it would have been better procedure for the arresting officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him.") (citing *Krause v. Bennett, 887 F.2d 362, 373 (2d Cir. 1989)); Mistretta, 5 F. Supp. 2d at 135* ("[Law enforcement officers] have no duty to investigate an exculpatory statement of the accused, and their refusal to do so does not defeat probable cause.") (citations omitted).

Thus, even if plaintiff can prove that he furnished exculpatory statements to the police, a finding of probable cause is not foreclosed. In fact, to take plaintiff's [*29] assertions one step further, even if plaintiff can establish that an investigation might have cast doubt upon the basis of his arrest, probable cause can still be established. *See Curley, 268 F.3d at 70* (citing *Krause, 887 F.2d at 371).* Indeed, the Second Circuit has found that "before making an arrest, if the arresting officer has probable cause, he need not also believe with certainty that the arrestee will be successfully prosecuted." *Id.* Thus, considering the totality of the circumstances, plaintiff has not shown why Burgess had reason to doubt the veracity of Tomey or discredit the investigation by CSI in formulating a probable cause determination. Therefore, Burgess had probable cause to effectuate plaintiff's arrest plaintiff. Accordingly, plaintiff's proposed § 1983 false arrest claim against Burgess in his individual capacity would be subject to dismissal and is denied as futile.

As an alternative, Burgess maintains that he is entitled to qualified immunity. [17] The doctrine of qualified immunity protects police officers from being subject to personal liability in cases where official conduct "does not violate clearly established statutory or [*30] constitutional rights of which a reasonable person would have known." *Ricciuti, 124 F.3d at 127.* The right not to be arrested without probable cause is a clearly established right. *See Lee, 136 F.3d at 102.* Thus, the critical issue is whether Burgess' probable cause determination was objectively reasonable. *See Lennon v. Miller, 66 F.3d 416, 422 (2d Cir. 1995)* ("In qualified immunity cases, we are not concerned with the correctness of the defendant's conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene.").

17    In his memorandum, it appears that Burgess is asserting qualified immunity as a defense to plaintiff's claims against him in his official capacity. However, the Second Circuit has stated that "the defense of qualified immunity protects only individual defendants sued in their individual capacity . . . *Ford v. Reynolds, 316 F.3d 351, 2003*

*WL 132977*, at *4 (2d Cir. 2003). Therefore, the qualified immunity defense will be considered only in the context of plaintiff's claims against Burgess in his individual capacity. In his opposition memorandum, plaintiff does not address Burgess' claim that he is entitled to qualified immunity other than a simple argument that all defendants carry the burden of showing that *absolute* immunity is justified in this case. *See* Pl.'s Opp'n, Point III. While plaintiff is correct that Burgess must establish the defense of immunity, *see Lee*, 136 F.3d at 101, Burgess is seeking *qualified* immunity, which Burgess maintains is established in this case.

[*31] In the Second Circuit, even when there is no probable cause to arrest, a police officer is immune from a false arrest claim "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Lee*, 136 F.3d at 102 (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)); *accord* Posr v. Court Officer Shield # 207, 180 F.3d 409, 416 (2d Cir. 1999) (same). In otherwords, "in an unlawful arrest action, an officer is immune if he has 'arguable probable cause,' and is subject to suit only if his 'judgment was so flawed that no reasonable officer would have made a similar choice.'" *Provost v. City of Newburgh*, 262 F.3d 146, 169 (2d Cir. 2001) (quoting *Lee*, 136 F.3d at 103; *Lennon*, 66 F.3d at 425, respectively).

Lastly, it should be noted that the qualified immunity entitlement is an "immunity from suit rather than a mere defense to liability; and . . . is effectively lost if the case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815-16, 86 L. Ed. 2d 411 (1985). [*32] Thus, to satisfy the goal of the doctrine, it is necessary that qualified immunity questions be resolved at the earliest possible stage of litigation. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991) (per curiam)).

Even if plaintiff's arrest and prosecution were without actual probable cause, Burgess' decision to arrest and criminally charge plaintiff was objectively reasonable under the circumstances of this case. As noted above, the Second Circuit allows police officers, in making a probable cause determination, to rely on a victim's allegations that a crime has been committed. *See Singer*, 63 F.3d at 119. Moreover, police officers can rely on information supplied by fellow officers, even if that information ultimately turns out to be false. *See Bernard*, 25 F.3d at 102-03. Lastly, it is not unreasonable for police officers to rely on accounts provided by a victim or officer, even

when an arrestee proclaims his innocence. *See Curley*, 268 F.3d at 70 (victim); *Ricciuti*, 124 F.3d at 128 [*33] (officer). The complaint in this case contains no allegations that undermine the veracity of the CSI officers or that allege that the CSI investigation was implausible. In addition, other than the mere allegation that Tomey was plaintiff's girlfriend, the complaint also lacks assertions that undermine the victim's credibility. Accordingly, even if there is no actual probable cause in this case, there is "arguable" probable cause that entitles Burgess to qualified immunity. Thus, plaintiff's proposed *§ 1983* claim for false arrest against Burgess in his individual capacity would be subject to dismissal on this alternative ground. Consequently, plaintiff's request to submit an amended complaint containing such allegations is denied as futile.

2. Malicious Prosecution

Malicious prosecution claims brought under *§ 1983* are guided by the tort law of the forum state. *See Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995); *Singer*, 63 F.3d at 118. To state a claim for malicious prosecution under New York law, plaintiff must allege that: "(1) [defendants] initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding [*34] can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in plaintiff's favor." *Ricciuti*, 124 F.3d at 130 (citing *O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996)). Accordingly, a finding of probable cause defeats a malicious prosecution claim. *See Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994). Probable cause to arrest is sufficient for probable cause to prosecute unless facts come to light between the arrest and arraignment that vitiate the probable cause. *See Carson v. Lewis*, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999) (citing *Dukes v. City of New York*, 879 F. Supp. 335, 342 (S.D.N.Y. 1995)); *see also Dimascio v. City of Albany*, 205 F.3d 1322 (2d Cir. 2000) (table). Burgess argues that since the facts at plaintiff's arraignment were based on the facts known at the time of his arrest, probable cause existed for both the arrest and the prosecution of plaintiff. In response, plaintiff makes only vague and general allegations that a prosecution was begun despite evidence given to the NYPD and Burgess before plaintiff's arrest, and allegedly in the [*35] District Attorney's possession, that exonerated plaintiff. *See* Compl. PP 23, 24. These allegations do not suffice to demonstrate that new evidence came to light after plaintiff's arrest that undermined the probable cause for his arrest.

Moreover, once a suspect has been indicted, there is a strong presumption of probable cause for purposes of defending against a malicious prosecution claim. *See Green v. Montgomery*, 219 F.3d 52, 60 (2d Cir. 2000) (citing *Marshall v. Sullivan*, 105 F.3d 47, 50 (2d Cir. 1996)); *Colon*, 60 N.Y.2d at 82, 455 N.E.2d at 1250, 468

*N.Y.S.2d at 455* (citations omitted). Plaintiff's complaint establishes that he was indicted. *See* Compl. P 24. Therefore, to overcome this presumption, plaintiff must allege that "the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Colon, 60 N.Y.2d at 83, 455 N.E.2d at 1251, 468 N.Y.S.2d at 456; accord Marshall, 105 F.3d at 50; Bernard, 25 F.3d at 104.* Plaintiff's complaint contains no allegations of fraud, perjury or suppression of evidence. [18]

18    Burgess argues that plaintiff cannot in fact support an allegation of fraud, perjury or suppression of evidence as to him since he did not testify before the grand jury that indicted plaintiff. However, as noted above, this fact, which was attested to in Burgess' affidavit, is not properly before this court and, therefore, will not be considered for purposes of this motion.

[*36]  The only assertion of "bad faith" that can be gleaned from plaintiff's complaint is that the allegations against him were of a "conspiratorial nature." Compl. PP 23, 24. However, plaintiff's proclamations of conspiracy amount to nothing more than generalized accusations. To be sure, plaintiff's complaint merely asserts that certain defendants disregarded information supplied by plaintiff apparently demonstrating the "conspiratorial nature" of the allegations lodged against him. *Id.* In his opposition memorandum, plaintiff attempts to flesh out these allegations with an argument that police misconduct can be inferred from the fact that the jury acquitted plaintiff, despite Tomey's testimony at trial. *See* Pl.'s Opp'n, Point II. Plaintiff appears to be asserting that Burgess acted in bad faith by relying for purposes of probable cause on Tomey's allegations, which, because plaintiff was ultimately acquitted, plaintiff argues were patently false. *See* Pl.'s Opp'n, Point II (arguing that "the defendants unreasonably sided with the complainant...."). Plaintiff's argument is unpersuasive and contrary to law.

As noted above, Burgess was not required to investigate plaintiff's [*37] protestations of innocence. *See Ricciuti, 124 F.3d at 128.* Indeed, an officer is not required to play judge or jury with conflicting evidence presented to him at the time of an arrest. *See Curley, 268 F.3d at 70* (citing *Krause, 887 F.2d at 371*). Moreover, an arrestee's ultimate guilt or innocence is irrelevant to the determination of probable cause. *See United States v. Patrick, 899 F.2d 169, 171 (2d Cir. 1990); Miloslavsky, 808 F. Supp. at 354* (citations omitted). Thus, the fact that plaintiff was ultimately found not guilty has no effect on the fact that there was probable cause to arrest him and bring him before a grand jury. Therefore, plaintiff's vague allegations of conspiracy and exculpatory evidence are insufficient to defeat the strong presumption

of probable cause created by his indictment. [19] Accordingly, as plaintiff's amended complaint fails to adequately allege that Burgess' did not have probable cause to prosecute him, plaintiff's proposed *§ 1983* claim of malicious prosecution is subject to dismissal as to Burgess.

19    Moreover, to the extent that plaintiff's conspiracy allegations attempt to assert a separate *§ 1983* claim, such allegations fail. A conspiracy is actionable under *§ 1983* only if plaintiff can prove an actual violation of constitutional rights. Since there was probable cause to arrest and prosecute plaintiff, plaintiff cannot prove an actual violation of his constitutional rights as to Burgess. *See Singer, 63 F.3d at 119-20.* Moreover, assuming *arguendo* that the complaint establishes a violation of plaintiff's constitutional rights, a complaint "containing only conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon, 709 F.2d 173, 175 (2d Cir. 1983)* (per curiam). Thus, plaintiff's conspiracy claim is dismissed as to Burgess because plaintiff's complaint cannot support a violation of his constitutional rights, and even if it could, the complaint contains no specific allegations to support his claim of conspiracy.

[*38]  Lastly, in a *§ 1983* claim for malicious prosecution, "the Court applies the same standard used to evaluate qualified immunity in the false arrest context." *Hardin v. Meridien Foods, 2001 U.S. Dist. LEXIS 15564, CV-98-2268, 2001 WL 1150344, at *5 (S.D.N.Y. Sept. 27, 2001)* (citing *Lennon, 66 F.3d at 425*). Thus, for the reasons stated above, even if Burgess did not have actual probable cause to prosecute plaintiff, he had arguable probable cause. Accordingly, like plaintiff's proposed *§ 1983* false arrest claim, plaintiffs proposed *§ 1983* malicious prosecution claim against Burgess in his individual capacity is denied as futile.

### 3. *§ 1981* [20]

20    In his motion to dismiss, Burgess does not address plaintiff's *§ 1981* claim.

Count I of plaintiff's amended complaint appears to allege a *§ 1981* claim against Burgess. [21] *Section 1981* "prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race, [and it] covers. . . efforts [*39] to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations." *Mian v. Donaldson, Lufkin & Jenrette*

Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993). To state a claim under § 1981, plaintiff must allege: (1) that he is a member of a racial minority; (2) that Burgess had an intent to discriminate against him on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute, namely make and enforce contracts, sue and be sued, give evidence, etc. See Mian, 7, F.3d at 1087.

> 21    Plaintiff also asserts a violation of his rights under the *Ninth* and *Thirteenth Amendments*. The *Ninth Amendment*, which concerns unenumerated rights, and the *Thirteenth Amendment*, which concerns slavery and involuntary servitude, are inapplicable to this case. Accordingly, these claims are dismissed. *See Campbell*, 2000 U.S. Dist. LEXIS 1617, at *17 (dismissing claims premised on *Ninth* and *Thirteenth Amendment* as inapplicable in case involving claims of false arrest and malicious prosecution under § 1981 and § 1983).

[*40]    To sustain a motion to dismiss, plaintiffs complaint must assert "that the defendant['s] acts were purposefully discriminatory. . . and racially motivated." *Albert v. Carovano*, 851 F.2d 561, 571-72 (2d Cir. 1988) (en banc). Plaintiff cannot defeat a *Rule 12(b)(6)* motion with "naked assertions" of discrimination; instead "the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf v. Vassar College*, 35 F.3d 709, 713-14 (2d Cir. 1994) (internal citations omitted).

Plaintiff's compliant establishes that he is black and that Tomey, the complainant, is white. *See* Compl. PP 19, 29. Plaintiff also alleges, "on information and belief" that some of the defendant police officers and/or CSI campus security officers also are white. *Id. P 29.* While plaintiff's amended complaint asserts that Burgess and other police officers "turned a deaf ear on the repeated pleas [of innocence] of the plaintiff, solely because the complainant was a white female and because the plaintiff. . . was Black," *see* Am. Compl. P 22, these [*41] bald allegations are insufficient to establish racially discriminatory intent under § 1981. *See Yusuf*, 35 F.3d at 713-14. Even if these allegations could establish such intent, plaintiff's complaint is devoid of any allegations that Burgess or any other police officers prevented plaintiff from enforcing or pursuing judicial enforcement of any rights, contractual or otherwise. Accordingly, to the extent plaintiff's amended complaint seeks to assert a § 1981 claim against Burgess in his individual capacity, it fails to state a viable claim and is dismissed as futile.

4. Pendent State Law Claims

Since none of plaintiff's federal law claims against Burgess in his individual capacity survive a motion to dismiss, this court declines to exercise pendent jurisdiction over the state law claims asserted against Burgess and the unnamed police officers in Count IV of plaintiff's original and amended complaint. *See Grace v. Rosenstock*, 228 F.3d 40, 55 (2d Cir. 2000) (stating that if all of plaintiffs "federal claims are dismissed before trial. . . the state claims should be dismissed as well.") (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)); [*42] *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 103 (2d Cir. 1998) (stating that since all of plaintiffs federal claims fail, "the balance of factors. . . favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice") (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 619, 98 L. Ed. 2d 720 (1988)). Consequently, the issue of whether plaintiffs state law tort claims were instituted in accordance with the Notice of Claim requirements under New York General Municipal Law will not be addressed.

(2)

**Official Capacity Claims**

In both his original and amended complaint, plaintiff asserts claims under § 1981 and § 1983 against Burgess in his official capacity as a police officer with the NYPD. *See* Compl. P 9; Am. Compl. P 8. A suit against an officer is his official capacity is essentially a suit against the government entity itself. *See Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691, n.55, 98 S. Ct. 2018, 2036, n.55, 56 L. Ed. 2d 611 (1978). Accordingly, plaintiffs claim against Burgess in his official capacity is basically a [*43] claim against the City of New York. To establish municipal liability, plaintiff must allege that a municipal custom or policy resulted in a deprivation of plaintiff's constitutional rights. *See id.* at 690-91, 98 S. Ct. at 2035-36. "The inference that such a policy existed may arise from 'circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123).

While Count III of plaintiff's initial complaint contained numerous allegations of municipal liability against the City of New York and the NYPD relating to the conduct of defendant police officers, at this court's urging, those allegations were withdrawn and do not appear in plaintiff's amended complaint. [22] The only discernible allegations of municipal liability in plaintiff's amended complaint are bald claims against the City of New York and "City of Staten Island" of failure to "properly train,

supervise and discipline its officers to avoid the use of [*44] unnecessary force, to refrain from acting without racial animus, to avoid the arbitrary stop and harassment of law-abiding black persons without probable cause." Am. Compl. PP 30 (City of New York), 32 (Staten Island). In addition, plaintiff asserts that the City of New York and its Executive Department and the NYPD, among others, failed to investigate the conduct of defendant police officers and to discipline defendants for their conduct. See id. PP 31 (discipline), 32 & 34 (investigate). Notably, plaintiff's complaint lacks any allegations of deliberate indifference to plaintiff's rights. Thus, these conclusory allegations are insufficient to establish a municipal policy or custom.

22  Plaintiff's amended complaint does, however, contains such allegations against Jackson relating to the conduct of CSI campus security officers. These claims are discussed infra in the context of plaintiff's claims against Jackson in her individual capacity.

Even if plaintiff's conclusory allegations could suffice to allege [*45] a municipal policy or custom, "a claim of inadequate training and supervision under § 1983 cannot be made out against a supervisory body without a finding of a constitutional violation by the persons supervised." Ricciuti, 941 F.2d at 123 (citing City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573, 89 L. Ed. 2d 806 (1986)). In this case, Burgess has established that he had probable cause to arrest plaintiff and that, if he did not, he at least was objectively reasonable in his determination of probable cause and thus entitled to qualified immunity. Consequently, since plaintiff cannot sustain a claim for constitutional deprivation by Burgess, plaintiff's claim of municipal liability also fails.

Accordingly, since the allegations against Burgess are premised on allegations of personal liability, the claims against Burgess in his official capacity are dismissed. See Campbell, 2000 U.S. Dist. LEXIS 1617, at *4-5 (dismissing claims of false arrest and malicious prosecution brought against NYPD detective in his official capacity because such claims were based on allegations of personal liability and not on a government [*46] entity's official policy or custom).

## State Defendants

State defendants maintain that they are immune from suit under the Eleventh Amendment and have moved to dismiss plaintiff's complaint under Rule 12(b)(1) for lack of jurisdiction. Plaintiff argues that this assertion is "without merit and really begs the question." Pl.'s Opp'n, Point III. "Courts must police subject matter delineations on their own initiative." Preston v. New York, 223 F. Supp. 2d 452, 461 (S.D.N.Y. 2002) (citing, inter alia Fed. R. Civ. P. 12(h)). Thus, when considering a motion to dismiss pursuant to Rule 12(b)(1), a court is required to resolve disputed jurisdictional facts. See Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1019 (2d Cir. 1993); see also Ruhrgas A.G. v. Marathon Oil Co., 526 U.S. 574, 583-84, 119 S. Ct. 1563, 1569-70, 143 L. Ed. 2d 760 (1999). When doing so, the court may reference evidence outside the pleadings, see Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000), and the court is not required to draw inferences in favor of the plaintiff. See Newsom-Lang v. Warren Int'l, 129 F. Supp. 2d 662, 663-64 (S.D.N.Y. 2001). [*47] As the party "seeking to invoke the subject matter jurisdiction of the district court," plaintiff bears the burden of demonstrating that there is subject matter jurisdiction in this case. Scelsa v. City Univ. of New York, 76 F.3d 37, 40 (2d Cir. 1996) (citations omitted).

## Defendants CUNY and CSI

It is well settled that the Eleventh Amendment bars suits for any kind of relief brought in federal court by a private individual against a state or its agencies in the absence of Congress' explicit abrogation of the state's sovereign immunity or the state's unequivocal waiver of its immunity. [23] See e.g., Bd. of Trustees v. Garrett, 531 U.S. 356, 363-64, 121 S. Ct. 955, 962, 148 L. Ed. 2d 866 (2001); Graham, 473 U.S. at 169, 87 L. Ed. 2d 114, 105 S. Ct. at 3107; Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 97-100, 104 S. Ct. 900, 906-908, 79 L. Ed. 2d 67 (1984). The State of New York and its agencies have not consented to suit in federal court. See Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38-40 (2d Cir. 1977). Moreover, neither § 1981 nor § 1983 validly abrogates a state's sovereign immunity. [*48] [24] See Quern v. Jordan, 440 U.S. 332, 343-45, 99 S. Ct. 1139, 1146-47, 59 L. Ed. 2d 358 (1979); see also Chin Chinn v. City Univ. of New York, 963 F. Supp. 218, 224 n.1 (1997) (§ 1981); Trotman, 557 F.2d at 38 (§ 1983).

23  The Eleventh Amendment to the U.S. Constitution reads as follows: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

24  For this reason, while plaintiff is correct in his assertion that Congress may authorize suits against nonconsenting states through its enforcement powers under § 5 of the Fourteenth Amendment, such argument is inapplicable in this

context. *See* Pl.'s Opp'n, Point IV (citing *Fitz-patrick v. Bitzer*, 427 U.S. 445, 456, 49 L. Ed. 2d 614, 96 S. Ct. 2666 (1976); *Scheuer v. Rhodes*, 416 U.S. 232, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)).

[*49] An entity like CUNY, *n* which is not a state agency, is nevertheless entitled to immunity if it is an "arm of the state." *Rosa R. v. Connelly*, 889 F.2d 435, 437 (1989) (considering whether local school board was "arm of the state and thus entitled to *Eleventh Amendment* protection from suit in federal court"); *accord Pikulin v. City Univ. of New York*, 176 F.3d 598, 600 (2d Cir. 1999) (per curiam) (quoting *Rosa R.*, 889 F.2d at 437).

    25  As noted earlier, CUNY is considered to include "each senior college and each community college." *N.Y. Educ. Law § 6202 (2)*. CSI is specifically referred to in the statute as a "senior college." *Id. § 6202 (5); see also Weinbaum v. Cuomo*, 219 A.D. 2d 554, 555, 631 N.Y.S.2d 825 (1st Dep't 1995) (finding CSI a CUNY senior college).

In *Pikulin*, a case involving a CUNY community college, the Second Circuit vacated and remanded the district court decision based [*50] on a line of cases that found CUNY and/or its senior colleges arms of the state for purposes of *Eleventh Amendment* immunity. *26 See* 176 F.3d at 600-01. These cases relied on the State of New York's obligation, under *New York Education Law § 6205(1)*, *27* to indemnify CUNY's trustees, officers, and staff against liability. *See, e.g., Burrell v. City Univ. of New York*, 995 F. Supp. 398, 411; *Moche v. City Univ. of N.Y.*, 781 F. Supp. 160, 165; *Minetos v. City Univ.*, 875 F. Supp. 1046, 1053; *Scelsa v. City Univ. of N.Y.*, 806 F. Supp. 1126, 1137. The court criticized exclusive reliance on the indemnification provisions of *§ 6205(1)* as inadequate, noting that the provision "requires the state to indemnify only such individuals affiliated with CUNY and does not address the state's financial responsibility, if any, to satisfy judgment entered against CUNY itself." *Pikulin*, 176 F.3d at 600. Instead, the court stated that when determining whether an institution is an arm of the state entitled to *Eleventh Amendment* immunity,

    the appropriate analysis focuses both on the extent to which the state would be responsible for satisfying the judgment that might be entered against the [*51] defendant entity, *see [Rosa R.*, 889 F.2d] at 437-38; *[Trotman*, 557 F.2d at 38], and on the degree of supervision exercised by the state over the defendant entity. *See Rosa R.*, 889 F.2d at 437.

    26  *See Burrell v. City Univ. of New York*, 995 F. Supp. 398, 410-11 (S.D.N.Y. 1998); *Minetos v. City Univ. of New York*, 875 F. Supp. 1046, 1053 (S.D.N.Y. 1995); *Moche v. City Univ. of New York*, 781 F. Supp. 160, 165 (E.D.N.Y. 1992); *Scelsa v. City Univ. of New York*, 806 F. Supp. 1126, 1137 (S.D.N.Y. 1992); *Silver v. City Univ. of New York*, 767 F. Supp. 494, 499 (S.D.N.Y. 1991); *Ritzie v. City Univ. of New York*, 703 F. Supp. 271, 276-77 (S.D.N.Y. 1989).

    27  That section of the New York Education Law provides as follows:

      § 6205. Liability of board of trustees and liability of city university of New York.

      1. The state shall save harmless and indemnify members of the board of trustees and any duly appointed member of the teaching or supervising staff, officer or employee of the senior colleges under the jurisdiction of such board pursuant to section seventeen of the public officers law against any claim, demand, suit or judgment arising by reason of any act or omission to act by such person occurring in the discharge of its duties and within the scope of his service on behalf of such university.

*N.Y. Educ. Law § 6205(1).*

[*52] The distinction between this case and *Pikulin* is that this case involves a CUNY senior college, while *Pikulin* involved a CUNY community college. This distinction is important because senior colleges enjoy a different relationship with the state than do community colleges. *Compare* N.Y. Educ. Law §§ 6244(1) and 6229 *with N.Y. Educ. Law §§ 6224(4) and 6230 see also Hester-Bey v. New York City Tech. Coll.*, 2000 U.S. Dist. LEXIS 5323, CV-98-5129, 2000 WL 488484, at *3-4 (E.D.N.Y Mar. 22, 2000) (describing differences in the New York Education Law between CUNY senior colleges and community colleges). Accordingly, in the post-Pikulin era, courts ruling on the immunity status of CUNY and its senior colleges have distinguished the holding in *Pikulin* and have found the colleges to be

arms of the state and thereby immune from suit *See, e.g., Sacay v. Research Found. of the City Univ. of New York, 193 F. Supp. 2d 611, 624-25 (E.D.N.Y. 2002); Salerno v. City Univ. of New York, 2000 U.S. Dist. LEXIS 12933, CV-99-11151, 2000 WL 1277324, at *2-4 (S.D.N.Y. Sept. 8, 2000),* vacated in part on reconsideration on other grounds, *2002 U.S. Dist. LEXIS 24454, CV-99-11151, 2002 WL 31856953 (S.D.N.Y. Dec. 19, 2002);* [*53] *Becker v. City Univ. of New York, 94 F. Supp. 2d 487, 489 (S.D.N.Y. 2000); Hester-Bey, 2000 U.S. Dist. LEXIS 5323, 2000 WL 488484,* at *2-4.

With regard to the first *Pikulin* analysis, "senior colleges of CUNY are both funded and administered, by the state to a great degree." *Hester-Bey, 2000 U.S. Dist. LEXIS 5323, 2000 WL 488484,* at *4. Indeed, the New York Education Law specifically provides for the state's payment of money judgments entered against CUNY senior colleges:

> Notwithstanding any inconsistent provisions of law, with respect to claims against the city university which arise on or after July first, nineteen hundred seventy-nine, the comptroller of the state of New York is authorized to examine, audit, certify for payment and pay from funding sources available for payment of claims by the state any settlement, order or judgement in any federal or state court, other than the court of claims, or any administrative tribunal which pertains to a senior college of the city university of New York.

*N.Y. Educ. Law § 6224(6); see Perry v. City of New York, 126 A.D.2d 714, 714, 511 N.Y.S.2d 310, 310 (2nd Dept. 1987)* (finding state responsible for paying [*54] money judgments against CUNY senior colleges); *see also Becker, 94 F. Supp. 2d at 489; Hester-Bey, 2000 U.S. Dist. LEXIS 5323, 2000 WL 488484,* at *2-3. Moreover, the state court of claims, which hears claims against New York State and its agencies, has exclusive jurisdiction over claims brought by any person against CUNY and its senior colleges for wrongful death, breach of contract and in tort. *See N.Y. Educ. Law § 6224(4); see also* id. *§ 6224(5)* (providing for state's payment of judgments entered against CUNY in state court of claims); *Hester-Bey, 2000 U.S. Dist. LEXIS 5323, 2000 WL 488484,* at *4. In addition, the state has ultimate responsibility for funding the budget of CUNY senior colleges. Indeed, *§ 6221(A)(4)* provides for the state's reimbursement of CUNY senior college's net operating expenses. *See N.Y. Educ. Law § 6221(A)(4); see also* id. *§ 6201(1).*

In his opposition memorandum, plaintiff cites *§ 6201(1) of the New York Education Law* in support of his contention that CUNY is not an arm of the state for *Eleventh Amendment* purposes. *See* Pl.'s Opp'n, Point IV. This provision, which sets forth legislative findings and intent, states in relevant part: [*55] "In order to meet the state's responsibility to provide post-secondary education in New York city beyond the associate degree level, as it does elsewhere in the state, *there should be full state funding of senior college operating and debt service.*" *N.Y. Educ. Law § 6201(1)* (emphasis added). Contrary to plaintiff's assertion, this provision actually *strengthens* the argument that the state has assumed financial responsibility for CUNY. *See Becker, 94 F. Supp. 2d at 490* (relying on, inter alia, *§ 6201* as support for finding that the state would pay a judgment against a CUNY senior college). Accordingly, "it is clear that any award against a senior college of CUNY will be paid for by public funds of the New York State treasury." *Hester-Bey, 2000 U.S. Dist. LEXIS 5323, 2000 WL 488484,* at *4; accord *Becker, 94 F. Supp. 2d at 491.*

However, as the *Pikulin* court advised, the analysis of CUNY's relationship to the state does not stop at this conclusion. With regard to the second *Pikulin* analysis, the state "has ultimate authority over how CUNY senior colleges are operated and governed." *Becker, 94 F. Supp. 2d at 491.* In fact, the [*56] state supervises the process for determining the budget for CUNY senior colleges, which includes presentment of a proposed budget for the senior colleges' operating and capital expenses to the governor. *See N.Y. Educ. Law § 6230(2); see also Becker, 94 F. Supp. 2d at 490; Hester-Bey, 2000 U.S. Dist. LEXIS 5323, 2000 WL 488484,* at *4. This process also provides for the governor to add his recommendations as part of the executive budget submitted to the state legislature. *See N.Y. Educ. Law § 6230(3).* In addition, the state comptroller is required to perform annual audits of the senior colleges' annual financial reports and to prepare a report to the governor and other officials. *See* id. *§ 6230(4); see also Becker, 94 F. Supp. 2d at 490.*

Moreover, other factors that indicate that the State exercises a great degree of supervision over CUNY senior colleges include: (1) the fact that the governor appoints 10 out of 17 members of CUNY's board of trustees *see N.Y. Educ. Law §§ 6204(2)(a) & 6204(2)(d);* (2) the fact that the real property of the CUNY senior colleges is owned by the state *see* id. *§ 6219(a)(1),* and (3) the fact that CUNY may [*57] acquire property for use by senior colleges using the state's eminent domain power, *see* id. *§§ 301, 6213. See Becker, 94 F. Supp. 2d at 490-91; Hester-Bey, 2000 U. S. Dist. LEXIS 5323, 2000 WL 488484,* at *4. These factors adequately establish that CUNY and its senior colleges are supervised by the State to a great degree.

Again, plaintiff asserts that § 6201(1) and § 6201(2) compel a different conclusion. Plaintiff has emphasized the legislature's finding that "the governance of the university must reflect increased state responsibility but should preserve the city's participation in the governance of the university it created and developed at city expense." *N.Y. Educ. Law § 6201(1)*. Section 6201(2) states, in relevant part, that "the legislature intends that the city university of New York should be maintained as an independent system of higher education." *Id. § 6201(2)*. These provisions do not undermine a finding that the state has a great deal of supervision over CUNY and its senior colleges. If anything, in light of all the other factors supporting state authority and control over CUNY and its senior colleges, these legislative findings indicate that "although [*58] CUNY has a degree of independence, it is ultimately accountable to, and dependent upon, the state." *Becker, 94 F. Supp. 2d at 491*. Thus, defendants CUNY and CSI - a CUNY senior college - are arms of the state of New York and are therefore immune from suit under § 1981 and § 1983.[28] Consequently, all of plaintiff's claims against these defendants are dismissed as barred by the *Eleventh Amendment*.

28   This finding is consistent with every post-Pikulin case that has addressed the question of whether CUNY and/or its senior colleges are arms of the state for *Eleventh Amendment* purposes. *See Husain v. Springer, et al., 193 F. Supp. 2d 664 (E.D.N.Y. 2002); Sacay, 193 F. Supp. 2d 611; Hamilton v. City College of the City Univ. of New York, 173 F. Supp. 2d 181, 184 (S.D.N.Y. 2001); see also Johnson v. City Univ. of New York, 2002 U.S. Dist. LEXIS 13718*, CV-00-4964, 2002 WL 1750841 (S.D.N.Y. July 24, 2002) ; *Ware v. City Univ. of New York, 2002 U.S. Dist. LEXIS 10905*, CV-01-9305, 2002 WL 1343752 (S.D.N.Y. June 18, 2002); *Sank v. City Univ. of New York, et al., 2002 U.S. Dist. LEXIS 5928*, CV-94-0253, 2002 WL 523282 (S.D.N.Y. Apr. 5, 2002); *Kulkarni v. City Univ. of New York, et al., 2001 U.S. Dist. LEXIS 18449*, CV-01-3019, 2001 WL 1415200 (S.D.N.Y. Nov. 13, 2001); *Loren v. Levy, et al., 2001 U.S. Dist. LEXIS 11809*, CV-00-7687, 2001 WL 921173 (S.D.N.Y. Aug. 14, 2001); *During v. City Univ. of New York, et al., 2002 U.S. Dist. LEXIS 9796*, CV-01-9584, 2002 WL 1159675 (S.D.N.Y. May 31, 2001); *Bunch v. City Univ. of New York, 2000 U.S. Dist. LEXIS 14227*, CV-98-1172, 2000 WL 1457078 (S.D.N.Y. Sept. 28, 2000), *reconsideration denied by 2000 U.S. Dist. LEXIS 17455, 2000 WL 1810959 ; Salerno, 2000 U.S. Dist. LEXIS 12933, 2000 WL 1277324; Becker, 94 F.*

*Supp. 2d 487; Hester-Bey, 2000 U.S. Dist. LEXIS 5323, 2000 WL 488484*.

[*59] **Defendants Jackson, Martinez and Yurman**

**(1)**

**Official Capacity Claims**

*Eleventh Amendment* immunity also extends to claims for monetary damages brought against state officers sued in their official capacities. *See Ford, 316 F.3d 351, 2003 WL 132977*, at *3; *Rodriguez v. Weprin, 116 F.3d 62, 66 (2d Cir. 1997); see also Chinn, 963 F. Supp. at 224*. In both his initial and amended complaint, plaintiff sued defendants Jackson, Martinez and Yurman in their official capacities. [29] *See* Compl. PP 8, 11, 12; Am. Compl. PP 7, 10-11. Accordingly, these defendants assert that they are immune from suit. Plaintiff, however, argues that under the doctrine of *Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908)*, these defendants are not entitled to immunity.

In *Ex Parte Young*, the Supreme Court established a limited exception to the general principal of sovereign immunity [that] allows a suit for injunctive relief challenging the constitutionality of a state official's actions in enforcing state law under the theory that such a suit is not one against the State, and therefore not barred by the *Eleventh Amendment*. [*60]

*Ford, 316 F.3d 351, 2003 WL 132977*, at *3 (quotation omitted). Very recently, the Second Circuit stated that "'in determining whether the doctrine of *Ex Parte Young* avoids an *Eleventh Amendment* bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 152 L. Ed. 2d 871, 122 S. Ct. 1753, 1760 (2002)* (internal citation and quotation marks omitted)). This characterization is important since, "retrospective compensatory relief, whether 'expressly denominated as damages... or tantamount to an award for damages for a past violation of federal law,' does not vindicate sufficient interests to justify overcoming the *Eleventh Amendment* bar." *Chinn, 963 F. Supp. at 225* (quoting *Papasan v. Allain, 478 U.S. 265, 278, 106 S. Ct. 2932, 2940, 92 L. Ed. 2d 209 (1986))*.

29   Plaintiff alleges in his complaint that Jackson is "Vice President" of CSI, Martinez is "employed as a Public Safety Officer/Director of

Public Safety" with CSI, and Yurman is "employed as a Public Safety Officer Asst. Director of Public Safety" at CSI. Compl. PP 8, 11-12; *accord* Am Compl. PP 7, 10-11.

[*61]  In this case, plaintiff's original and amended complaint unequivocally seek monetary relief against defendants Jackson, Martinez and Yurman for an alleged deprivation of plaintiffs rights based on an arrest and subsequent prosecution of plaintiff. *See* Compl., Count I, "wherefore" clause (seeking $ 1,000,000.00 in actual and compensatory damages); *id.*, Count II, "wherefore" clause (same). Nowhere in these complaints does plaintiff seek injunctive relief. Thus, there being no claim for prospective injunctive relief, *Ex Parte Young* is inapplicable to this case. *See Ford, 316 F.3d 351, 2003 WL 132977,* at *4. Accordingly, as plaintiffs § 1981 and § 1983 claims against Jackson, Martinez and Yurman seek solely "retrospective compensatory relief" for actions taken in their official capacity, these claims are dismissed. [30] *See Chinn, 963 F. Supp. at 225* (dismissing on *Eleventh Amendment* basis § 1981 claims for monetary relief asserted against Dean of CUNY senior college in her official capacity).

30  Since these claims are dismissed on *Eleventh Amendment* grounds, it is not necessary to consider state defendants' alternative ground for dismissal, namely that neither a state agency or entity, nor a state official sued in his or her official capacity, is a "person" subject to suit within the meaning of § 1981 or § 1983.

[*62]  (2)

**Individual Capacity Claims**

"However, the *eleventh amendment* does not extend to a suit against a state official in his [or her] individual capacity, even when the conduct complained of was carried out in accordance with state law.'" *Ford, 316 F.3d 351, 2003 WL 132997,* at *4 (quoting *Berman Enters. v. Jorling, 3 F.3d 602, 606 (2d Cir. 1993)*). In his amended complaint, plaintiff seeks to assert his § 1981 and § 1983 claims against Martinez and Yurman in their individual, as well as official, capacity. In both his original and amended complaints, plaintiff sued Jackson in both her individual and official capacity. These individual-capacity claims are not barred by the *Eleventh Amendment. See Chinn, 963 F. Supp. at 225.*

**Martinez and Yurman**

State defendants, however, assert that the § 1983 claims against Martinez and Yurman in their individual capacity should be dismissed pursuant to *Rule 12(b)(6)* for failure to state a claim because those defendants (1) acted with probable cause and/or (2) are entitled to quali-

fied immunity. [31] The crux of plaintiff's claims against these defendants is that Martinez and Yurman had no justification [*63] for "approaching" plaintiff, "escorting" him to the campus security office, and thereafter contacting the NYPD. *See* Compl. PP 17-21. However, by plaintiff's own account, these officers acted with probable cause, and their conduct is thus not actionable. Indeed, as stated above, probable cause is an absolute defense to an action for false arrest under § 1983. *See Singer, 63 F.3d at 118* (citations omitted). In this case, Martinez and Yurman were responding to a report of sexual assault by Tomey, a person described as plaintiff's girlfriend. *See* Compl. P 17. In the Second Circuit, an allegation by a crime victim personally acquainted with her alleged assailant establishes probable cause. *See Curley, 268 F.3d at 70; Lee, 136 F.3d at 103.* As noted above, plaintiff's complaint sets forth no allegations that undermine Tomey's accusations. Thus, Martinez and Yurman were justified in relying on Tomey's complaint to establish probable cause to detain plaintiff.

31  State defendants do not argue any grounds for dismissal of plaintiff's § 1981 claim asserted against Martinez, Yurman and Jackson in their individual capacity. Nonetheless, plaintiff cannot maintain a § 1981 claim against Martinez and Yurman because plaintiff's complaint is devoid of any allegations that these state defendants had an intent to discriminate against him or that, even if they did, they deprived plaintiff of one of the statute's enumerated rights. Plaintiff's § 1981 claim against Jackson is discussed *infra* in the context of plaintiff's claims against Jackson in her individual capacity.

[*64]  Plaintiff alleges that he "attempted to plead his innocence," but that the officers ignored his pleas, and nevertheless contacted the NYPD, who arrested plaintiff. However, probable cause is not foreclosed when an officer relies on a victim's complaint, even if the alleged assailant provides a different version of events. *See Curley, 268 F.3d at 70.* Thus, under applicable law, and based on information available to them at the time of plaintiff's detainment, Martinez and Yurman acted appropriately and with probable cause. Accordingly, plaintiff's proposed § 1983 false arrest claim against these state defendants in their individual capacity is denied as futile.

Alternatively, even if Martinez and Yurman did not have actual probable cause, state defendants argue that their conduct was not objectively unreasonable and that these defendants are therefore entitled to qualified immunity. [32] In the false arrest context, an action, is objectively unreasonable only if "'no officer of reasonable competence could have made the same choice in similar

Case 1:07-cv-04795-NRB    Document 6-3    Filed 07/21/2008    Page 49 of 51

2003 U.S. Dist. LEXIS 2886, *                                    Page 16

circumstances.'" *Lee, 136 F.3d at 102* (quoting *Lennon, 66 F.3d at 420-21*). In this case, Martinez [*65] and Yurman responded appropriately to a report of sexual assault by a crime victim, who could not have been mistaken as to plaintiff's identity. Thus, even if plaintiff can prove that he presented Martinez and Yurman with an account that conflicted with Tomey's version of events, these defendants are entitled to qualified immunity because "officers of reasonable competence could disagree" as to the determination of probable cause. *Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986)*. Accordingly, the proposed § 1983 claim against Martinez and Yurman in their individual capacity is subject to dismissal on this alternative ground and is denied as futile.

32    Of course, as with Burgess, if Martinez and Yurman had actual probable cause, they would be entitled to qualified immunity on the basis that their conduct did not violate plaintiff's constitutional right. *See Saucier, 533 U.S. at 201; see also Lee, 136 F.3d at 102* (stating that the right not to be arrested without probable cause is a constitutional right).

**[*66] Jackson**

**A. § 1983**

To the extent that plaintiff alleges against Jackson a § 1983 claim premised on plaintiff's arrest and/or prosecution, state defendants argue that this claim fails. To state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and law of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55, 101 L. Ed. 2d 40 (1988)*. Plaintiff's amended complaint contains no allegations whatsoever of Jackson's involvement in any of the events relating to plaintiff's arrest and prosecution. [33] "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)* (quoting *Moffitt v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir. 1991)*). Because plaintiff's complaint contains no allegations of Jackson's personal involvement in plaintiff's arrest and prosecution, any claim for false arrest against her [*67] is "fatally defective on its face" and is dismissed. *Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987)* (quotation and citation omitted); *see also, Dove v. Fordham University, 56 F. Supp. 2d 330, 335-36 (S.D.N.Y. 1999), aff'd without opinion, 210 F.3d 354 (2d Cir. 2000)* (table) (dismissing § 1981 and § 1983 claims as legally deficient because compliant was devoid of allegations of

wrongdoing or personal involvement by particular defendants).

33    Plaintiff's complaint does, however, allege that each defendant was acting under color of state law. *See Compl. P 15.*

Nonetheless, Count I of plaintiff's amended complaint contains the following allegation against Jackson:

Shortly after the arrest of the plaintiff, Defendant Carol Jackson, as the Vice President of [CSI] coerced and forced and threatened the plaintiff and in effect disbarred and, unlawfully removed the plaintiff as a student of [CSI], even though the plaintiff was duly qualified [*68] to be in attendande at said College. Despite being found not guilty by the jury at the completion of the criminal prosecution against the plaintiff, Defendant Carol Jackson has unjustly and unlawfully failed and/or refused to permit the plaintiff to continue his studies at [CSI]. The actions of Defendant Jackson were not in accordance with the Plaintiff's Constitutional rights and other legal requirements and were done with race based animus towards the plaintiff solely because he is Black and born in Nigeria.

Am. Compl. P 37. [34] As the paragraph indicates, plaintiff does not specify the constitutional rights that he alleges Jackson violated. A plaintiff "must make specific allegations that indicate a deprivation of constitutional rights; general indirect and conclusory allegations are not sufficient." *Hankard v. Town of Avon, 126 F.3d 418, 423 (2d Cir. 1997); see also Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987)* (stating that complaints based on a violation of civil rights must include specific allegations of facts showing a violation of rights "instead of a litany of general conclusions that shock but have no meaning"). Thus, it is [*69] arguable that these general allegations are insufficient to state a claim under § 1983. Nonetheless, it is apparent that plaintiff's counsel merely inserted this paragraph at the end of the allegations in Count I. Thus, liberally construing the complaint, it can be argued that the previous paragraph, which asserts that the allegations in Count I constitute a violation of, *inter alia*, plaintiff's *Fourteenth Amendment* right to due process of the law and to be afforded the equal protection and benefit of the law" could be applied to his allegation. [35]

34    At oral argument, counsel for state defendant's argued that Obilo, in fact, voluntarily with-

drew from CSI and even requested tuition reimbursement. However, for purposes of this motion, plaintiff's allegations will be accepted as true.

35   At oral argument, plaintiff's counsel argued that the allegations in paragraph 37 of plaintiff's amended complaint establish a violation of plaintiff's equal protection rights under the *Fourteenth Amendment*.

To the extent that plaintiff's allegations could be construed to allege an equal protection claim under the *Fourteenth Amendment*, the allegations are insufficient on their face. [16] Plaintiff's complaint does not allege that similarly situated persons were treated differently by Jackson, an essential element in any equal protection claim. *See Gagliardi v. Village of Pawling, 18 F.3d 188, 193 (2d Cir. 1994)* ("It is axiomatic that plaintiff [making an equal protection claim] must [*70] allege that similarly situated persons were treated differently.").

36   The *Fourteenth Amendment* prohibits a state from depriving "any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *U.S. Const. amend. XIV § 1.*

Similarly, to the extent that plaintiff's allegations could be construed to allege a due-process violation under the *Fourteenth Amendment*, the allegations are facially defective. To establish a due process violation, plaintiff must allege: (1) that the government deprived him of an interest "encompassed by the *Fourteenth Amendment's* protection of liberty and property," (2) without the constitutionally required process. *Bd. of Regents v. Roth, 408 U.S. 564, 569, 92 S. Ct. 2701, 2705, 33 L. Ed. 2d 548 (1972).* Thus, "the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Narumanchi v. Bd. of Trustees of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988); see also DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 195-96, 109 S. Ct. 998, 1003, 103 L. Ed. 2d 249 (1989)* (stating that a claim based on a violation of "due [*71] process must involve the deprivation of a recognized life, liberty, or property interest). Nowhere in plaintiff's complaint does he allege that he had a liberty or property interest of which Jackson deprived him. Accordingly, plaintiff fails to allege a violation of his due process rights. Thus, plaintiff's proposed claim against Jackson is subject to dismissal for failure to state a claim and is consequently denied as futile.

In addition, Count III of plaintiff's amended complaint seeks to impose liability on Jackson for "lack of sufficient and appropriate training" of, among others, CSI campus security officers, [17] which allegedly resulted in "the wrongful arrest, detention, abuse, harassment, threat, use of unnecessary force and excessive force, arbitrary stop and arrest of plaintiff." Am. Compl. P 47. According to plaintiff, this insufficient training and resultant unlawful conduct "constituted a standing policing [sic] and custom and was condoned by the supervisory officials within [CSI] and [CUNY]." *Id. P 44.*

37   A review of plaintiff's original and amended complaint reveals that plaintiff's amended complaint asserts against Jackson essentially the same claim that his original compliant asserts against Guliani and Kerik -- the municipal liability claim that plaintiff's counsel agreed to withdraw at the February 5, 1999 conference.

[*72]  As noted above, since Jackson is a state official, a *§ 1983* claim for damages can only be asserted against her in her individual capacity. *C.f., Will v. Michigan Dep't of State Police, 491 U.S. 58, 68-70, 105 L. Ed. 2d 45, 109 S. Ct. 2304, 2311-12.* Moreover, before she can be liable for damages in a *§ 1983* action, the plaintiff must allege Jackson's "personal involvement" in the alleged deprivation of plaintiff's constitutional rights. *Wright, 21 F.3d at 501.* Plaintiff has not alleged that Jackson was in any way personally involved in the detainment or subsequent arrest and prosecution of Jackson. Indeed, plaintiff's complaint does not assert that Martinez and Yurman detained plaintiff at Jackson's request or that Jackson called the NYPD. Nonetheless, plaintiff does allege that Jackson had "an obligation and duty to plaintiffs to properly train and supervise campus police officers." Am. Compl. P 43. Borrowing from the municipal liability context, as a supervisor, Jackson can be liable under *§ 1983* if plaintiff alleges (1) Jackson "directly participated" in the violation, (2) Jackson "created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue, [*73] " or (3) Jackson was " grossly negligent in managing subordinates who caused the unlawful condition or event." *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)* (citing *Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).* However, it is not necessary to determine whether plaintiff has adequately alleged such liability on the part of Jackson, because, as discussed above, plaintiff's compliant establishes that Martinez and Yurman had actual, or at least, arguable probable cause and thus, are not liable to plaintiff. In other words, if Martinez and Yurman are not liable to plaintiff on the *§ 1983* false arrest claim, Jackson cannot be liable in a supervisory capacity. Accordingly, plaintiff's proposed claim against Jackson in her individual capacity is denied as futile.

**B. § 1981**

Case 1:07-cv-04795-NRB    Document 6-3    Filed 07/21/2008    Page 51 of 51

2003 U.S. Dist. LEXIS 2886, *                                      Page 18

Lastly, to the extent that paragraph 37 of plaintiff's amended complaint seeks to assert a § 1981 claim against Jackson, that claim fails since plaintiff has not alleged a deprivation of one of the statute's enumerated rights. As indicated above, to state a claim under § 1981, plaintiff must allege, *inter alia*, that the discrimination concerned one or more [*74] of the activities enumerated in the statute, namely make and enforce contracts, sue and be sued, give evidence, etc. *See Mian, 7 F.3d at 1087*. Assuming, *arguendo*, that plaintiff's allegations could establish racially discriminatory intent, plaintiff's compliant contains no allegations that Jackson thwarted plaintiff's attempt to enforce his rights or that plaintiff has a contractual relationship with Jackson. Accordingly, like plaintiff's proposed § 1983 claim, plaintiff's proposed § 1981 claim is defective on its face and is denied as futile.

**Conclusion**

In sum,

. Plaintiff's proposed § 1983 claim against Burgess in his individual capacity is DENIED since (1) Burgess had probable cause to arrest and prosecute plaintiff or (2) at least, Burgess had arguable probable cause and is therefore entitled to qualified immunity.

. Plaintiff's proposed § 1981 claim, to the extent he asserts it against Burgess in his individual capacity, is DENIED because plaintiff has failed to allege racially purposeful discrimination and, even if he did, he has failed to allege that the discrimination concerned one or more of the activities enumerated in the statute.

. Plaintiff's § [*75] 1983 claim against Burgess in his official capacity is DISMISSED as plaintiff has failed to adequately allege a municipal policy or custom, and, even if he did, Burgess is not liable to plaintiff because he either had probable cause to arrest plaintiff or is entitled to qualified immunity.

. Plaintiff's pendent state law claims against Burgess and the unnamed police officers are DISMISSED as all of plaintiff's federal claims against those defendants are dismissed.

. All of plaintiff's claims against CUNY and CSI are DISMISSED as these defendants are entitled to *Eleventh Amendment* immunity.

. All of plaintiff's claims against Jackson, Martinez and Yurman in their official capacity are DISMISSED as these defendants are entitled to *Eleventh Amendment* immunity.

. Plaintiff's proposed § 1983 claim against Martinez and Yurman in their individual capacity is DENIED since (1) they had probable cause to detain plaintiff or (2) at least, they had arguable probable cause and are therefore entitled to qualified immunity.

. Plaintiff's proposed § 1981 claim, to the extent he asserts it against Martinez and Yurman in their individual capacity, is DENIED because plaintiff has failed to allege [*76] racially discriminatory intent.

. Plaintiff's proposed § 1983 claims against Jackson in her individual capacity is DENIED because (1) she was not personally involved in any alleged constitutional deprivation and (2) to the extent, plaintiff seeks to impose liability on Jackson for the actions of Martinez and Yurman, those defendants are not liable to plaintiff since they had probable cause to detain plaintiff or are subject to qualified immunity.

. Plaintiff's proposed § 1981 claim, to the extent he asserts it against Jackson in her individual capacity, is DENIED because plaintiff has failed to allege racially purposeful discrimination and, even if he did, he has failed to allege that the discrimination concerned one or more of the activities enumerated in the statute.

. Plaintiff's request to amend his complaint is DENIED because, as indicated above, all of plaintiff's proposed claims are subject to dismissal and are therefore futile.

Since none of plaintiff's claims remain, this case is dismissed in its entirety. The Clerk of the Court is directed to close the case.

Dated: Brooklyn, New York

April 7, 2003

SO ORDERED:

David G. Trager

United States District Judge [*77]